**Stephen Manning,** OSB No. 013373
smanning@ilgrp.com
**Nadia Dahab,** OSB No. 125630
nadia@innovationlawlab.org
**Jordan Cunnings,** OSB No. 182928
jordan@innovationlawlab.org
**Tess Hellgren,** OSB No. 191622
tess@innovationlawlab.org
**INNOVATION LAW LAB**
The Oregon Trail Bldg
333 SW 5th Ave Ste 200
Portland OR 97204
Telephone: 503.241.0035

**Melissa Crow** (*pro hac vice pending*)
Melissa.Crow@splcenter.org
**SOUTHERN POVERTY LAW CENTER**
1101 17th Street, NW, Suite 705
Washington, DC 20036
Telephone: 202.355.4471

*Attorneys for Plaintiffs*
*Las Americas Immigrant Advocacy Center;*
*Asylum Seeker Advocacy Project; Catholic*
*Legal Immigration Network, Inc.;*
*Innovation Law Lab; Santa Fe Dreamers*
*Project; and Southern Poverty Law Center*

**Bryan D. Beel,** OSB No. 073408
BBeel@perkinscoie.com
**Heidee Stoller,** OSB No. 072835
HStoller@perkinscoie.com
**Nathan R. Morales,** OSB No. 145763
NMorales@perkinscoie.com
**PERKINS COIE LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Telephone: 503.727.2000

**Christopher Parker** (*pro hac vice pending*)
CParker@perkinscoie.com
**PERKINS COIE LLP**
505 Howard St Ste 1000
San Francisco, CA 94105
Telephone: 415.344.7000

**Rebecca Cassler** (*pro hac vice pending*)
Rebecca.Cassler@splcenter.org
**Gracie Willis** (*pro hac vice pending*)
Gracie.Willis@splcenter.org
**SOUTHERN POVERTY LAW CENTER**
P.O. Box 1287
Decatur, GA 30031-1287
Telephone: 404.221.6700

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER; ASYLUM SEEKER ADVOCACY PROJECT; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.; INNOVATION LAW LAB; SANTA FE DREAMERS PROJECT; AND SOUTHERN POVERTY LAW CENTER,<br><br>Plaintiffs, | No. 3:19-cv-2051<br><br>COMPLAINT |

COMPLAINT

v.

DONALD J. TRUMP, in his official
capacity as President of the United States;
WILLIAM BARR, in his official capacity
as Attorney General of the United States;
U.S. DEPARTMENT OF JUSTICE;
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW; AND JAMES
MCHENRY, in his official capacity as
EOIR Director of the United States,

Defendants.

# INTRODUCTION

1.      In the American tradition of justice, judges are supposed to be impartial. Under

principles dating back to the founding of the nation, judges are insulated from political power

and play a role distinct from that of prosecutors.[1] As a result, lawyers across the country practice

law in courts where transparency, impartiality, and predictability serve the interests of justice.

2.      Not so in the immigration courts of the United States, where judges answer to the

nation's chief prosecutor, the Attorney General.

3.      The immigration courts make life-and-death decisions every day: vulnerable

people seeking asylum in the United States depend on a functioning court system to protect them

from persecution, torture, and death. Yet, in the immigration courts, the tradition of judicial

independence has been turned upside down. Systemic dysfunction and anti-immigrant animus

create a Kafkaesque reality where prosecution merges with judging and the ultimate goal is

deportation rather than fair adjudication.

---

[1] *See*, *e.g.,* The Federalist No. 78, at 392 (I. Shapiro ed. 2009) (A. Hamilton); The
Declaration of Independence (U.S. 1776) (among litany of reasons for seeking independence, the
King "has made Judges dependent on his Will alone for the tenure of their offices, and the
amount and payment of their salaries").

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

4.      Defendants have manipulated the immigration court system to serve an anti-immigrant agenda. Categorizing people fleeing persecution as "invaders," Defendants are using the immigration courts as a weapon against the asylum system and vulnerable migrants—to beat them back to places of danger—instead of lawfully adjudicating their claims based on their merits.[2]

5.      Specifically, Defendants have created an adjudication system where applicants for asylum are supposed to lose. Defendants rush some asylum claims to adjudication prematurely in order to achieve rapid removals. Defendants simultaneously delay other claims long past the time when they were ripe for adjudication, undermining fundamental fairness and the rule of law. Everywhere in this dysfunctional adjudication spectrum, the standards set forth in the Immigration and Nationality Act (INA), intended to ensure case-by-case decision-making, are subverted by Defendants' design.

6.      First, Defendants have abused their authority to perpetuate vast asylum-free zones. In many immigration court jurisdictions, covering large swaths of the country, asylum is effectively impossible to win—a de facto nullification of a duly-enacted statutory scheme.

7.      Second, Defendants have abused their authority by burdening the immigration courts with a backlog that structurally undermines fairness. Throughout the immigration court system, Defendants' policies and practices have created an impenetrable backlog of more than a million immigration cases that impairs the INA's case-by-case decision-making process.

8.      Third, using thinly veiled pretexts, Defendants have implemented enforcement-oriented performance metrics for immigration judges (the Enforcement Metrics Policy) and a rapid-removal family docketing directive (the FAMU Directive) to weaponize the immigration courts.

---

[2] June 24, 2018; Twitter; https://perma.cc/35AQ-NSDH. (Last accessed Dec. 12, 2019).

2 -   COMPLAINT

9.     Defendants' Enforcement Metrics Policy requires immigration judges to comply with certain performance benchmarks, including case completion quotas that require them to decide approximately three cases per day, to receive a satisfactory performance rating. Through the Enforcement Metrics Policy, Defendants have given immigration judges a direct pecuniary interest in the outcome of each case they adjudicate, thus categorically denying asylum seekers and their legal representatives an impartial forum every time they walk into court.

10.    Defendants' FAMU Directive creates a specialized nationwide docket that stigmatizes cases of recently-arrived families, undermining the fairness of their proceedings and frustrating the efforts of their legal representatives to provide meaningful representation.

11.    These policies represent a deliberate effort by Defendants to systematize the denial of asylum claims by nullifying asylum law, speeding up immigration court proceedings for certain asylum seekers, and unreasonably delaying them for others.

12.    Under the Take Care Clause of the U.S. Constitution, the President and his delegates, including the Attorney General, must "take Care that the Laws," including the INA, "be faithfully executed."  But the Attorney General and the other Defendants have not done so. Instead of ensuring that each case is individually adjudicated based on its merits, they have created a deportation machine in violation of the INA's case-by-case adjudication standards.

13.    Plaintiffs are immigration legal service providers that depend on a legitimate immigration court system to provide meaningful legal assistance to desperate individuals fleeing persecution. In this case, they challenge the Defendants' efforts to deny them a fair forum in which to vindicate their organizational missions. Plaintiffs seek to bring integrity to the immigration court system, defend the dignity of the important work they perform in the nation's immigration courts, and preserve their ability to pursue their missions.

14.    Plaintiffs seek a declaration that the Attorney General has failed to take care that the laws relating to the immigration court system be faithfully executed; a declaration that the

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

Enforcement Metrics Policy and the FAMU Directive violate the INA, the Administrative Procedure Act (APA), and the Take Care Clause of the U.S. Constitution; an order enjoining their continued implementation; and an order requiring Defendants to take specific steps to ensure nationwide implementation of the case-by-case adjudication standards in the INA.

JURISDICTION AND VENUE

15.    This action arises under the U.S. Constitution and the laws of the United States, including the INA, 8 U.S.C. § 1101 *et seq.*, and the APA, 5 U.S.C. § 701 *et seq.* Therefore, this Court has subject matter jurisdiction under 28 U.S.C. § 1331. The federal government has waived its sovereign immunity pursuant to 5 U.S.C. § 702. This Court has additional remedial authority under 28 U.S.C. §§ 2201-02.

16.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States and officers of the United States acting in their official capacities and one of the Plaintiffs has its principal residence in this District.

PARTIES

**A.    Plaintiffs**

17.    Plaintiff **Las Americas Immigrant Advocacy Center** (Las Americas) is a nonprofit organization incorporated in Texas and based in El Paso, Texas, that serves immigrants and refugees in Ciudad Juarez, Mexico, West Texas, and New Mexico. The mission of Las Americas is to provide free and low-cost legal services to low-income immigrants, including refugees and asylum seekers, families seeking reunification, and victims of crime. To achieve its mission, Las Americas manages several programs including a Detained Deportation Defense Program that serves detained migrants in the El Paso Processing Center, Otero Service Center, and West Texas Detention Center; a Non-Detained Deportation Defense Program that represents clients and provides *pro se* assistance in immigration court proceedings, including clients who are awaiting their immigration court proceedings in Mexico pursuant to the Migrant Protection

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

Protocols; and a Crime Victims Program that assists survivors of crime by aiding them through

legal intake, consultations, and the petitioning process to obtain deferred action and lawful status,

work permits, and/or lawful permanent residency. Las Americas employs attorneys, accredited

representatives, coordinators, and paralegals, among others, to implement its programs and

achieve its mission.

18.    Plaintiff **Asylum Seeker Advocacy Project** (ASAP) is a nonprofit organization

incorporated in New York. ASAP's mission is to provide support and legal assistance to

individuals who have arrived at the Mexico-U.S. border to seek asylum, regardless of where they

are currently located. To achieve its mission, ASAP's model uses three components: online

community support, emergency legal aid, and nationwide systemic reform. ASAP provides

guidance about how to navigate the immigration court system and answers legal questions online

for asylum seekers, including parents who were separated from their children and adults subject

to the Migrant Protection Protocols. Through its legal emergency room, ASAP provides short-

term legal assistance at a distance to asylum seekers, preparing emergency motions and other

legal filings. ASAP also pushes for change through systemic reform, which includes complex

immigration representation at the immigration courts, Board of Immigration Appeals, and federal

courts of appeals. In each area of its work, ASAP creates templates, resources, and training

materials to support pro bono attorneys, private attorneys, and other organizations representing

asylum seekers before the immigration courts.

19.    Plaintiff **Catholic Legal Immigration Network, Inc.** (CLINIC) is a nonprofit

organization incorporated in Washington, D.C., and based in Silver Spring, Maryland, with

affiliates working in immigration courts across the country. CLINIC's mission is to promote the

dignity and protect the rights of immigrants in partnership with a dedicated network of Catholic

and community legal immigration programs. To achieve its mission, CLINIC operates a number

of programs, including its Defending Vulnerable Populations Program, which works to increase

5 -    COMPLAINT

the number of fully accredited representatives and attorneys who are qualified to represent immigrants in immigration court proceedings. The Defending Vulnerable Populations Program conducts court skills training for nonprofit agency staff (accredited representatives and attorneys) and pro bono attorneys; develops practice materials to assist legal representatives; advocates against retrogressive policy changes; and works to expand public awareness on issues faced by vulnerable immigrants. CLINIC leads national efforts matching formerly separated families with legal counsel, mentoring and training legal counsel on these cases, providing direct representation on motions to reopen, and guiding the families through an online community. CLINIC's remote bond project mentors pro bono counsel who represent detained noncitizens. The remote bond project pro bono attorneys appear before the Batavia, Otero, Bloomington, and LaSalle immigration courts. CLINIC provides free representation in removal proceedings, including appeals, throughout the country. CLINIC provides limited legal assistance, orientation and pro bono placement in Ciudad Juárez to those subject to the Migrant Protections Protocols with immigration court hearings in El Paso. CLINIC provides direct legal support and advice to immigrants through its Montgomery County Project. CLINIC employs attorneys and assistants, among others, to implement its programs and achieve its mission.

20.    Plaintiff **Innovation Law Lab** (Law Lab) is a nonprofit organization incorporated in Oregon and based in Portland, Oregon. Law Lab's mission is to combine technology, law, and activism to advance immigrant justice and ensure that every meritorious immigration case wins in immigration court. To achieve its mission, Law Lab operates programs in the state of Oregon as well as in Atlanta, Georgia; San Diego, California; Kansas City, Missouri; Charlotte, North Carolina; and San Antonio and El Paso, Texas. In Oregon, Law Lab provides direct representation to noncitizens in immigration court; manages Equity Corps of Oregon, the nation's first statewide publicly-funded universal representation program for non-detained noncitizens facing removal proceedings; and the Centers of Excellence, a program that places

unrepresented noncitizens seeking asylum in removal proceedings with pro bono attorneys in Georgia, Kansas, Missouri, North Carolina, and Oregon. Law Lab manages a Deportation Defense Legal Network in Kansas City. Law Lab's BorderX project uses technology and collaboration tools to provide support to legal service providers at immigrant detention centers throughout the United States and at several sites on both sides of the U.S.-Mexico border. Law Lab employs attorneys, accredited representatives, coordinators, and software engineers, among others, to implement its programs and achieve its mission.

21.    Plaintiff **Santa Fe Dreamers Project** (SFDP) is a nonprofit organization incorporated in New Mexico and based in Santa Fe. SFDP's mission is to provide free legal services to immigrants to promote economic empowerment, community development, family unity, and liberation from detention. To achieve its mission, SFDP operates several programs in New Mexico and Texas. In New Mexico, SFDP provides free direct representation in immigration court to children through its Special Immigrant Juvenile program, to transgender individuals held in detention in New Mexico who are seeking asylum or related relief, and to separated and recently reunified families. In Texas, SFDP provides technical support to volunteer pro bono attorneys and law students in addition to direct representation in immigration court of individuals detained within the El Paso region's five immigrant detention centers. SFDP employs attorneys and coordinators, among others, to implement its programs and achieve its mission.

22.    Plaintiff **Southern Poverty Law Center** (SPLC) is a nonprofit organization incorporated in Alabama and based in Montgomery, with offices in Florida, Georgia, Louisiana, Mississippi, and Washington, D.C. SPLC's mission is to engage in litigation and advocacy to make equal justice and equal opportunity a reality for all. To achieve its mission, SPLC operates a number of programs, including the Southeast Immigrant Freedom Initiative (SIFI). SIFI provides pro bono direct representation exclusively to immigrants facing removal proceedings while confined in detention centers in Georgia and Louisiana. To implement the SIFI program

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

and achieve its mission, SPLC employs attorneys, administrators, coordinators, and assistants, among others. To improve clients' access to their legal teams, SIFI program staff work from offices near detention centers in Folkston, Lumpkin, and Ocilla, Georgia, and in Alexandria, Louisiana. SIFI also relies on a network of in-person and remote legal volunteers—attorneys, law students, and lay advocates—to provide legal representation to detained immigrants.

**B.    Defendants**

23.    Defendant **Donald J. Trump** is the President of the United States. In this capacity, he is required to "take Care" that the laws of the United States, including those relating to immigration, "be faithfully executed." U.S. Const. Art. II, § 3. He is sued in his official capacity.

24.    Defendant **William Barr** is the Attorney General of the United States. In this capacity, Mr. Barr is responsible for the Department of Justice and its component agencies, including the Executive Office for Immigration Review, and serves as the chief law enforcement officer of the federal government. The Attorney General is the President's agent, and he must ensure the faithful execution of the laws. The Attorney General is sued in his official capacity.

25.    Defendant **U.S. Department of Justice (DOJ)** is a cabinet-level Department of the U.S. government that is responsible for enforcing the laws of the United States.

26.    Defendant the **Executive Office for Immigration Review (EOIR)** is a component agency of DOJ. EOIR encompasses more than fifty immigration courts across the country as well as an administrative appellate body, the Board of Immigration Appeals (BIA). Under delegated authority from the Attorney General, EOIR administers the U.S. immigration court system.

27.    Defendant **James McHenry** is the Director of EOIR. He oversees immigration court proceedings, appellate reviews, and administrative hearings and supervises immigration judges and members of the BIA. He is sued in his official capacity.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

## LEGAL BACKGROUND

### A.    The Immigration Court System

28.    The immigration court system is the essential forum for the resolution of removal proceedings. Immigration courts are intended to make decisions on an individualized, case-by-case basis. When they adjudicate claims for asylum, the immigration courts are meant to fulfill our nation's commitment to humanitarian protection of persons fleeing persecution.

29.    Where the federal government seeks to remove a noncitizen from the United States—sometimes years after arrival—Congress provided that the Department of Homeland Security (DHS) initiate removal proceedings in immigration court.[3] *See generally* 8 U.S.C. § 1229a (governing removal proceedings); 8 C.F.R. §§ 1003.12-1003.47 (governing immigration court procedure). Individual immigration judges (IJs) adjudicate removal proceedings in the first instance. 8 U.S.C. § 1229a(a)(1); 8 C.F.R. § 1003.10.

30.    IJ decisions may be appealed to the BIA, 8 C.F.R. §§ 1003.2(b)(c), 1003.10(c), and certain BIA decisions are judicially reviewable through a petition for review filed in a circuit court of appeals, 8 U.S.C. § 1252(d). Proceedings at the BIA are governed by 8 C.F.R. § 1003.1, which requires that BIA members "exercise their *independent* judgment and discretion in considering and determining the cases." 8 C.F.R. § 1003.1(d)(1)(ii) (emphasis added). The Supreme Court has interpreted the applicable regulations as requiring that the BIA "in arriving at its decision exercise its own independent discretion, after a fair hearing." *Accardi v. Shaughnessy*, 347 U.S. 260, 265, 268 (1954).

31.    The government has statutory authority to detain certain noncitizens during, and in some cases after the conclusion of, removal proceedings. *See, e.g.,* 8 U.S.C.

---

[3] Congress also provided for removal without a full hearing, referred to as "expedited removal," for certain individuals who have applied for admission without required documentation, 8 U.S.C. § 1182(a)(6)(C), or who have sought admission through a misrepresentation, 8 U.S.C. § 1182(a)(7).  *See generally* 8 U.S.C. § 1225(b).  A person subject to expedited removal must still have access to process, including the possibility of a full hearing before an immigration judge, if she expresses a fear of return to her country of origin.  8 U.S.C. § 1225(b)(1)(B)(ii); 8 U.S.C. § 1158.

9 -   COMPLAINT

§§ 1225(b)(1)(B)(ii)(IV), 1226(a), (c), 1231(a). Certain noncitizens may seek review by an immigration judge of a custody determination made by DHS by filing a bond motion with the court. 8 C.F.R § 1003.19(a); *cf.* 8 C.F.R § 1003.19(h)(2) (listing noncitizens who are ineligible for bond). This review, based on an analysis of an individual's danger to the community and risk of flight, *Matter of Patel*, 15 I. & N. Dec. 666 (BIA 1979), is separate and distinct from the merits phase of the case. 8 C.F.R. § 1003.19(d).

32.     A noncitizen may appeal the judge's decision on bond to the BIA. 8 C.F.R. § 1236.1(d)(1), (3). An immigration judge may reconsider a bond determination only on the basis of changed circumstances. 8 C.F.R. § 1003.19(e).

33.     The stakes in removal proceedings are extremely high. Immigration judges exercise delegated authority to grant asylum to persons fleeing persecution; grant permanent residence to asylees, refugees, and close family members of U.S. citizens; cancel removal of noncitizens where hardship to a close U.S. citizen or lawful permanent resident family member would result; cancel removal of long-time permanent residents who have criminal convictions; and grant bond to detained noncitizens, among other relief.

**B.     The INA's Case-by-Case Adjudication Standards**

34.     Noncitizens in immigration proceedings, who are termed "respondents" in immigration court, are entitled to "a full and fair hearing" that accords with Constitutional due process. To this end, Congress established a cohesive statutory scheme codifying a number of case-by-case adjudicatory standards that must be followed in immigration court.

35.     First, respondents have the right to be represented by counsel at no cost to the government. U.S. Const. Amend. V; 8 U.S.C. § 1229a(b)(4)(A); 8 U.S.C. § 1362; 8 C.F.R. § 1003.16(b); 8 C.F.R. § 1292.1; 8 C.F.R. § 1001.1(f). The Attorney General must maintain and furnish respondents with a list of local pro bono legal service providers and advise them that they may be represented by counsel. INA §§ 239(a)(1), (b)(2), 208(d)(4)(A)-(B); 8 C.F.R. § 1003.61.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

As the Office of the Director of EOIR has explained, the provision of such a list is intended to "[i]mprove the efficiency and fairness of immigration proceedings by facilitating access to legal representation."[4] Preliminary hearings, or "Master Calendar Hearings," may take place with the respondent's attorney of choice appearing by telephonic conference. INA § 240(b)(2); *see also* 8 C.F.R. § 1003.25(c).

36.    Second, respondents have the right to a reasonable opportunity to submit evidence, including through telephonic hearings where appropriate, *see* INA § 240(b)(2); 8 C.F.R. § 1003.25(c); cross-examine witnesses; and examine evidence submitted by the government. 8 U.S.C. § 1229a(b)(4)(B); *see also* 8 C.F.R. § 1240.1(c) (requiring that an immigration judge "shall receive and consider material and relevant evidence"). To ensure these rights, respondents are entitled to accurate interpretation. 8 C.F.R. § 1240.5.

37.    Third, respondents have the right to a full record of the proceedings, including a verbatim transcript, testimony, exhibits, applications, proffers, requests, the immigration judge's decision, all written orders, all motions, all appeals, and all briefs and other papers. 8 U.S.C. § 1229a(b)(4)(C); 8 C.F.R. § 1240.9.

38.    Fourth, and critically, respondents have the right to have a decision based solely on the record created in the proceedings. 8 U.S.C. § 1229a(c)(1)(A). This right necessarily implies that such a decision must be made by an impartial adjudicator. *See, e.g.*, *Wong Yang Sung v. McGrath*, 339 U.S. 33, 50 (1950), *overruled on other grounds, Marcello v. Bonds*, 349 U.S. 302 (1955) ("When the Constitution requires a hearing, it requires a fair one, one before a tribunal which meets at least currently prevailing standards of impartiality.").

39.    The INA's case-by-case adjudication standards are binding on all immigration courts. To the extent that immigration judges adopt local operating procedures, they must

---

[4] *See* List of Pro Bono Legal Service Providers, Office of the Director of EOIR (Oct. 8, 2015), https://www.justice.gov/sites/default/files/pages/attachments/2015/11/30/list_of_pro_bono_legal _service_providers_overview_20151008.pdf. (Last accessed Dec. 12, 2019).

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

preserve these rights and comply with other applicable regulations. *See* 8 C.F.R. § 1003.40 (providing that local operating procedures "shall not be inconsistent" with other regulations and can be adopted only if a majority of judges in the local court concur in writing and the Chief Immigration Judge gives written approval).

**C.    Plaintiffs' Roles in the Immigration Court System**

40.    Plaintiffs are nonprofit legal services organizations that play critical roles in the immigration court system by facilitating the meaningful participation of asylum-seeking respondents in their removal proceedings. Plaintiffs represent and advise detained individuals in custody proceedings; accompany, represent, and advise detained and non-detained respondents seeking asylum; explain the legal process to asylum seekers; conduct factual investigations; research and articulate potential forms of relief; prepare clients and witnesses to testify; and fill out English-language court forms for non-English speaking clients in a clear and legible manner.

41.    Because immigration law is complex and the stakes involve life or death, Plaintiffs play a particularly important role in assisting persons fleeing persecution who are seeking asylum. The burden of proof on the respondent is high in asylum proceedings, where the central focus is whether the applicant has demonstrated that she fits the definition of a "refugee"—an individual who has a well-founded fear of persecution in her home country based on race, religion, nationality, membership in a particular social group, or political opinion—and is otherwise eligible for asylum.

42.    Asylum applications require detailed, fact-specific submissions containing evidence related to a noncitizen's fear of persecution as well as evidence showing the noncitizen's fear is objectively reasonable. Plaintiffs must allow time for relationship-building so that their clients trust their representatives enough to share sensitive past experiences. For clients suffering the effects of severe trauma, Plaintiffs may need to provide extra time and resources to build these relationships. To obtain necessary evidence, Plaintiffs must often engage experts

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

from the United States or other countries to review the facts of a respondent's case and provide expert testimony regarding country conditions. Plaintiffs may also need to seek testimony from expert medical or mental health professionals to corroborate the injuries of a client who has survived past persecution. In each case, Plaintiffs must coordinate all of these pieces while also ensuring that they are zealously representing their clients by developing rigorous legal arguments, submitting legal briefs, and complying with a myriad of court procedures.

43.     In many courts, much of this work must be done to prepare for a custody hearing, where immigration judges weigh heavily whether a noncitizen is likely to succeed on her application for relief before the court. Plaintiffs in these courts must thus prepare a bond case almost as if it were a case on the merits in removal proceedings.

44.     Recognizing Plaintiffs' crucial roles in the immigration court system, the Office of the Chief Immigration Judge has explained that "[p]ro bono representation benefits both the respondent and the court" and "promotes the effective and efficient administration of justice."[5] EOIR has further acknowledged the importance of pro bono representation through the Office of Legal Access Programs (OLAP), which is meant to expand the availability and improve the quality of legal representation in the immigration courts.[6] In addition to facilitating pro bono representation through maintenance of the List of Pro Bono Legal Service Providers, OLAP runs the Model Hearing Program, which aims to offer "hands-on training in immigration court with the goal of increasing the number of pro bono representatives available for individuals in immigration removal proceedings."[7]

---

[5] David L. Neal, Chief Immigration Judge, Operating Policies and Procedures Memorandum 08-01: Guidelines for Facilitating Pro Bono Legal Services at 1 (Mar. 10, 2008), https://www.justice.gov/sites/default/files/eoir/legacy/2008/04/24/08-01.pdf. (Last accessed Dec. 12, 2019).

[6] EOIR, Office of Legal Access Programs, https://www.justice.gov/eoir/office-of-legal-access-programs (Last accessed Dec. 12, 2019) (explaining access to counsel and pro bono projects operated and maintained by EOIR); *see also* Hon. Robert A. Katzmann, The Legal Profession and the Unmet Needs of the Immigrant Poor, 21 Geo. J. Legal Ethics 3 (2008).

[7] EOIR, Office of Legal Access Programs, https://www.justice.gov/eoir/office-of-legal-access-programs. (Last accessed Dec. 12, 2019).

13 - COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

45.     EOIR has recognized Plaintiffs Las Americas, SFDP, and Law Lab as organizations "eligible . . . to provide representation through accredited representatives who appear on behalf of clients before the Immigration Courts, the Board, and DHS, or DHS alone." 8 C.F.R. § 1292.11(a). The accredited representative program was created to "address[] the critical and ongoing shortage of qualified legal representation for underserved populations in immigration cases before the Federal administrative agencies." Dep't of Justice, Executive Office for Immigration Review, Recognition of Organizations and Accreditation of Non-Attorney Representatives, proposed rule, 80 Fed. Reg. 59514, 59514 (Oct. 1, 2015). Only "non-profit religious, charitable, social service, or similar organization[s] that provide[] immigration legal services primarily to low-income and indigent clients within the United States" may be so accredited. 8 C.F.R. § 1292.11(a)(1).

46.     Plaintiffs Las Americas and SPLC are qualified organizations that are registered with EOIR as pro bono legal service providers and appear on the statutorily-mandated Pro Bono Legal Service Providers List. *See* 8 U.S.C. § 1158(d)(4)(B) (relating to asylum proceedings); 8 U.S.C. § 1229(a)(1)(e) (relating to all removal proceedings); 79 Fed. Reg. 55662, 55662 (Sept. 17, 2014) (explaining that the list "is central to EOIR's efforts to improve the amount and quality of representation before its adjudicators, and it is an essential tool to inform aliens in proceedings before EOIR of available pro bono legal services"). Plaintiff Law Lab's Equity Corps of Oregon directly supports all official pro bono legal service providers in Oregon, and provides legal support to numerous other official pro bono legal service providers through its BorderX and Centers of Excellence programs. Since 2001, Plaintiff CLINIC's BIA Pro Bono Project has worked with EOIR to identify detained respondents with meritorious appeals and match these detained respondents with pro bono counsel.[8]

---

[8] EOIR, BIA Pro Bono Project, https://www.justice.gov/eoir/bia-pro-bono-project. (Last accessed Dec. 17, 2019).

14 - COMPLAINT

**D.      The Attorney General's Responsibilities Within the Immigration Court System**

47.      The Attorney General, who oversees the immigration court system, bears ultimate responsibility for ensuring that the INA's standards for individual hearings—which require case-by-case adjudication—apply in immigration court proceedings.

48.      The Attorney General is empowered to "establish such regulations, prescribe such forms of bond, reports, entries, and other such papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts," 8 U.S.C. § 1103(g)(2), as he deems necessary to carry out his obligation to lawfully administer the INA. *See* 8 U.S.C. § 1103(g)(1).

49.      The Director of EOIR, who oversees the agency's day-to-day operations, reports directly to the Attorney General. 8 C.F.R. § 1003.0(a), (b)(1). The Director of EOIR supervises all other agency personnel in accordance with 8 C.F.R. Part 3. Subject to the authority and guidance of the Attorney General, the Chief Immigration Judge leads the Office of the Chief Immigration Judge, which establishes operating policies for the immigration courts and oversees their implementation.

50.      Immigration judges are "administrative judges" whom the Department of Justice has characterized as "non-supervisory career attorneys employed by" the Attorney General. *See* Final Brief of Appellees (EOIR), ECF No. 156759 at 15, *Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667 (D.C. Cir. 2016) (No. 15-5201); 8 U.S.C. § 1101(b)(4); 8 C.F.R. § 1003.10. Appointed by the Attorney General, immigration judges "shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe" and "act as the Attorney General's delegates in the cases that come before them." 8 U.S.C. § 1101(b)(4); 8 C.F.R. § 1003.10(a). "In conducting [removal] hearings . . . and such other proceedings the Attorney General may assign to them, immigration judges shall exercise the powers and duties delegated to them by the Act and by the Attorney General through regulation." 8 C.F.R. § 1003.10(b).

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

51.     The members of the BIA are also "attorneys appointed by the Attorney General to act as the Attorney General's delegates." 8 C.F.R. § 1003.1(a)(1), (d)(1). BIA members, like immigration judges, are governed not only by law and regulations, but also by "decisions of the Attorney General." 8 U.S.C. § 1103(a); 8 C.F.R. § 1003.1(d)(1)(i), (g). All decisions of the BIA are subject to review by the Attorney General. 8 C.F.R. § 1003.1(h).

52.     The Attorney General has broad authority to review and unilaterally reverse BIA decisions on his own initiative or at the request of the BIA or DHS. 8 U.S.C. § 1103(g); 8 C.F.R. § 1103.1(h). Determinations and rulings by the Attorney General on questions of law bind both immigration judges and the BIA.  8 U.S.C. § 1103(a)(1), 8 C.F.R. § 1003.1(g)(2).

53.     In addition to overseeing the immigration court system, the Attorney General, as the head of the Department of Justice, also serves as the nation's lead prosecutor. 28 U.S.C. §§ 503, 509, 547.

54.     Under the Take Care Clause of the U.S. Constitution, the President and his delegated executive officials, including the Attorney General, must "take Care that the Laws are faithfully executed." U.S. Const. Art. II, § 3. The Attorney General's faithful execution of the laws includes ensuring the immigration courts function in accordance with INA's case-by-case adjudication standards.

## DEFENDANTS' HOSTILITY TOWARD ASYLUM SEEKERS, THEIR LEGAL REPRESENTATIVES, AND THE IMMIGRATION COURT SYSTEM

55.     Federal law clearly recognizes the right to seek asylum, regardless of an individual's manner of entry into the United States. 8 U.S.C. § 1158(a)(1). Plaintiffs' zealous representation of their clients is consistent with this statutory scheme.

56.     Nevertheless, the President, his Attorneys General, and numerous other cabinet officials and agency personnel have publicly and repeatedly vilified people fleeing to the United States because of persecution in their home countries. Defendants have also made baseless

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

attacks against both the attorneys and organizations who represent asylum seekers, and the integrity of the immigration court system itself.

57.     Defendants' message—repeated in multiple ways, in different forums, and routinely over time—is the same: individuals seeking asylum are frauds, the attorneys and organizations representing them are cheats, and people from "shithole"[9] countries must be stopped at the border. Defendants have operationalized this message through a set of policies and practices that fundamentally undermine the INA's case-by-case adjudication standards. These policies and practices seek to convert the immigration courts into a tool to achieve deportations and recast immigration judges as enforcement agents of the Attorney General.

58.     President Trump has made it a priority of his administration to curb the so-called "abuse" of the asylum process.[10] In reality, however, these claims of abuse are a pretext for Defendants' efforts to nullify duly enacted statutory law.

59.     On January 25, 2017, four days after being sworn in to "preserve, protect and defend the Constitution of the United States," U.S. Const. Art. II, § 1, cl.8, and to faithfully execute the laws of the United States, U.S. Const. Art. II, § 3, the President issued an Executive Order that states that "[i]t is the policy of the executive branch to end the abuse of parole and asylum provisions currently used to prevent the lawful removal of removable aliens."[11]

60.     In line with this directive, President Trump has repeatedly broadcast Defendants' position that people who seek asylum are frauds who deserve no judicial process. On June 24, 2018, a week after describing asylum seekers as "pour[ing] into and infest[ing] our Country,"[12]

---

[9] *See* Eli Watkins & Abby Phillip, *Trump Decries Immigrants from 'Shithole Countries' Coming to US*, CNN (Jan. 12, 2018), https://www.cnn.com/2018/01/11/politics/immigrants-shithole-countries-trump/index.html. (Last accessed Dec. 12, 2019).

[10] *See* Exec. Order No. 13767, Border Security and Immigration Enforcement Improvements (Jan. 25, 2017).

[11] *Id.*

[12] Donald J. Trump (@realDonaldTrump), Twitter (June 19, 2018, 6:52 AM), https://twitter.com/realDonaldTrump/status/1009071403918864385. (Last accessed Dec. 12, 2019).

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

President Trump tweeted that "We cannot allow all of these people to invade our Country. When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came. Our system is a mockery to good immigration policy and Law and Order." [13]

61.     The President's anti-immigrant animus is widely shared throughout his administration, including by successive Attorneys General and other appointees at the Department of Justice.

62.     In an August 2017 press release, the DOJ boasted of an overall increase in removal orders—not merely case completions—accomplished since President Trump took office, framing the rise in the mere number of deportations, without regard to the merits of the cases or the process afforded, as a marker of a "return to the rule of law." [14]

63.     In an October 2017 speech to EOIR, former Attorney General Jefferson B. Sessions stated that the immigration "system is currently subject to rampant abuse and fraud" and is "overloaded with fake claims." [15] The former Attorney General described the asylum system as "being gamed" and "abused to the detriment of the rule of law, sound public policy, public safety, and of just claims." He accused asylum seekers and their lawyers of filing "meritless," "baseless," and "fraudulent" claims. Lamenting the "surge in trials, hearings, appeals, [and] bond proceedings," he undermined the work of attorneys by calling them "dirty immigration lawyers" who "make false claims of asylum." He denounced the requirement of "a court hearing on every asylum application" and accused immigration attorneys of having

---

[13] Donald J. Trump (@realDonaldTrump), Twitter (June 24, 2018, 8:02 AM), https://perma.cc/35AQ-NSDH. (Last accessed Dec. 12, 2019).
[14] DOJ, Office of Public Affairs, "Return to Rule of Law in Trump Administration Marked by Increase in Key Immigration Statistics" (Aug. 8, 2017), https://www.justice.gov/opa/pr/return-rule-law-trump-administration-marked-increase-key-immigration-statistics. (Last accessed Dec. 12, 2019).
[15] U.S. Att'y Gen., Remarks to the Executive Office for Immigration Review (Oct. 12, 2017) https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review. (Last accessed Dec. 12, 2019).

18 - COMPLAINT

"exploited loopholes in the law, court rulings, and lack of resources to substantially undermine" the immigration laws.[16]

64.    In April 2018, approximately a month after vacating a precedential BIA decision requiring an evidentiary hearing for respondents who had filed applications for asylum,[17] the former Attorney General characterized asylum seekers as "criminals" and explained that "[w]ith President Trump, we have a new era of support for law enforcement like we haven't seen in a long time" and that one "might even say we have a new sheriff in town[.]"[18]

65.    The former Attorney General publicly stated his plan to use DOJ's law enforcement powers against asylum-seekers, whom he characterized as "break[ing] into this country" and "exploit[ing]" the asylum process.[19] He denigrated organizations such as Plaintiffs as "open border radicals" and people who express fear of return to countries where they face persecution and seek asylum as "illegal aliens."[20]

66.    In May 2018, ten days before issuing a decision ending the longstanding availability of the docket management tool known as administrative closure,[21] the former Attorney General continued his condemnation of attorneys affiliated with organizations such as Plaintiffs, stating that "[r]epresentatives of illegal aliens have purposely used tactics designed to delay the adjudication of their clients' cases." Referring to the rising number of people seeking

---

[16] *Id.*
[17] *Matter of E-F-H-L-*, 27 I. & N. Dec. 226 (A.G. 2018).
[18] Jeff Sessions, U.S. Att'y Gen., Remarks on Immigration Enforcement, Las Cruces, NM (Apr. 11, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-immigration-enforcement (Last accessed Dec. 12, 2019), https://perma.cc/DT3U-X4UG. (Last accessed Dec. 12, 2019).
[19] *Id.*
[20] *Id.*
[21] *See Matter of Castro-Tum*, 27 I. & N. Dec. 271 (A.G. 2018). The Fourth Circuit recently held that DHS regulations confer on immigration judges the authority to administratively close cases, and that the regulatory interpretation announced in *Matter of Castro-Tum* is not entitled to deference. *Romero v. Barr*, 937 F.3d 282 (4th Cir. 2019).

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

asylum at the U.S.-Mexico border and insinuating, inaccurately, that such requests are illegal, he stated that "this must end."[22]

67.   In June 2018, in the midst of his policy to prosecute and incarcerate all individuals who cross the border without inspection, and in support of his newly-published case severely curtailing asylum eligibility for those fleeing from Central America,[23] the former Attorney General ordered immigration judges at a training session to "end the lawlessness that now exists in our immigration system."[24] He referred to the asylum process as "one of our major difficulties today" and instructed that when people assert their fear of returning to their home countries as a basis for protection under the INA, they are "abus[ing]" that system. He decried the statutory right to apply for asylum on the basis that it "transform[s] a straightforward arrest for illegal entry and immediate return into a prolonged legal process." Accordingly, he announced a number of EOIR reforms directed at "reducing illegal immigration" by addressing "baseless [asylum] claims."[25]

68.   In the same month, the President tweeted that "Hiring manythousands [sic] of judges, and going through a long and complicated legal process, is not the way to go – will always be disfunctional [sic]. People must simply be stopped at the Border and told they cannot come into the U.S. illegally."[26]

---

[22] Jeff Sessions, U.S. Att'y Gen., Remarks Discussing the Immigration Enforcement Actions of the Trump Administration, San Diego, CA (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions. (Last accessed Dec. 12, 2019).
[23] *See Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018).
[24] Jeff Sessions, U.S. Att'y Gen., Remarks to the Executive Office for Immigration Review Legal Training Program, Wash. D.C. (June 11, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-executive-office-immigration-review-legal. (Last accessed Dec. 17, 2019).
[25] *Id.*
[26] Donald J. Trump (@realDonaldTrump), Twitter (June 25, 2018, 5:43 AM), https://twitter.com/realDonaldTrump/status/1011228265003077632. (Last accessed Dec. 12, 2019).

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

69.    In September 2018, the former Attorney General again declared to an incoming class of immigration judges that attorneys who represent and assist asylum seekers "work every day—like water seeping through an earthen dam—to get around the plain words of the INA to advance their clients' interests." Further denigrating organizations like Plaintiffs, the former Attorney General advised the immigration judges that for immigration lawyers, "[t]heirs is not the duty to uphold the integrity of the [A]ct." He said that lawyers, like those who work for Plaintiffs, file "unjustified and sometimes blatantly false claims" and engage in "deceit."[27]

70.    In November 2018, in a public address, President Trump referred to asylum as a "loophole"; to asylum claims as broadly "fraudulent or meritless"; and to asylum seekers' lawyers as providing "well-coached language" in order to get "fees or whatever they can get."[28] He accused immigration lawyers of providing a "little legal statement to read" that somehow "qualif[ied]" migrants for asylum.[29]

71.    In spring 2019, Defendant Barr became Attorney General Barr. In his previous role as Attorney General under George H. W. Bush, Defendant Barr took positions demonstrating hostility toward immigrants, including advocating for fewer procedural protections in asylum cases under the guise of weeding out supposed "phony claims for asylum."[30] The Attorney General's actions during his current appointment embody a similar

---

[27] Jeff Sessions, U.S. Att'y Gen., Remarks to the Largest Class of Immigration Judges in History for the Executive Office for Immigration Review (EOIR), Falls Church, VA (Sept. 10, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-largest-class-immigration-judges-history. (Last accessed Dec. 12, 2019).

[28] Nov. 1, 2018 – Remark by President Trump on the Illegal Immigration Crisis and Border Security; https://www.whitehouse.gov/briefings-statements/remarks-president-trump-illegal-immigration-crisis-border-security/. (Last accessed Dec. 12, 2019).

[29] *Id.*

[30] Dara Lind, *William Barr Hearing: Attorney General Nominee's Immigration Record Aligns with Trump's*, Vox (Jan. 16, 2019), https://www.vox.com/2018/12/7/18128926/barr-confirmation-senate-immigration-trump (Last accessed Dec. 12, 2019) (quoting Barr's 1992 statement to a journalist in which he advocated "summary deportation proceedings to weed out patently phony claims for asylum").

Barr's prior record confirms his anti-immigrant views. For example, Attorney General Barr oversaw the creation of a prison camp for HIV-positive Haitian asylum seekers in Guantánamo Bay—where, in Barr's view, U.S. official action would not be constrained by basic

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

hostility toward immigrants at the expense of the rule of law. For example, in April 2019, he issued a precedential EOIR decision that, had it not been preliminarily enjoined on constitutional grounds, would have led to the mandatory, prolonged detention of tens of thousands of asylum seekers—including those who pose no flight risk or danger to the community—while their cases are pending.[31]

72.     Meanwhile, President Trump has continued to condemn the asylum process. On April 2, 2019, in an Oval Office meeting, after praising Mexico for "apprehend[ing] a lot of people at their southern border coming in from Honduras and Guatemala and El Salvador," he urged that "we have to do something about asylum."[32] The President asserted that "the asylum procedures are ridiculous."[33] Consistent with that view, the President signaled his intent to limit access to fair hearings by stating that "to be honest with you, you have to get rid of judges."[34] Lamenting that when an individual seeks asylum "you have to bring them through a court system," President Trump mocked the process for seeking asylum, stating "[w]elcome to being Perry Mason. You now have a big trial."[35]

constitutional protections. The asylum seekers lived in deplorable conditions in the camp, where "latrines were brimming over" and there was little potable water. John Washington, *William Barr May Be Worse on Immigration Than Jeff Sessions*, The Intercept (Jan. 15, 2019), https://theintercept.com/2019/01/15/william-barr-confirmation-hearings-immigration/ (Last accessed Dec. 12, 2019); Chantal Da Silva, *Trump's Attorney General Pick Saw Thousands of Refugees Fleeing Violence Locked Up in Guantanamo Bay*, Newsweek (Dec. 11, 2018), https://www.newsweek.com/trumps-attorney-general-pick-saw-thousands-refugees-fleeing-violence-locked-1253102 (Last accessed Dec. 12, 2019); *see also* Kate Smith, *'A Stain on U.S. History': Trump's Attorney General Pick Used Guantanamo Bay to Hold Thousands of Haitian Refugees*, CBS News (Dec. 10, 2018), https://www.cbsnews.com/news/william-barr-attorney-general-nominee-asylum-seekers-haiti-hiv-positive-patients-guantanamo-bay-2018-12-10/ (Last accessed Dec. 12, 2019) (noting that Defendant Barr defended the prolonged and abusive imprisonment of 12,000 Haitian asylum seekers as recently as 2001, and that the camp operated for about 18 months until a judge ordered its end).

[31] *See Matter of M-S-*, 27 I. & N. Dec. 509 (A.G. 2019), *enjoined by Padilla v. U.S. Immigration & Customs Enforcement*, 387 F. Supp. 3d 1219 (W.D. Wash. 2019).

[32] Remarks by President Trump and NATO Secretary General Jens Stoltenberg Before Bilateral Meeting, *The White House* (Apr. 2, 2019) https://perma.cc/5ZKY-P53D. (Last accessed Dec. 12, 2019).

[33] *Id.*

[34] *Id.*

[35] *Id.*

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

73.    At an April 5, 2019, border security roundtable, President Trump stated, "[asylum]'s a scam. Okay? It's a scam. It's a hoax . . . So, our system is full. We're not taking them anymore."[36]

74.    On May 16, 2019, President Trump referred to the laws providing refuge to those who have been persecuted as "the horrible asylum laws that are so unfair."[37]

75.    On July 1, 2019, President Trump characterized asylum claims as "frivolous" and "bogus" while advocating for mass deportations of asylum seekers.[38] He stated that large-scale deportations of people seeking protection, including children, are "what we do."[39]

76.    Later in July 2019, President Trump called the legal requirement of access to a hearing before deportation "stupidity."[40] When asked about families seeking asylum, he responded "You know what? They came in illegally. They have to go out."[41]

77.    In order to get "them" "out," Defendants have compromised the legitimacy of the immigration court system by recasting immigration judges as enforcers of the executive branch's anti-immigrant agenda. The President conveyed his goal of eradicating case-by-case adjudication in the immigration courts in a June 20, 2018 Tweet, stating, "When people come into our

---

[36] *Trump on Asylum Seekers: 'It's a Scam, It's a Hoax'*, Daily Beast (Apr. 5, 2019), https://www.thedailybeast.com/trump-on-asylum-seekers-its-a-scam-its-a-hoax (Last accessed Dec. 12, 2019).

[37] March 15, 2019, "Remarks by President Trump on the National Security and Humanitarian Crisis on our Southern Border," https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-security-humanitarian-crisis-southern-border-2/ (Last accessed Dec. 12, 2019).

[38] https://factba.se/transcript/donald-trump-remarks-bill-signing-taxpayer-act-july-1-2019. (Last accessed Dec. 12, 2019).

[39] *Id.*

[40] Donald Trump Press Conference at the G20 Summit in Osaka (June 29, 2019) https://factba.se/transcript/donald-trump-press-conference-g20-osaka-june-29-2019 (Last accessed Dec. 12, 2019) ("And the reason that Mexico is so good – because they do have very, very tough immigration. They don't have the kind of things and the kind of stupidity that we have. I mean, where somebody touches one foot on our sand and now we have to bring them into a court.")

[41] https://factba.se/transcript/donald-trump-press-gaggle-marine-one-departure-july-12-2019.  (Last accessed Dec. 12, 2019).

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

Country illegally, we must IMMEDIATELY escort them back out without going through years of legal maneuvering. Our laws are the dumbest anywhere in the world."[42]

78.    In September 2019, President Trump claimed that he had "solved" asylum through policies that prevent asylum seekers from accessing U.S. immigration courts.[43] The next day, he equated support for asylum with support for "crime," "drugs," and "human trafficking."[44]

79.    Defendants' statements expose their desire to administer an adjudicatory system that is not governed by law. Defendants seek an immigration court system that functions as a deportation machine driven by a desire to issue removal orders against as many "undesirable" individuals as possible, regardless of the merits of their cases.

### THE FAILURE OF THE IMMIGRATION COURT SYSTEM

80.    The standards laid out in the INA require the Attorney General to administer a case-by-case adjudication system in which noncitizens have a full and fair opportunity to present their claims for relief before an impartial adjudicator. *See supra* ¶¶ 35-40. The abusive practices of the current and former Attorneys General have fundamentally compromised these standards and have resulted in an "irredeemably dysfunctional" system that is "on the brink of collapse[.]"[45]

81.    The current and former Attorneys General have been well aware of the persistently substandard functioning of the immigration court system. Federal courts have repeatedly found that "the adjudication of [immigration] cases at the administrative level has

---

[42] Donald J. Trump (@realDonaldTrump), Twitter (June 30, 2018, 3:44 PM), https://twitter.com/realDonaldTrump/status/1013146187510243328?s=20. (Last accessed Dec. 12, 2019).
    [43] https://factba.se/transcript/donald-trump-remarks-bilat-nayib-bukele-el-salvador-september-25-2019. (Last accessed Dec. 12, 2019).
    [44] https://factba.se/transcript/donald-trump-remarks-law-enforcement-september-26-2019. (Last accessed Dec. 12, 2019).
    [45] *See* ABA Commission on Immigration, 2019 Update Report: Reforming the Immigration System, Am. Bar Ass'n (Mar. 2019) at 2-3–2-4, https://perma.cc/94TF-FXGV. (Last accessed Dec. 12, 2019).

24 - COMPLAINT

fallen below the minimum standards of legal justice." *See, e.g., Benslimane v. Gonzales*, 430 F.3d 828, 830 (7th Cir. 2005) (citing "staggering" reversal rates and "severe" critique of immigration court decisions in at least 12 recent decisions across 4 circuits).[46]

82.    The Attorney General has taken no meaningful action to correct course to ensure that the immigration court system routinely adheres to the INA's requirement of case-by-case adjudication, thereby abdicating his duty to faithfully execute the INA. To the contrary, the Attorney General has taken affirmative actions to weaponize the immigration courts, further evidence of his abuse of his statutorily delegated authority.

83.    Instead of administering a case-by-case adjudicatory system, the Attorney General perpetuates a court system that is like "adjudicating death penalty cases . . . in settings that most closely resemble traffic courts."[47]

## A.    The Attorney General Has Abused His Authority by Perpetuating Vast Asylum-Free Zones

84.    The INA's case-by-case adjudication standards require that applications for asylum be adjudicated based on their merits in an impartial forum. *Supra* ¶¶ 35-40.

85.    Congress has entrusted the Attorney General to ensure that the immigration courts fairly apply the law to the facts of each case. Under Congress's statutory design, immigration courts cannot categorically deny asylum claims.

---

[46] *See also Colmenar v. I.N.S.*, 210 F.3d 967, 973 (9th Cir. 2000) ("We do not enjoy second-guessing the way Immigration Judges run their courtrooms. But when a petitioner has so clearly been denied a full and fair hearing, we have no choice. Judges do little to impress the world that this country is the last best hope for freedom by displaying the hard hand and closed mind of the forces asylum seekers are fleeing."); *Wang v. Att'y Gen.*, 423 F.3d 260, 268 (3d Cir. 2005) (observing that although "we have repeatedly sought to remind IJs of their duty to remain neutral and impartial when they conduct immigration hearings," a "disturbing pattern of IJ misconduct has emerged"); *Zuh v. Mukasey*, 547 F.3d 504, 513–14 (4th Cir. 2008) (adding to the "rising tide of criticism" of immigration courts while noting that "academic literature and court decisions have grown increasingly strident in their criticism of the immigration review process" and "courts have grown increasingly skeptical of the high error rate within the immigration system").

[47] Dana Leigh Marks, Now is the Time to Reform the Immigration Courts, Int'l Affairs Forum at 47 (Winter 2016), https://perma.cc/8WB7-H8D7. (Last accessed Dec. 12, 2019).

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

86.    However, the Attorney General has abused his control of EOIR by allowing an expanding number of immigration courts to categorically deny asylum claims regardless of their merits. These immigration courts are known as "asylum-free zones."[48]



---

[48] *See, e.g.*, Jeanne Atkinson, Michelle Mendez, David Baluarte, Atenas Burrola, Lindsay Harris, Sarah Owings, Stephen Manning, & Blaine Bookey, Petitioners' Brief, Inter-American Commission on Human Rights: Special Interest Hearing on the Human Rights of Asylum Seekers in the United States (Dec. 2, 2016), https://cliniclegal.org/sites/default/files/resources/defending-vulnerable-popluations/Human-Rigts-of-Asylum-Seekers-in-US-%5BPetitioners%5D.pdf. (Last accessed Dec. 12, 2019). The chart below is based on EOIR data for immigration courts deciding at least 50 asylum cases in a given year. *See* TRAC Immigration, *Asylum Decisions* (data through Sept. 2019), https://trac.syr.edu/phptools/immigration/asylum/ (Last accessed Dec. 12, 2019). Years refer to the federal government's fiscal years (October 1 – September 30). Asylum-free zones are defined as courts denying at least 85% of asylum cases in a given year.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

87.     In Atlanta, where Plaintiffs Law Lab, SPLC, and ASAP provide legal services, the immigration courts denied 95.7% of asylum claims adjudicated between 2014 and 2019.[49]

88.     As Judge Jordan of the Eleventh Circuit aptly noted, "[i]f [Atlanta's] statistics pertained to a federal district court, the Administrative Office would begin an investigation in a heartbeat." *Diaz-Rivas v. Att'y Gen.*, 769 F. App'x 748, 768 (11th Cir. 2019) (Jordan, J., dissenting). Atlanta's denial rates are "deeply troubling, as it would appear that the immigration judges in Atlanta are inherently biased (the government's phrasing) against asylum applicants in the same way." *Id.* at 767-68.

89.     In the El Paso region, where Plaintiffs Las Americas, CLINIC, Law Lab, Santa Fe Dreamers Project, and ASAP provide legal services, asylum denial rates have also been persistently high. From 2014 to September 2019, the El Paso Immigration Court denied 92.7% of asylum claims, and the El Paso Service Processing Center Immigration Court, which adjudicates detained cases, denied 89.0%. The Otero Immigration Court, located just outside El Paso in Chaparral, New Mexico, denied 84.8%.

90.     During this same period, the Houston Immigration Court, where Plaintiff ASAP has provided legal services, denied 91.8% of asylum claims; and the Charlotte Immigration Court, where Plaintiffs Law Lab and CLINIC provide legal services, denied 89.5% of asylum claims.

---

[49] Unless otherwise noted, all statistics cited in ¶¶ 88–96 are based on Plaintiffs' analysis of EOIR data obtained by TRAC Immigration for immigration courts that decided at least fifty asylum claims in a given year. *See* TRAC Immigration, *Asylum Decisions* (data through Sept. 2019), https://trac.syr.edu/phptools/immigration/asylum/ (Last accessed Dec. 12, 2019). Years refer to the federal government's fiscal years (October 1 – September 30). During the period reported here, the Atlanta Immigration Court was a single court operating out of two locations: Ted Turner Drive and W. Peachtree Street (known as the "Atlanta Annex"). As of Oct. 15, 2019, EOIR has established the W. Peachtree Street location as a separate, second Atlanta court. *See* EOIR, *Executive Office for Immigration Review to Open Atlanta – W. Peachtree Street*, Notice (Oct. 1, 2019), https://www.aila.org/infonet/eoir-to-open-new-immigration-court-in-atlanta (Last accessed Dec. 12, 2019); EOIR, EOIR Immigration Court Listing (updated Nov. 6, 2019), https://www.justice.gov/eoir/eoir-immigration-court-listing. (Last accessed Dec. 12, 2019).

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

91.    Plaintiff SPLC has also faced persistently high denial rates in the courts with detained-only dockets where its SIFI project appears. From 2014 to 2019, the LaSalle Immigration Court denied 94.0% of asylum claims; the Stewart Immigration Court, where Plaintiff Law Lab has also provided legal services, denied 91.4% of asylum claims; and the Oakdale Immigration Court denied 87.7% of asylum claims.

92.    Defendants' recent actions have entrenched and expanded asylum-free zones across the country.

93.    In 2017, Defendants' weaponization of the immigration courts began, and asylum denial rates rose significantly.

94.    From December 2016 to September 2019, the nationwide rate of asylum denials by immigration courts rose from 55.1% to 71.1%. Before the beginning of the Trump Administration, the nationwide monthly denial rate had been below 60% since September 2005. Monthly denial rates surpassed 60% in March 2017 and reached record-high levels by June 2018.[50]

---

[50] Based on record of EOIR data since October 2000 for all immigration courts. *See* TRAC Immigration, *Asylum Decisions.*

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

95.    In 2019, twenty-three immigration courts—nearly 40% of the total number—were asylum-free zones denying at least 85% of asylum claims.[51] The median denial rate for asylum-free zones in 2019 was 88.9%. In contrast, the median denial rate for all other immigration courts was 70.0%.[52]



96.    On information and belief, no legitimate variable affecting case outcomes explains the existence and entrenchment of asylum-free zones. On information and belief, the

_____

[51] Two additional courts, Fishkill and Ulster, each denied 100% of asylum cases but decided fewer than fifty cases this year.

[52] The chart below is based on EOIR data for immigration courts deciding at least 50 asylum cases in a given year. *See* TRAC Immigration, *Asylum Decisions*. Years refer to the federal government's fiscal years (October 1 – September 30). Asylum-free zones are defined as courts denying at least 85% of asylum cases in a given year.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

high number of asylum denials in these courts is due to the fact that these cases were docketed in jurisdictions where case-by-case adjudication is not the norm.

97.    Additionally, since 2017, Defendants have entrenched the suspension of asylum law in these immigration courts because of a discriminatory animus against asylum seekers.

98.    The asylum-free zones include many courts that hear detained cases. Detention itself imposes significant barriers to proving an asylum claim. Evidence collection, witness preparation, and providing advice and counsel, among other activities, are substantially impaired when a respondent is detained. In detained courts in asylum-free zones where Plaintiffs SPLC, Law Lab, CLINIC, and Las Americas provide legal services or pro bono support, some immigration judges indicate a predisposition to deny bond to asylum seekers, consistent with their overall predisposition to deny asylum. They do so by, for example, stating that they do not give bond to "recent arrivals," which is a coded reference to asylum seekers, given that the overwhelming majority of bond-eligible recent arrivals are asylum seekers.

99.    The twenty-three immigration courts listed above have effectively nullified asylum law. In these asylum-free zones, the rule of law has ceased, and asylum law is functionally suspended. This suspension of the rule of law has created a country where two different versions of the INA apply: one that includes asylum and one that does not.

100.    Nevertheless, the suspension of asylum law in these immigration courts has not been subject to corrective administrative guidance or action.

101.    The Attorneys General have been well aware of the extraordinary rates of denials in these immigration courts, which have persisted for years. *See, e.g.*, U.S. Gov't Accountability Off., GAO-08-940, U.S. Asylum System: Significant Variation Existed in Asylum Outcomes across Immigration Courts and Judges at 7 (2008), https://www.gao.gov/assets/290/281794.pdf (Last accessed Dec. 12, 2019) (identifying significant disparities in asylum outcomes across courts and analyzing the factors leading to the disparity); U.S. Gov't Accountability Off., GAO-

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

17-72, Asylum: Variation Exists in Outcomes of Applications Across Immigration Courts and Judges (2016), https://www.gao.gov/assets/690/680976.pdf (Last accessed Dec. 12, 2019) (observing continued disparities in the 2007–2014 period, despite having made concrete recommendations to EOIR in 2008).

102.    The Attorney General has further abused his supervisory authority by failing to create a fair and functioning administrative appellate system. The Attorney General has failed to ensure that the Board of Immigration Appeals provides the "clear and uniform guidance," 8 C.F.R. § 1003.1(d)(1), that is required by law. The widespread arbitrariness of both procedural and substantive decision-making among immigration courts is thus left systemically uncorrected.

103.    Indeed, Defendants' recent actions demonstrate their intent to turn the entire country into an asylum-free zone. Defendants, for example, recently "reorganized" the BIA in ways that remove the independence of its members. *See* EOIR, *Organization of the Executive Office of Immigration Review*, 84 Fed. Reg. 44,537 (Aug. 26, 2019). That so-called reorganization subjects BIA members to strict deadlines for deciding every case, no matter how complex, and gives the Director of EOIR, who is an administrator rather than a judge, the authority to decide individual appeals if BIA members do not adhere to those deadlines. *See id.* at 44,539-40. The failure to meet the deadlines can result in adverse employment action. Defendants also recently appointed to the BIA six immigration judges with some of the highest asylum denial rates in the country—and waived the longstanding probationary period for new BIA members in order to make those new appointees almost impossible to remove.[53]

---

[53] *See, e.g.*, Tal Kopan, *AG William Barr promotes immigration judges with high asylum denial rates*, S.F. Chronicle (Aug. 23, 2019), *at* https://www.sfchronicle.com/politics/article/AG-William-Barr-promotes-immigration-judges-with-14373344.php) (Last accessed Dec. 12, 2019); Tanvi Misra, *DOJ changed hiring to promote restrictive immigration judges*, Roll Call (Oct. 29, 2019), *at* https://www.rollcall.com/news/congress/doj-changed-hiring-promote-restrictive-immigration-judges/." (Last accessed Dec. 12, 2019).

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

**B.      The Attorney General Has Abused His Authority by Burdening the Immigration
          Courts with a Backlog That Structurally Undermines Fairness**

104.    At the end of 2010, the backlog of cases pending before the immigration courts

was approximately 265,000 cases. Today, there is a backlog of more than 1,000,000 cases.[54] In

fewer than nine years, the backlog has grown by nearly 300%. As a result of the backlog, non-

detained immigration court cases regularly remain unresolved for years.

105.    These backlog-related delays are not due to case-specific factors; instead, they are

a direct result of the Attorney General's mismanagement of the immigration court docket. Even

when new filings have decreased, the Attorney General's mismanagement of the immigration

courts has resulted in an increasing backlog.[55] Since 2017, the immigration court backlog has

skyrocketed: between January 2017 and September 2019, the backlog nearly doubled from

542,411 cases to the current 1,023,767.[56]

---

[54] TRAC Immigration, *Backlog of Pending Cases in Immigration Courts as of September 2019*, https://trac.syr.edu/phptools/immigration/court_backlog/apprep_backlog.php (accessed Dec. 14, 2019). Years refer to the federal government's fiscal years (October 1 – September 30).

[55] *See* chart based on EOIR data from TRAC Immigration, *Immigration Court Backlog Tool*, https://trac.syr.edu/phptools/immigration/court_backlog/ (Last accessed Dec. 12, 2019)., and *Details on Deportation Proceedings in Immigration Court: Initial Filing*, https://trac.syr.edu/phptools/immigration/nta/ (both accessed Dec. 6, 2019). Years refer to the federal government's fiscal years (October 1 – September 30).

[56] *See* TRAC Immigration, Immigration Court Backlog Tool; TRAC Immigration, *Crushing Immigration Judge Caseloads and Lengthening Hearing Wait Times* (Oct. 25, 2019), https://trac.syr.edu/immigration/reports/579/ (Last accessed Dec. 12, 2019). (reporting backlog as of September 30, 2019); EOIR, Adjudication Statistics: Pending Cases (Oct. 7, 2019), available at https://www.justice.gov/eoir/page/file/1060836/download (Last accessed Dec. 12, 2019) (reporting 987,274 pending "removal, deportation, exclusion, asylum-only, and withholding only" cases at end of FY2019).

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000



106.    In courts where Plaintiffs provide legal services, the cases of thousands of people who have applied for asylum are marooned in the backlog, with asylum seekers being forced to wait years just for their next court hearing. In over half of backlogged cases, the "next" court hearing will not even result in a decision on the merits of the case. Instead, it is a master calendar hearing that will result in another hearing being scheduled—meaning that those asylum applicants may wait years longer for evidentiary hearings on their claims.[57]

107.    As of the end of September 2019, the average projected wait time for a respondent's next immigration court hearing was more than two and a half years in El Paso,

---

[57] *See* https://trac.syr.edu/immigration/reports/579/#f5  (Last accessed Dec. 12, 2019) ("These statistics are merely projected figures for the average wait time based on the court's hearing schedule as of the end of September. Over half of these cases are waiting for their master calendar hearing - somewhat like an arraignment were this a criminal court. Thus, these projected wait times do not include further delays required to schedule any individual merit hearings after these initial master calendar hearings are held.").

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

where Plaintiffs Las Americas, SFDP, ASAP, and Law Lab provide legal services; and in

Portland, where Plaintiff Law Lab appears.[58]

108.    As of the end of September 2019, the average projected wait time for a

respondent's next immigration court hearing was over three years in Atlanta, where Plaintiffs

SPLC, ASAP, and Law Lab provide legal services; and in San Francisco, where Plaintiffs ASAP

and Law Lab provide legal services.[59]

109.    As of the end of September 2019, the average projected wait time for a

respondent's next immigration court hearing was over three and a half years in Houston and in

San Antonio, where Plaintiff ASAP has provided legal services.[60]

110.    As of the end of September 2019, the average projected wait time for a

respondent's next immigration court hearing was approaching four and a half years in Denver,

where Plaintiffs SFDP, CLINIC, and ASAP provide legal services; and in Arlington, where

Plaintiff ASAP has provided legal services.[61]

111.    These unreasonably long delays undermine the INA's case-by-case adjudication

standards. The delays compromise the right to a reasonable opportunity to present witnesses and

other evidence in support of an asylum claim because with the passage of time, witnesses

---

[58] According to TRAC Immigration, the average projected total wait time for cases in the El Paso Immigration Court was 2.56 years (934 days). The average projected total wait time for cases in the Portland Immigration Court was 2.78 years (1015 days). *See* https://trac.syr.edu/immigration/reports/579/#f5. (Last accessed Dec. 12, 2019).

[59] The average projected total wait time for cases in the Atlanta Immigration Court was 3.06 years (1117 days). The average projected total wait time for cases in the San Francisco Immigration Court was 3.13 years (1142 days). *See* https://trac.syr.edu/immigration/reports/579/#f5. (Last accessed Dec. 12, 2019).

[60] The average projected total wait time for cases in the Houston Immigration Court was 3.57 years (1303 days). *See* https://trac.syr.edu/immigration/reports/579/#f5. (Last accessed Dec. 12, 2019).

[61] The average projected total wait time for cases in the Denver Immigration Court was 4.29 years (1566 days). The average projected total wait time for cases in the Arlington Immigration Court was 4.40 years (1607 days). *See* https://trac.syr.edu/immigration/reports/579/#f5. (Last accessed Dec. 12, 2019).

---

34 - COMPLAINT

become unavailable and evidence becomes lost or stale. In addition, the delays make legal representation more challenging to obtain and sustain.

112.    Defendants have used the case backlog to justify many draconian executive actions, including the weaponization policies described below. Yet in reality, many of Defendants' policies—such as those implemented through certified decisions or internal policy guidance—have exacerbated the backlog instead of reducing it. In addition to the over one million active cases already in the backlog, Defendants' recent policy changes have encouraged another 322,535 previously closed cases to be added back to the docket.[62]

113.    Defendants frequently use manipulative docketing practices that exacerbate the backlog, resulting in longer case delays that further undermine the INA's case-by-case adjudication standards. Defendants regularly mismanage immigration court dockets by adopting "politically motivated changing court priorities[,]" which disregard the individualized facts of each case, instead engaging in "incessant docket shuffling in furtherance of various law enforcement 'priorities.'"[63] For example, DHS estimates that 100 to 150 immigration judges from across the country have been, or will be, reassigned to perform video proceedings in the tent courts hearing cases under the so-called Migrant Protection Protocols.[64]

---

[62] *See* TRAC Immigration, *Crushing Immigration Judge Caseloads and Lengthening Hearing Wait Times* (Oct. 25, 2019); https://www.justice.gov/eoir/page/file/1061521/download. (Last accessed Dec. 12, 2019).

[63] Statement of Judge A. Ashley Tabaddor, President National Association of Immigration Judges, Before the Senate Judiciary Committee, Border Security and Immigration Subcommittee Hearing on "Strengthening and Reforming America's Immigration Court System" 3 (Apr. 18, 2018) https://www.judiciary.senate.gov/imo/media/doc/04-18-18%20Tabaddor%20Testimony.pdf. (Last accessed Dec. 12, 2019).

[64] *See, e.g.*, Adolfo Flores, *The Trump Administration Opened Secretive Tent Courts at the Border. The Public Is Not Allowed Inside.*, Buzzfeed News (Sept. 11, 2019), https://www.buzzfeednews.com/article/adolfoflores/tent-court-hearings-asylum-seekers-public-denied-access (Last accessed Dec. 12, 2019); Mica Rosenberg et al., *Hasty rollout of Trump immigration policy has 'broken' border courts*, Reuters (Sept. 10, 2019), https://www.reuters.com/article/us-usa-immigration-courts-insight/hasty-rollout-of-trump-immigration-policy-has-broken-border-courts-idUSKCN1VV115. (Last accessed Dec. 12, 2019).

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

114.    Defendants thus often and increasingly direct immigration judges to postpone long-scheduled hearings in their own courtrooms to respond to ideologically motivated assignments to other courts. These postponements return respondents to the backlog, often adding more multi-year delays to cases that have long been ripe for adjudication.

115.    For example, in just three months in 2017, when the Attorney General "surged" immigration judges to the border, he caused nearly 23,000 scheduled hearings to be "adjourned" (postponed), compounding the backlog.[65]

116.    Between March and June 2017, judge reassignments caused nearly 3,500 adjournments in the Los Angeles Immigration Court, 200 in San Antonio, 129 in Baltimore, nearly 400 in Chicago, 1,822 in San Francisco, 242 in Kansas City, some 2,600 in New York City, nearly 2,000 in Arlington, and almost 900 in Atlanta.[66]

## C.    To Advance their Anti-Immigrant Agenda, Defendants Have Weaponized the Immigration Courts

117.    Capitalizing on the breadth of the AG's authority over EOIR, Defendants have repeatedly sought to further their anti-immigrant agenda under the guise of fixing a broken system and promoting efficiency. Both the Enforcement Metrics Policy, introduced in October 2018, and the family-unit rapid removal track, or FAMU Directive, introduced in November 2018, have accelerated the weaponization of the immigration courts against persons fleeing persecution and eviscerated Plaintiffs' ability to carry out their missions.

118.    The Enforcement Metrics Policy gives immigration judges a financial interest in cases before them by setting mandatory timelines and remand limits that impact judges' performance evaluations. This vested interest entrenches systemic bias into the immigration courts and undermines Plaintiffs' efforts to provide meaningful legal services to respondents.

---

[65] https://immigrantjustice.org/immigration-surge-courts (Last accessed Dec. 12, 2019); https://www.humanrightsfirst.org/sites/default/files/hrf-tilted-justice-final%5B1%5D.pdf (Last accessed Dec. 12, 2019) at 15.
[66] *Id.*

36 - COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

119.    The FAMU directive is intended primarily for Central American families who apply for asylum. On this specialized accelerated docket, the families have fewer procedural rights and their cases are stigmatized from the beginning.

120.    Defendants' policies are intended to deport asylum seekers "back from where they came" "so fast, your head will spin" "with no Judges or Court Cases[.]"[67] These policies represent a deliberate effort by Defendants. Through these policies, Defendants have solidified the immigration courts as a system that is categorically biased and unfair, relegated immigration judges to the role of enforcement officers, and frustrated Plaintiffs' missions and programs.

**1.    Immigration Judge Enforcement Metrics Policy**

121.    Pursuant to a policy issued in October 2018, Defendants imposed a new Enforcement Metrics Policy on immigration judges.

122.    The Enforcement Metrics Policy has three components: a Case Completion Quota, a Remand Rate, and Speed-Related Adjudication Benchmarks.

123.    The Case Completion Quota requires immigration judges to complete 700 cases each year, equivalent to about three case completions every business day.

124.    The Remand Rate requires immigration judges to have fewer than fifteen percent of their decisions reversed on appeal.

125.    The Speed-Related Adjudication Benchmarks are itemized into six different categories. Benchmarks 1, 2, and 3 govern the speed of adjudication after the evidentiary portion of a case is completed or a motion is filed. These Benchmarks constrain the amount of time an immigration judge may spend on a matter.

---

[67] Donald J. Trump (@realDonaldTrump), Twitter (June 24, 2018, 8:02 AM), https://twitter.com/realDonaldTrump/status/1010900865602019329 (Last accessed Dec. 12, 2019), https://perma.cc/35AQ-NSDH (Last accessed Dec. 12, 2019); Marina Fang, Donald Trump Still Supports Mass Deportation for Undocumented Immigrants, HuffPost (Aug. 23, 2016) https://www.huffpost.com/entry/donald-trump-immigration-flip-flop_n_57bb9743e4b03d51368a7e24. (Last accessed Dec. 12, 2019).

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

126.    Benchmarks 4, 5, and 6 govern the scheduling of bond cases, individual merits hearings, and credible and reasonable fear reviews, imposing categorical timeframes without regard to whether a particular case is ready for adjudication.

127.    To achieve compliance with these so-called "performance metrics," the Attorney General reminds an immigration judge each time he or she takes the bench that the judge's financial interest is tied to the prompt completion of the pending case through a "dashboard" on the immigration judge's computer.[68] The dashboard measures, in nearly real time, the judge's progress in achieving the Attorney General's performance metrics, with meters showing red, yellow or green to indicate whether the judge is on track to meet the benchmarks.[69] Examples of the dashboards[70] visible to immigration judges include:

---

[68] Press Release, American Immigration Lawyers Association, The Need for an Independent Immigration Court Grows More Urgent as DOJ Imposes Quotas on Immigration Judges (Oct. 1, 2018), AILA Doc. No. 18100103; *see also* Email from James McHenry, EOIR Director, to All EOIR Judges, on Immigration Judge Performance Metrics (Mar. 30, 2018), AILA Doc. No. 18040301.

[69] Mary Harris, *This Immigration Judge Has a Fix for Immigration Courts*, Slate, https://slate.com/news-and-politics/2019/04/immigration-courts-doj-independence-separation.html (Last accessed Dec. 12, 2019); *see also* Liz Robbins, *In Immigration Court, It is Judges v. Justice Department*, N.Y. Times (Sept. 7, 2018), https://www.nytimes.com/2018/09/07/nyregion/nyc-immigration-judges-courts.html (Last accessed Dec. 12, 2019) (describing DOJ's monitoring of immigration judges with a "performance dashboard . . . which indicates if they are keeping up their pace").

[70] Beth Fertig, *Presiding Under Pressure*, WNYC (May 21, 2019), https://www.wnyc.org/story/presiding-under-pressure/. (Last accessed Dec. 12, 2019). "Non-status" refers to cases that are not on an immigration judge's status docket.  An immigration judge may use the status docket for cases in which final adjudication may be delayed—for example, where the respondent is awaiting adjudication of an application or petition by U.S. Citizenship and Immigration Services.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000



128.    On information and belief, the dashboard and the Enforcement Metrics Policy influence the adjudication of a case.

129.    The dashboard and the performance of an individual immigration judge related to the Enforcement Metrics are not included in the record of proceedings.

130.    Defendants can take adverse action against immigration judges who fail to comply with the Case Completion Quota, the Remand Rate, and at least half of the Speed-Related Adjudication Benchmarks, or who receive an "Unsatisfactory" performance rating on any of the remaining benchmarks. These adverse actions include discipline, reassignment, and termination.

131.    By imposing the Enforcement Metrics Policy, Defendants have given immigration judges a personal pecuniary interest in the outcome of the cases they adjudicate, compromising their impartiality in each and every case.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

132.   The Enforcement Metrics Policy also conflicts with current EOIR policy preventing immigration judges from having a financial interest in their adjudications. *See* Ethics and Professionalism Guide for Immigration Judges (Jan. 2011) at Chap. XVI ("An Immigration Judge is prohibited from participating in any matter in which he or she has a financial interest.").

133.   An immigration judge who grants a continuance for additional testimony, postpones a hearing because a witness was unavailable, takes a matter under advisement to consider the evidence, or takes any other action that falls short of case completion could lose her job.

134.   The Enforcement Metrics Policy requires immigration judges to prioritize speed in a manner that is disconnected from the specific facts and circumstances of each case.

135.   For example, Benchmark 5 requires immigration judges to complete individual merits hearings on the initial scheduled hearing date in 95% of their cases. This metric will regularly undermine an asylum applicant's statutory right to "have a reasonable opportunity to examine the evidence against [her], to present evidence on [her] own behalf, and to cross-examine the witnesses presented by the Government." 8 U.S.C. § 1229a(b)(4). Thus, notwithstanding the circumstances of a particular case, an immigration judge striving to meet her benchmarks would never be able to continue a hearing or extend a hearing to allow for the completion of testimony, to collect or analyze additional evidence, or to facilitate attorney-client consultation.

136.   Additionally, Benchmark 6 requires an IJ to complete 100% of reasonable fear reviews on the initial hearing date.[71] The only exception is where DHS fails to produce the

---

[71] IJ Performance Measures, 2018 Executive Office for Immigration Review Legal Training Program, AILA Doc. No. 18073084 (July 30, 2018).  A noncitizen is subject to a reasonable fear interview if she claims a fear of return to her country of origin after either the government has reinstated a prior order of removal or she has been ordered removed in expedited proceedings after having been convicted of an aggravated felony.  *See* 8 C.F.R. § 208.31.  If an asylum officer finds that the noncitizen does not meet the standard for demonstrating a "reasonable fear" of persecution or torture, the noncitizen may seek review by an immigration judge.  8 C.F.R. § 1208.31(g).

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

respondent on the date of the hearing. Thus, an immigration judge striving to meet her benchmarks would never be able to continue a reasonable fear review, even if exceptional circumstances warranted a continuance to allow the respondent to collect additional evidence or to facilitate attorney-client consultation.

137.    The Attorney General has effectively directed that an immigration judge should consider the Enforcement Metrics Policy when deciding whether to grant a continuance. *See Matter of L-A-B-R*,- 27 I. & N. Dec. 405, 415 (A.G. 2018) (expressly holding that judges should consider "concerns of administrative efficiency" when evaluating motions to continue).

138.    In conjunction with the Administration's public condemnation of the asylum system, asylum seekers, and their legal representatives, the Enforcement Metrics Policy pressures immigration judges to order removal instead of granting asylum or other relief.

139.    The Enforcement Metrics Policy has created a constitutionally intolerable risk of actual bias in the immigration courts.

140.    The Enforcement Metrics Policy imposes an increased probability of bias for newly-hired judges, who are subject to a two-year probationary period. Probationary immigration judges have an additional pecuniary interest in complying with the Enforcement Metrics Policy in order to ensure that their tenure extends beyond probation.

141.    Additionally, although the stated purpose of the Enforcement Metrics Policy is to minimize the immigration court backlog, the Policy is not rationally related to the goal of backlog reduction.

142.    On April 6, 2017, EOIR completed a year-long study (the "EOIR Legal Case Study") of the immigration courts that identified how the case backlog was created and made recommendations to solve it.

41 - COMPLAINT

143.    The study found that "inefficient practices and case processing due to understaffing, issues relating to workforce culture and careers, deficient or ineffective processes, and external dependencies" were the cause of the backlog.

144.    The EOIR Legal Case Study recommended that EOIR should not engage in political hiring; rather EOIR should "[b]roaden hiring pools and outreach programs to increase diversity of experience among Immigration Judges."

145.    The EOIR Legal Case Study recommended, among other things, that EOIR "[i]mplement performance reviews in line with a judicial performance review model that emphasizes process over outcomes and [places] high priority on judicial integrity and independence." The study recommended that EOIR "[i]nstitute mandatory continuous training on temperament, asylum adjudication, and updates to immigration law for all IJs."[72]

146.    Without any reasoned explanation, the Attorney General rejected the EOIR Legal Case Study's recommendations and instead adopted the Enforcement Metrics Policy, which is the functional opposite of the EOIR Legal Case Study recommendations.

**2.    FAMU Directive**

147.    On November 16, 2018, Defendant McHenry issued a directive that created a prioritized docket for "family unit" ("FAMU") cases in ten cities nationwide. As of October 2019, over 95,000 cases are on the FAMU docket.[73]

148.    On information and belief, Defendants intend to expand the FAMU Directive to apply across all immigration courts; indeed, several of its terms already apply beyond the ten cities where the full directive is currently being piloted.

---

[72] DOJ Executive Office for Immigration Review, Legal Case Study Summary Report (Apr. 6, 2017) at 21, https://www.americanimmigrationcouncil.org/sites/default/files/foia_documents/immigration_judge_performance_metrics_foia_request_booz_allen_hamilton_case_study.pdf. (Last accessed Dec. 17, 2019).
[73] "Family Unit" Data for Selected Courts, *Executive Office for Immigration Review* (last updated Oct. 28, 2019), https://www.justice.gov/eoir/page/file/1187416/download (Last accessed Dec. 12, 2019).

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

149.    "Family Unit" is a term created by the Department of Homeland Security and adopted by EOIR as an "apprehension classification" used when an adult noncitizen parent or legal guardian accompanied by his or her own minor child seeks asylum at the U.S. southern border.

150.    Notices to Appear, the initiating charging documents in removal proceedings, are marked with "FAMU," "FA," or a similar designation to indicate that respondents were classified as a Family Unit when apprehended at the U.S. southern border.

151.    In cases subject to the FAMU Directive, immigration judges are hamstrung by mandatory timelines. On information and belief, immigration courts in the ten pilot cities must schedule an initial hearing within 30 days of the filing of the Notice to Appear, schedule an evidentiary (or "merits") hearing within six months of the filing of the Notice to Appear, and complete the case with a written or oral decision within 365 days of the filing of the Notice to Appear. On information and belief, immigration judges in the ten pilot cities must set merits hearings in FAMU-designated cases for the next available open live or video teleconference hearing slot, even if it means scheduling the hearing before a different judge or a different court altogether.

152.    On information and belief, in the ten pilot cities, an immigration judge may authorize only a single continuance of no more than 45 days in a FAMU-designated case, regardless of the facts or circumstances of the individual case. In no other type of case is such a limitation imposed on immigration judges' ability to exercise discretion by granting a continuance.

153.    All immigration courts, including those outside the ten pilot cities, must complete FAMU-designated cases within 365 days of the filing of the Notice to Appear, regardless of the individual facts of the case.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

154.    In conjunction with the Administration's public condemnation of Central American families at the border—such as its refrain that "an overwhelming majority of cases don't qualify for relief"[74]—and repeated instructions to immigration judges that they are law enforcement officers, the "FAMU" or similar designation indicates to the immigration judge that the case must be hastened through the system with little regard for individualized facts or circumstances.

### DEFENDANTS' POLICIES AND PRACTICES HARM PLAINTIFFS

155.    Plaintiffs are nonprofit organizations that were established to provide or facilitate the provision of legal and other services to noncitizens fleeing persecution. Defendants' failure to faithfully execute the asylum statute and the INA's case-by-case adjudication standards have impaired Plaintiffs' ability to provide these services in a meaningful way and thereby frustrated their missions.

156.    Plaintiffs provide legal services by representing, advising, accompanying, and otherwise supporting persons fleeing persecution on applications for asylum, in-court presentation of their claims, requests for release from detention, and other immigration relief available under law.

157.    Plaintiffs employ lawyers, accredited representatives, paralegals, coordinators, software engineers, and others in order to fulfill their missions.

158.    Plaintiffs accomplish their missions through at least four types of programming: providing direct representation through staff attorneys or accredited representatives; supporting unrepresented asylum applicants by providing limited legal services; screening, placing and supporting cases through vetted pro bono attorneys; and supporting organizations representing asylum-seekers with technical and case support.

---

[74] "The goal is to 'disincentivize families — where an overwhelming majority of cases don't qualify for relief, but instead end with removal orders — from making the treacherous journey to the United States,' Immigration and Customs Enforcement said in a statement." https://www.apnews.com/1e3d49caa25940a88de13306af0ead78 (Last accessed Dec. 12, 2019).

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

159.    As described below, Defendants' practices and policies have directly frustrated Plaintiffs' missions by substantially or totally nullifying the impact of their programming and causing their resources and efforts to be squandered.

160.    Defendants' practices and policies have also forced Plaintiffs to divert resources from their programming to re-design programs and systems, re-train staff and volunteers, re-write written guides and materials, contact clients to explain new policies and practices, and engage in increasing community education, monitoring, and advocacy work necessary to pursue their missions in the face of Defendants' illegal practices and policies.

## A.    The Reality of Trying to Practice Law in Immigration Courts

161.    All Plaintiffs provide or facilitate representation in asylum-free zones. Plaintiff SFDP, for example, spent months preparing an asylum case for the El Paso immigration court. Before the merits hearing, the immigration judge told SFDP's attorney that he had not read the briefing and was going to deny the case, because he did not grant "that type of case." SFDP has also invested extensive programmatic resources into producing training materials to support pro bono attorneys in the El Paso immigration court, only to find their recruitment efforts futile as attorneys are unwilling to volunteer to practice in such a hostile court environment.

162.    The long delays caused by the impenetrable immigration court backlog significantly impair certain Plaintiffs' abilities to provide and facilitate meaningful representation to individuals seeking asylum. Plaintiff Law Lab has found recruitment of long-term pro bono legal representation in Atlanta nearly impossible given the years-long wait time for hearings. Law Lab staff engages in targeted training of pro bono attorneys, only to have to repeat that training when cases are unexpectedly rescheduled and those attorneys must withdraw before attending a single hearing. Law Lab therefore must maintain a rotating bench of pro bono attorneys who require training and support, but who will never provide substantive volunteer service due to unreasonable delays and unpredictable hearing schedules.

45 - COMPLAINT

163.     Defendants' Enforcement Metrics Policy results in additional squandering of Plaintiffs' resources and similarly impedes their representation efforts. For example, in El Paso, where Plaintiffs Las Americas and SFDP operate, judges double-book merits hearings in each four-hour time slot, leaving Plaintiffs with only two hours to present complex asylum claims, including live testimony, almost always through an interpreter. Plaintiff Law Lab wastes resources preparing for hearings in Portland that are similarly cut off after a set amount of time regardless of whether an attorney has fully presented a client's asylum case. Plaintiffs have also suffered harm from judges' unwillingness to grant continuances, regardless of the circumstances in an individual case. An attorney at Plaintiff SFDP recently appeared at a merits hearing on behalf of a colleague in the Otero Immigration Court, who had entered her appearance on the case only the day before. The judge denied the attorney's continuance request, resulting in the attorney representing a client she had just met. The judge was abusive, mocking, and aggressive throughout the hearing and ultimately denied the case. Plaintiff Las Americas staff has been put under severe strain by judges' inflexible timelines; in one instance, an attorney was given only six days to prepare a new client's entire asylum case.

## B.     Defendants Have Impaired Plaintiffs' Direct Representation Programs

164.     All Plaintiffs achieve their missions, in part, by providing direct representation to noncitizens seeking asylum in immigration court proceedings.

165.     In the course of direct representation, Plaintiffs conduct in-depth interviews with clients, provide advice on available relief, undertake extensive factual investigation and legal research, compile evidence, prepare clients and witnesses to testify, develop arguments, and conduct hearings, among other things.

166.     Given the near-total denial of asylum cases in asylum-free zones, including El Paso, Atlanta, Charlotte, and Houston, Plaintiffs can reasonably expect immigration judges to deny asylum in every case, regardless of its merit and despite Plaintiffs' zealous advocacy. This

46 - COMPLAINT

reality forces Plaintiffs to divert additional resources in nearly every case to support the inevitable appeal of the immigration judge's decision and, where possible, to file additional applications for relief other than asylum.

167.    In some asylum-free zones, immigration judges directly impede Plaintiffs' direct representation efforts by imposing unlawful local operating procedures that, among other things, restrict their access to case files, prevent them from facilitating expert testimony by categorically denying motions for telephonic appearances, and deny them adequate time to gather requisite evidence.

168.    Defendants' maintenance and expansion of asylum-free zones unravels Plaintiffs' direct representation efforts. Because judges in these immigration courts do not abide by the asylum statute or the INA's case-by-case adjudication standards, Plaintiffs' time-consuming efforts to provide zealous representation—including consulting with clients, developing robust individualized records, and formulating legal arguments—are nullified, and the resources Plaintiffs devote to these endeavors are wasted.

169.    Data supports Plaintiffs' experiences. In 2019, respondents in immigration court were 21.4% less likely to have their asylum cases denied if they had legal representation. In asylum-free zones, however, respondents with legal representation were only 3.7% less likely to have their asylum cases denied.[75] This data reflects what Plaintiffs already know: that asylum-free zones significantly impair attorneys' ability to provide effective legal services.

170.    Defendants' push toward prejudgment of cases and biased decision-making additionally harms Plaintiff SPLC's work in bond proceedings. Because of immigration judges' bias against asylum seekers in these jurisdictions, SPLC attorneys spend inordinate amounts of time and resources to create unusually extensive bond applications. This frustrates SPLC's

---

[75] Based on Plaintiffs' analysis of EOIR data obtained by TRAC Immigration for fiscal year 2019. *See* TRAC Immigration, *Asylum Decisions*. Asylum-free zones refer to immigration courts that denied at least 85% of asylum claims and decided at least fifty asylum claims during this period.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

mission because bond applications in these locations are so resource-intensive as to prevent mass bond representation in the locations where SPLC's SIFI project operates.

171.    Defendants' expansion of the immigration courts' case backlog also undermines Plaintiffs Las Americas, SFDP, ASAP, and Law Lab's direct representation efforts. By arbitrarily extending case timelines, Defendants make it vastly more challenging to provide and sustain timely legal assistance to clients.

172.    Through the Enforcement Metrics Policy, which implicates immigration judges' personal financial interests, Defendants further impair all Plaintiffs' abilities to provide direct representation and advice. Where immigration judges are pressured to decide cases based on Case Quotas, Benchmarks, and Remand Rates, Plaintiffs' missions are frustrated because they are powerless to address or influence these extra-record factors.

**C.    Defendants Have Impaired Plaintiffs' Limited Legal Service Programs**

173.    Plaintiffs Las Americas, Law Lab, CLINIC, and ASAP's missions include programs to provide limited legal services to pro se respondents in asylum proceedings.

174.    These Plaintiffs' pro se programming includes holding workshops for trial preparation, review of pro se submissions, and providing tailored materials to orient asylum seekers regarding immigration court proceedings and bolster their ability to represent themselves in court.

175.    Defendants' maintenance and expansion of asylum-free zones impairs these Plaintiffs' limited legal service programs. Because judges in these immigration courts do not abide by the asylum statute or the INA's case-by-case adjudication standards, these Plaintiffs' time-consuming efforts to provide meaningful pro se support—including developing legally robust resources, hosting case preparation workshops, and helping clients prepare their individual case materials—are nullified, and the resources these Plaintiffs devote to these endeavors are wasted.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

176.     Defendants' maintenance and expansion of the asylum case backlog causes long delays that impair Plaintiffs Law Lab and ASAP's ability to provide pro se support services. Due to backlog-related delays, respondents must wait for months, or even years, for their initial hearings where they receive their first orientation to the court process. Respondents' resulting case complications demand increased attention and resources by these Plaintiffs, who provide pro se support services.

177.     Through the Enforcement Metrics Policy, which implicate immigration judges' personal financial interests, Defendants further nullify the impact of these Plaintiffs' pro se support. Because immigration judges are pressured to decide cases based on extra-record considerations, the limited legal services these Plaintiffs provide have no bearing on the ultimate outcome of a case.

178.     Additionally, by directing judges to hear cases on an expedited timeline regardless of case-by-case adjudication requirements, Defendants' FAMU docket impairs Plaintiff Law Lab's ability to provide limited legal services by minimizing their window to offer workshops and support to pro se respondents.

**D.      Defendants Have Impaired Plaintiffs' Pro Bono Programs**

179.     Plaintiffs Law Lab, CLINIC, SFDP, and SPLC operate or support large pro bono direct representation projects in the immigration courts. These pro bono projects provide critical deportation defense services that are central to these Plaintiffs' individual missions.

180.     Defendants' maintenance and expansion of asylum-free zones impairs Plaintiffs Law Lab, CLINIC, and SFDP's pro bono representation efforts. Because judges in these immigration courts do not abide by the asylum statute or the INA's case-by-case adjudication standards, these Plaintiffs' time-consuming efforts to facilitate meaningful pro bono representation—including recruiting pro bono attorneys, offering training and tactical assistance,

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

developing legal templates and resources, and reviewing legal arguments and asylum briefs—are impaired, and the resources these Plaintiffs devote to these endeavors are wasted.

181.    Plaintiffs Law Lab, CLINIC, and SFDP are also unable to recruit and retain a sufficient number of volunteer attorneys to support their pro bono representation programs because attorneys are hesitant to submit to the hostility and futility that characterizes asylum-free zones.

182.    Defendants' push toward prejudgment of cases and biased decision-making additionally harms Plaintiff CLINIC's work mentoring pro bono attorneys in bond proceedings. CLINIC has spent an inordinate amount of time and resources navigating exceptional delays on bond hearing scheduling and categorical denials of counsel's motions to appear at bond hearings telephonically.

183.    Defendants' maintenance and expansion of the immigration court backlog also poses a major threat to the viability of Plaintiffs CLINIC, Law Lab, and SFDP's pro bono programs. Since at least 2017, the immigration court backlog—and the consequent unpredictability of hearing schedules—has impaired these Plaintiffs' abilities to accept and place cases for pro bono representation through their programs.

184.    In some cases, years-long delays have caused Plaintiffs Law Lab and SFDP's representation programs to lose pro bono attorneys who move to new firms or leave the field. Consequently, these Plaintiffs' resources are diverted to reassignment of pending cases and training of new pro bono attorneys rather than expanding their dockets to serve additional asylum seekers.

185.    Plaintiffs Law Lab and SFDP are unable to recruit a sufficient number of volunteer attorneys to sustain their pro bono representation programs because prospective pro bono attorneys are deterred by the years-long scheduling delays caused by the backlog.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

186.     In a purported effort to manage the immigration courts' backlogged dockets, Defendants have repeatedly and unilaterally canceled hearings in cases managed through Plaintiffs CLINIC, Law Lab, SFDP, and SPLC's pro bono programs. These cases return to the backlog, resulting in additional delays.

187.     When Defendants cancel hearings that are ready to move forward, Plaintiffs CLINIC, Law Lab, SFDP, and SPLC's pro bono program resources used to prepare testimony, evidence, witnesses, and briefing are squandered.

188.     Through the Enforcement Metrics Policy, which implicates immigration judges' personal financial interests, Defendants further nullify the impact of Plaintiffs CLINIC, Law Lab, SFDP, and SPLC's pro bono representation programs. Because immigration judges are pressured to decide cases based on extra-record considerations, these Plaintiffs' missions are frustrated, as their resources, training, and tactical support to pro bono attorneys have minimal impact on case outcomes.

189.     For Plaintiff Law Lab, the strict nature of the FAMU Directive's case processing timelines also substantially impairs its pro bono program. Given the limited availability of continuances for attorney preparation, the Directive functionally requires a pro bono placement before the first hearing in order to adequately screen an individual for relief and prepare for filing deadlines. However, a respondent often does not learn about her rights in proceedings or how to find counsel until her first court appearance. Nonetheless, under the strict terms of the Directive, applications for relief need to be filed at the next appearance or be deemed abandoned.

**E.     Defendants Have Impaired Plaintiffs' Technical Assistance and Support Programs**

190.     To further their missions, Plaintiffs Law Lab, ASAP, and CLINIC's programming includes technical assistance to other removal defense attorneys, including the creation and dissemination of practice advisories, process-related guidance, and legal templates. These

51 - COMPLAINT

Plaintiffs have also created guides, videos, and other resources to help explain asylum law and immigration court proceedings to unrepresented respondents in removal proceedings.

191.    By enabling the maintenance and expansion of asylum-free zones, Defendants have impaired these Plaintiffs' abilities to provide useful legal resources.

192.    Similarly, Defendants' Enforcement Metrics Policy and FAMU Directive, both of which enable judges to decide cases based on extra-legal factors, impair Plaintiffs' abilities to provide useful technical assistance and mentorship to other removal defense attorneys.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### DECLARATORY AND INJUNCTIVE RELIEF AGAINST THE ATTORNEY GENERAL

**The Attorney General's Perpetuation of Asylum-Free Zones and the Immigration Court Backlog Violate the Take Care Clause of the U.S. Constitution and the Immigration and Nationality Act's Case-by-Case Adjudication Standards**

**On behalf of all Plaintiffs**

193.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

194.    Through the INA, Congress has delegated power to the Attorney General to oversee the Executive Office for Immigration Review. This delegated power includes the duty to take necessary actions to carry out EOIR's statutory role, 8 U.S.C. § 1103(g), and the duty to supervise immigration judges, 8 U.S.C. § 1101(b)(4).

195.    The Attorney General's duty to oversee EOIR includes uniform execution of the INA's entire statutory scheme governing case-by-case adjudication of removal proceedings. This statutory scheme requires that immigration court proceedings occur before an impartial adjudicator and establishes the right to a decision based only on the evidence presented by the parties on the record, the right to present and examine evidence and cross-examine government

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

witnesses, and the right to representation at no cost to the government. 8 U.S.C.

§§ 1229a(b)(4)(A)-(B), (c)(1)(A), (c)(4)(B).

196.     Under the Take Care Clause, U.S. Const. Art. II, § 3, the President must "take Care that the laws are faithfully executed." This duty extends to the Attorney General, who receives his delegated executive power from the President.

197.     The Attorney General has violated the Take Care Clause because he has suspended the INA's case-by-case adjudication standards through the abuse of authority and mismanagement of the immigration courts. The failure to faithfully execute this statutory scheme has resulted in the persistence and proliferation of asylum-free zones and the immigration court backlog.

198.     The Attorney General's violations of the INA and the Take Care Clause have deprived Plaintiffs of a lawful adjudicatory forum in which to provide legal representation, frustrated their core missions, impaired their efforts, and forced them to divert substantial resources away from their existing programs.

199.     An actual controversy has arisen and now exists between Plaintiffs and Defendants. Plaintiffs contend that the Attorney General's failure to establish and oversee an immigration court system that meets the INA's case-by-case adjudication standards violates the Take Care Clause. Plaintiffs seek a judicial determination as to the rights and obligations of the parties with respect to this controversy.

200.     Plaintiffs do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief requiring the Attorney General to comply with his duties as prescribed by Congress through the INA by taking specific corrective actions to ameliorate and mitigate the dysfunction of the immigration court system.

53 - COMPLAINT

**SECOND CLAIM FOR RELIEF**
**DECLARATORY AND INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS**

**Defendants' Weaponization of the Immigration Court System Violates the Immigration and Nationality Act's Impartial Adjudicator Requirement**

**On behalf of all Plaintiffs**

201.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

202.    The INA requires that an impartial adjudicator preside over removal hearings and decide cases based on case-specific evidence. *See, e.g.*, 8 U.S.C. § 1229a; *Wong Yang Sung*, 339 U.S. at 50. The INA necessarily incorporates the impartial adjudicator guarantee embodied in the Due Process Clause of the Fifth Amendment; therefore, the INA's impartial adjudicator requirement is not met when there is a constitutionally intolerable probability of actual bias in immigration court adjudication. *See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 882–84 (2009); *Withrow v. Larkin*, 421 U.S. 35, 46–47 (1975).

203.    Applicable regulations state that "[i]n all cases, immigration judges shall seek to resolve the questions before them in a timely and impartial manner consistent with the [INA] and regulations." *See* 8 C.F.R. § 1003.10(b). Immigration judges are further directed to "exercise their independent judgment and discretion" in deciding individual cases, "subject to the applicable governing standards," and to engage in "the expeditious, fair, and proper resolution of matters." *See* 8 C.F.R. §§ 1003.10(b), 1003.12.

204.    In direct contravention of the INA, Defendants have impeded judges from serving as impartial adjudicators. Instead, Defendants have pushed them to prejudge cases by imposing the Enforcement Metrics Policy; by implementing the FAMU Directive; and by fostering an adjudicatory system that is permeated by bias against immigrants, including by perpetuating asylum-free zones. The Enforcement Metrics Policy and the FAMU Directive require judges to consider factors unrelated to the facts and merits of cases they decide. The Enforcement Metrics

54 - COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

Policy also gives judges a personal pecuniary interest in the prompt adjudication of the claims before them. Defendants' pervasive hostility toward asylum seekers drives immigration judges to negatively prejudge asylum claims and bond motions. These actions by the Defendants, either individually or collectively, create a constitutionally and statutorily intolerable probability of actual bias in immigration court adjudication.

205.   Defendants' violations of the INA have frustrated Plaintiffs' core missions, impaired their efforts, and forced them to divert substantial resources away from their existing programs to counteract EOIR's obstruction of impartial adjudication.

206.   An actual controversy has arisen and now exists between Plaintiffs and Defendants. Plaintiffs contend that Defendants have violated the INA by implementing the Enforcement Metrics Policy and the FAMU Directive, by perpetuating asylum-free zones, and by otherwise driving judges to prejudge asylum claims. Plaintiffs seek a judicial determination as to the rights and obligations of the parties with respect to this controversy.

207.   Plaintiffs do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from continuing to thwart the impartial adjudication of asylum claims.

### THIRD CLAIM FOR RELIEF
### DECLARATORY AND INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS

**Immigration Judge Enforcement Metrics Policy Violates the Administrative Procedure Act Because It Is Not in Accordance with Law and in Excess of Statutory Authority**

#### On behalf of all Plaintiffs

208.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

209.   Under the APA, "the reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law: . . . [or] in excess of

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C.

§§ 706(2)(A), (C).

210.   The INA requires that an impartial adjudicator preside over removal hearings and decide cases based on case-specific evidence. *See, e.g.*, 8 U.S.C. § 1229a; *Wong Yang Sung*, 339 U.S. at 50. The INA necessarily incorporates the impartial adjudicator guarantee embodied in the Due Process Clause of the Fifth Amendment; therefore, the INA's impartial adjudicator requirement is not met when there is a constitutionally intolerable probability of actual bias in immigration court adjudication. *See Caperton*, 556 U.S. at 882–84; *Withrow*, 421 U.S. at 46–47.

211.   Applicable regulations state that "[i]n all cases, immigration judges shall seek to resolve the questions before them in a timely and impartial manner consistent with the [INA] and regulations." *See* 8 C.F.R. § 1003.10(b). Immigration judges are further directed to "exercise their independent judgment and discretion" in deciding individual cases, "subject to the applicable governing standards," and to engage in "the expeditious, fair and proper resolution of matters." *See* 8 C.F.R. §§ 1003.10(b), 1003.12.

212.   By imposing the Enforcement Metrics Policy, Defendants have acted in a manner that is not in accordance with law and in excess of their statutorily prescribed authority in violation of section 706(2) of the APA. *See* 5 U.S.C. §§ 706(2)(A), (C).

213.   Because the INA and its implementing regulations require that immigration judges act as impartial adjudicators and refrain from prejudging cases and claims, the Enforcement Metrics Policy is "not in accordance with law" because it requires immigration judges to consider factors unrelated to the facts and merits of cases they decide and gives judges a pecuniary interest in the adjudication of the claims before them. The Enforcement Metrics Policy thus creates a constitutionally and statutorily intolerable probability of actual bias in immigration court adjudication. The Policy thereby prevents Plaintiffs from providing meaningful legal assistance.

56 - COMPLAINT

214.    None of the applicable statutory or regulatory provisions authorizes Defendants to impose performance metrics that require immigration judges to consider factors unrelated to the facts and merits of cases they decide and give them a pecuniary interest in the timing of the completion of each case.

215.    Defendants' Enforcement Metrics Policy constitutes a final agency action under 5 U.S.C. § 704 that is reviewable under 5 U.S.C. §§ 702 and 706.

216.    By implementing the Enforcement Metrics Policy, Defendants have frustrated Plaintiffs' core missions, impaired their efforts, and forced them to divert substantial resources away from their existing programs.

217.    An actual controversy has arisen and now exists between Plaintiffs and Defendants. Plaintiffs contend that Defendants' Enforcement Metrics Policy, as well as the conduct and practices carried out in reliance on the Policy, violate the INA and the APA. Plaintiffs seek a judicial determination as to the rights and obligations of the parties with respect to this controversy.

218.    Plaintiffs do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from continuing to implement their unlawful Enforcement Metrics Policy.

## FOURTH CLAIM FOR RELIEF
## DECLARATORY AND INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS

**Immigration Judge Enforcement Metrics Policy Violates the Administrative Procedure Act Because It Is Arbitrary and Capricious**

### On behalf of all Plaintiffs

219.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

220.    The APA provides that courts "shall … hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

221.    The Enforcement Metrics Policy is arbitrary and capricious because, in adopting it, Defendants failed to articulate a reasoned explanation for their decision, which represents a change in the agency's longstanding policy; required immigration judges to consider factors in adjudicating removal cases that Congress did not intend for them to consider; entirely failed to consider important aspects of the problem of immigration court backlogs; and provided an explanation so implausible that it could not be ascribed to agency expertise.

222.    The Enforcement Metrics Policy is arbitrary and capricious for the additional reason that it is intended to drive judges toward prejudgment of immigration court cases and to systematize the denial of asylum claims regardless of their merits.

223.    By implementing the Enforcement Metrics Policy, Defendants have frustrated Plaintiffs' core missions, impaired their efforts, and forced them to divert substantial resources away from their existing programs.

224.    An actual controversy has arisen and now exists between Plaintiffs and Defendants. Plaintiffs contend that Defendants' Enforcement Metrics Policy, as well as the conduct and practices carried out in reliance on the Policy, violate the APA. Plaintiffs seek a judicial determination as to the rights and obligations of the parties with respect to this controversy.

225.    Plaintiffs do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from continuing to implement their unlawful Enforcement Metrics Policy.

58 - COMPLAINT

## FIFTH CLAIM FOR RELIEF
## DECLARATORY AND INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS

**The FAMU Directive Violates the Administrative Procedure Act Because It Is Not in Accordance with Law and in Excess of Statutory Authority**

**On behalf of Plaintiffs CLINIC and Law Lab**

226.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

227.     Under the APA, "the reviewing court shall … hold unlawful and set aside agency action, finding, and conclusions found to be . . . not in accordance with law [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C).

228.     The INA requires that an impartial adjudicator preside over removal hearings and decide cases based on case-specific evidence. *See, e.g.*, 8 U.S.C. § 1229a; *Wong Yang Sung*, 339 U.S. at 50. The INA necessarily incorporates the impartial adjudicator guarantee embodied in the Due Process Clause of the Fifth Amendment; therefore, the INA's impartial adjudicator requirement is not met when there is a constitutionally intolerable probability of actual bias in immigration court adjudication. *See Caperton*, 556 U.S. at 882–84; *Withrow*, 421 U.S. at 46–47.

229.     Applicable regulations state that "[i]n all cases, immigration judges shall seek to resolve the questions before them in a timely and impartial manner consistent with the [INA] and regulations." *See* 8 C.F.R. § 1003.10(b). Immigration judges are further directed to "exercise their independent judgment and discretion" in deciding individual cases, "subject to the applicable governing standards," and to engage in "the expeditious, fair and proper resolution of matters." *See* 8 C.F.R. §§ 1003.10(b), 1003.12.

230.     Defendants, by implementing the FAMU Directive, have acted in a manner not in accordance with law and in excess of their statutorily prescribed authority in violation of section 706(2) of the APA. *See* 5 U.S.C. §§ 706(2)(A), (C).

59 - COMPLAINT

231.    Through the FAMU Directive, Defendants stigmatize cases of recently-arrived families and impose rigid timelines that curtail important procedural protections. None of the applicable statutory or regulatory provisions authorizes Defendants to permit prejudgment of cases involving family units applying for asylum or other relief.

232.    By imposing a directive that contravenes the INA case-by-case adjudication standards, Defendants have acted and continue to act not in accordance with law.

233.    The FAMU Directive was authorized by Defendants and constitutes a final agency action under 5 U.S.C. § 704 that is reviewable under 5 U.S.C. §§ 702 and 706.

234.    By implementing the FAMU Directive, Defendants have frustrated the core mission of Plaintiffs CLINIC and Law Lab, impaired their efforts, and forced them to divert substantial resources away from their existing programs.

235.    An actual controversy has arisen and now exists between Plaintiffs CLINIC and Law Lab and Defendants. Plaintiffs CLINIC and Law Lab contend that Defendants' FAMU Directive, as well as the conduct and practices carried out in reliance on it, violate the INA and the APA. Plaintiffs CLINIC and Law Lab seek a judicial determination as to the rights and obligations of the parties with respect to this controversy.

236.    Plaintiffs CLINIC and Law Lab do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from continuing to implement the FAMU Directive.

60 - COMPLAINT

## SIXTH CLAIM FOR RELIEF
## DECLARATORY AND INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS

**The FAMU Directive Violates the Administrative Procedure Act Because It Is Arbitrary**

**and Capricious**

**On behalf of Plaintiffs CLINIC and Law Lab**

237.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

238.     The APA provides that courts "shall … hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

239.     The FAMU Directive is arbitrary and capricious because it requires immigration judges to consider factors in adjudicating removal cases that Congress did not intend for them to consider and drives judges toward prejudgment of family unit cases in violation of the INA's case-by-case adjudication standards.

240.     By implementing the FAMU Directive, Defendants have frustrated the core missions of Plaintiffs CLINIC and Law Lab, impaired their efforts, and forced them to divert substantial resources away from their existing programs.

241.     An actual controversy has arisen and now exists between Plaintiffs CLINIC and Law Lab and Defendants. Plaintiffs CLINIC and Law Lab contend that Defendants' FAMU Directive, as well as the conduct and practices carried out in reliance on it, violate the INA and the APA. Plaintiffs CLINIC and Law Lab seek a judicial determination as to the rights and obligations of the parties with respect to this controversy.

242.     Plaintiffs CLINIC and Law Lab do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from continuing to implement the FAMU Directive.

61 - COMPLAINT

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court:

a.  Issue a judgment under 28 U.S.C. §§ 2201–02 and Fed. R. Civ. P. 57 declaring that:

  1.  The Attorney General's perpetuation of asylum-free zones and the immigration court backlog suspends the INA's case-by-case adjudication standards, and thereby violates the Take Care Clause, U.S. Const. Art. II, § 3;

  2.  Defendants' Enforcement Metrics Policy violates the Immigration and Nationality Act and the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (C);

  3.  Defendants' FAMU Directive violates the Immigration and Nationality Act and the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (C);

b.  Issue injunctive relief prohibiting Defendants from continuing to implement the Enforcement Metrics Policy insofar as it requires immigration judges to consider factors unrelated to the facts and merits of cases they decide, gives them a pecuniary interest in the adjudication of claims before them, and drives them to prejudge cases;

c.  Issue injunctive relief prohibiting Defendants from continuing to implement the FAMU Directive insofar as it stigmatizes cases of recently-arrived families, imposes rigid timelines that curtail important procedural protections, and drives prejudgment of family unit cases;

d.  Issue injunctive relief requiring Defendants to take specific corrective actions to ameliorate and mitigate the dysfunctionality of the immigration court system that has resulted in the asylum-free zones, immigration court backlogs, and lack of impartial adjudication;

e.  Award Plaintiffs reasonable attorney's fees, costs and other expenses pursuant to 28 U.S.C. § 2412, and other applicable law; and

62 - COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

f.    Grant any and all such other relief as the Court deems just and equitable.

DATED:  December 18, 2019                **PERKINS COIE LLP**

By:  *s/ Bryan D. Beel*
_____

**Bryan D. Beel,** OSB No. 073408
BBeel@perkinscoie.com
**Heidee Stoller,** OSB No. 072835
HStoller@perkinscoie.com
**Nathan R. Morales,** OSB No. 145763
NMorales@perkinscoie.com
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Telephone: 503.727.2000

**Stephen Manning,** OSB No. 013373
smanning@ilgrp.com
**Nadia Dahab,** OSB No. 125630
nadia@innovationlawlab.org
**Jordan Cunnings,** OSB No. 182928
jordan@innovationlawlab.org
**Tess Hellgren,** OSB No. 191622
tess@innovationlawlab.org
**INNOVATION LAW LAB**
The Oregon Trail Bldg
333 SW 5th Ave Ste 200
Portland OR  97204
Telephone: 503.241.0035

**Christopher Parker** (*pro hac vice pending*)
CParker@perkinscoie.com
505 Howard St Ste 1000
San Francisco, CA 94105
Telephone: 415.344.7000

**Melissa Crow** (*pro hac vice pending*)
Melissa.Crow@splcenter.org
**SOUTHERN POVERTY LAW
CENTER**
1101 17th Street, NW, Suite 705
Washington, DC  20036
Telephone:  202.355.4471

*Attorneys for Plaintiffs*
*Las Americas Immigrant Advocacy Center;*
*Asylum Seeker Advocacy Project; Catholic*
*Legal Immigration Network, Inc.; Innovation*
*Law Lab; Santa Fe Dreamers Project; and*
*Southern Poverty Law Center,*

**Rebecca Cassler** (*pro hac vice pending*)
Rebecca.Cassler@splcenter.org
**Gracie Willis** (*pro hac vice pending*)
Gracie.Willis@splcenter.org
**SOUTHERN POVERTY LAW
CENTER**
P.O. Box 1287
Decatur, GA 30031-1287
Telephone: 404.221.6700

63 - COMPLAINT