JOSEPH H. HUNT
Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
District Court Section
EREZ R. REUVENI
Assistant Director
BRIAN C. WARD
Senior Litigation Counsel
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel.: (202) 616-9121
Email: brian.c.ward@usdoj.gov

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | | |
|---|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER; ASYLUM SEEKER ADVOCACY PROJECT; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.; INNOVATION LAW LAB; SANTA FE DREAMERS PROJECT; and SOUTHERN POVERTY LAW CENTER, | ) ) ) ) ) ) ) ) | CASE NO. 3:19-cv-02051-SB |
| Plaintiffs, | ) ) | |
| v. | ) ) | **DEFENDANTS' MOTION TO DISMISS** |
| DONALD TRUMP, in his official capacity as President of the United States; WILLIAM BARR, in his official capacity as Attorney General of the United States; U.S. DEPARTMENT OF JUSTICE; EXECUTIVE OFFICE FOR IMMIGRAITON REVIEW; and JAMES McHENRY, in his official capacity as Director of EOIR, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

# TABLE OF CONTENTS

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7-1 ........................................................ 1

MOTION TO DISMISS ......................................................................................................................... 1

   I.     INTRODUCTION .......................................................................................................... 1

   II.    BACKGROUND ............................................................................................................ 4

   III.   LEGAL STANDARD .................................................................................................... 5

   IV.   ARGUMENT .................................................................................................................. 6

        A.  Plaintiffs lack Article III standing. .............................................................. 6

        B.  Plaintiffs are outside the zone of interests of the statutes they seek to enforce. ........ 14

        C.  The INA limits jurisdiction over challenges to the conduct of removal proceedings and prevents Plaintiffs from establishing jurisdiction here ................... 16

        D.  Plaintiffs fail to state a claim upon which relief can be granted. ............................... 22

        E.  The Complaint should be dismissed for improper venue. .......................................... 32

   V.     CONCLUSION ............................................................................................................. 35

# TABLE OF AUTHORITIES

## Cases

*Aguilar v. ICE*,
510 F.3d 1 (1st Cir. 2007) ........................................................................17, 26

*Alvarez v. Sessions*,
338 F. Supp. 3d 1042 (N.D. Cal. 2018) .......................................................19

*Am. Diabetes Ass'n v. United States Dep't of the Army*,
938 F.3d 1147 (9th Cir. 2019).......................................................................12

*Am. Immigration Lawyers Ass'n v. Reno*,
199 F.3d 1352 (D.C. Cir. 2000) .....................................................................9

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*,
659 F.3d 13 (D.C. Cir. 2011) .......................................................................11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................6, 29

*Asylum Seeker Advocacy Project v. Barr*,
409 F. Supp. 3d 221 (S.D.N.Y. 2019)..............................................17, 19, 20

*Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*,
571 U.S. 49 (2013) ...........................................................................6, 31, 32

*Bains v. Schiltgen*,
No. 97-2573, 1998 WL 204977 (N.D. Cal. Apr. 21, 1998) ..........................20

*Baker v. United States*,
817 F.2d 560 (9th Cir. 1987)........................................................................24

*Barr v. East Bay Sanctuary Covenant*,
140 S. Ct. 3 (2019) ......................................................................................25

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................6, 25

*Bennett v. Spear*,
520 U.S. 154 (1997) .....................................................................................30

*Bhasin v. Gonzales*,
423 F.3d 977 (9th Cir. 2005)........................................................................19

*Biwot v. Gonzales*,
   403 F.3d 1094 (9th Cir. 2005)...................................................................................19

*Block v. Cmty. Nutrition Inst.*,
   467 U.S. 340 (1984) ...............................................................................................20, 21

*Bos. Telecommunications Grp., Inc. v. Wood*,
   588 F.3d 1201 (9th Cir. 2009).................................................................................34

*C.J.L.G. v. Barr*,
   923 F.3d 622 (9th Cir. 2019)...................................................................................19

*Caperton v. A.T. Massey Coal Co.*,
   556 U.S. 868 (2009).................................................................................................29

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
   868 F.3d 104 (2d Cir. 2017).....................................................................................11

*Chacoty v. Tillerson*,
   285 F. Supp. 3d 293 (D.D.C. 2018) .........................................................................23

*Chen v. United States*,
   854 F.2d 622 (2d Cir. 1988).....................................................................................24

*Citizens for Responsibility & Ethics in Washington v. Trump*,
   302 F. Supp. 3d 127 (D.D.C. 2018) .........................................................................22

*Citizens of Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971).................................................................................................24

*City of Oakland v. Lynch*,
   798 F.3d 1159 (9th Cir. 2015).................................................................................31

*Clapper v. Amnesty Int'l*,
   568 U.S. 398, 416 (2013). .......................................................................................11

*Clarke v. Secs. Indus. Ass'n*,
   479 U.S. 388 (1987).................................................................................................14

*Coleman v. Quaker Oats Co.*,
   232 F.3d 1271 (9th Cir. 2000)..................................................................................33

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
   657 F.3d 936 (9th Cir. 2011)....................................................................................13

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*,
   482 F.3d 1157 (9th Cir. 2007)..................................................................................24

*Coughlin v. Rogers*,
130 F.3d 1348 (9th Cir. 1997)............................................................................34

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ...................................................................................6, 9

*Diaz-Covarrubias v. Mukasey*,
551 F.3d 1114 (9th Cir. 2009)............................................................................21

*Diaz-Rivas v. Att'y Gen.*,
769 F. 748 (11th Cir. 2019)............................................................................19

*DRG Funding Corp. v. HUD*,
76 F.3d 1212 (D.C. Cir. 1996) ............................................................................30

*E. Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018)............................................................................12

*East Bay Sanctuary Covenant v. Barr*,
934 F.3d 1026 (9th Cir. 2019)............................................................................25, 26

*East Bay Sanctuary Covenant v. Trump*,
No. 18-17274, 2020 WL 962336 (9th Cir. Feb. 28, 2020).......................................11, 15

*Ekimian v. I.N.S.*,
303 F.3d 1153 (9th Cir. 2002)............................................................................21

*El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review*,
959 F.2d 742 (9th Cir. 1992)............................................................................13

*Fed'n for Am. Immigration Reform, Inc. (FAIR) v. Reno*,
93 F.3d 897 (D.C. Cir. 1996) ............................................................................15

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ............................................................................12, 13

*Gill v. Whitford*,
138 S. Ct. 1916 (2018) ............................................................................7

*H.M. v. United States*,
No. 17-00786-SJO, 2017 WL 10562558 (C.D. Cal. Aug. 21, 2017)............................................33

*Haitian Refugee Ctr. v. Gracey*,
809 F.2d 794 (D.C. Cir. 1987) ............................................................................9

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)............................................................................12, 13

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ...................................................................................... 21, 22

*Hovhannisyan v. Holder,*
  577 F. App'x 748 (9th Cir. 2014) ...................................................................... 19

*Hui Ran Mu v. Barr,*
  936 F.3d 929 (9th Cir. 2019) .............................................................................. 19

*Immigrant Rights Project v. USCIS,*
  325 F.R.D. 671 (W.D. Wash. 2016) .................................................................... 15

*INS v. Legalization Assistance Project of L.A. Cty.,*
  510 U.S. 1301 (1993) ......................................................................................... 15

*J.E.F.M. v. Lynch,*
  837 F.3d 1026 (9th Cir. 2016) .......................................................... 16, 17, 18, 19

*Jaffee v. United States,*
  592 F.2d 712 (3d Cir. 1979) ............................................................................... 24

*Jennings v. Rodriguez,*
  138 S. Ct. 830 (2018) ......................................................................................... 16

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
  511 U.S. 375 (1994) ............................................................................................. 6

*La Asociacion de Trabajadores de Lake Forest v. Lake Forest,*
  624 F.3d 1083 (9th Cir. 2010) ........................................................................... 11

*Lafler v. Cooper,*
  566 U.S. 156 (2012) ........................................................................................... 28

*Lance v. Coffman,*
  549 U.S. 437 (2007) ............................................................................................. 8

*Linda R.S. v. Richard D.,*
  410 U.S. 614 (1973) ........................................................................................ 9, 10

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ...................................................................................... passim

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871, 890-93 (1990) .............................................................................. 30

*Marcello v. Bonds,*
  349 U.S. 302 (1955) ........................................................................................... 28

*Martinez v. Napolitano*,
  704 F.3d 620 (9th Cir. 2012)...............................................................................................17, 19

*Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ..................................................................................................................15

*McLeod v. INS*,
  802 F.2d 89 (3d Cir. 1986).......................................................................................................24

*Mississippi v. Johnson*,
  71 U.S. 475 (1866) ................................................................................................................3, 22

*Mountain States Legal Found. v. Glickman*,
  92 F.3d 1228 (D.C. Cir. 1996) ................................................................................................14

*National Distillers and Chemical Corp. v. Dep't of Energy*,
  487 F. Supp. 34 (1980)............................................................................................................33

*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) ..........................................................................................12, 13

*Natural Resources Defense Council, Inc. v. Tennesse Val. Authority*,
  459 F.2d 255 (1972) .................................................................................................................32

*Norton v. S. Utah Wilderness,*
  *All.*, 542 U.S. 55 (2004) ..........................................................................................................30

*O'Bannon v. Town Court Nursing Ctr.*,
  447 U.S. 773 (1980) ...................................................................................................................9

*P.L. v. U.S. Immigration and Customs Enforcement*,
  No. 1:19-CV-01336, 2019 WL 2568648 (S.D.N.Y. June 21, 2019)......................................17, 20

*PETA v. U.S. Dep't of Agriculture*,
  797 F.3d 1087, 1099 (D.C. Cir. 2015) ...............................................................................10, 11

*Reno v. American-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999) .................................................................................................................21

*Reno v. Catholic Social Servs., Inc.*,
  509 U.S. 43 (1993) .....................................................................................................................8

*Saavedra Bruno v. Albright*,
  197 F.3d 1153 (D.C. Cir. 1999) ..............................................................................................20

*Scales v. INS*,
  232 F.3d 1159 (9th Cir. 2000).................................................................................................30

*Schlanger v. Seamans*,
  401 U.S. 487 (1971) ...................................................................................32

*Sessions v. Morales-Santana*,
  137 S. Ct. 1678 (2017) ................................................................................9

*Shaughnessy v. United States ex rel. Accardi*,
  349 U.S. 280 (1955) ...................................................................................28

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ...................................................................................13

*Situ v. Leavitt*,
  No. C06–2841, 2006 WL 3734373 (N.D. Cal. Dec. 18, 2006) ..................15

*Sophia v. Decker*,
  No. 19-9599, 2020 WL 764279 (S.D.N.Y. Feb. 14, 2020) ........................17

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ........................................................................7, 8, 10

*Stafford v. Briggs*,
  444 U.S. 527 (1980) ...................................................................................32

*Sure-Tan, Inc. v. NLRB*,
  467 U.S. 883 (1984) ...................................................................................10

*Turlock Irrigation Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015) .....................................................................11

*U.S. ex rel. Knauff v. Shaughnessy*,
  338 U.S. 537 (1950) ...................................................................................23

*United States ex rel. Accardi v. Shaughnessy*,
  347 U.S. 260 (1954) ...................................................................................28

*United States ex rel. Mateski v. Raytheon Co.*,
  816 F.3d 565 (9th Cir. 2016) .......................................................................6

*United States ex rel. Solis v. Millennium Pharm., Inc.*,
  885 F.3d 623 (9th Cir. 2018) .......................................................................6

*United States v. Decoster*,
  624 F.2d 196 (D.C. Cir. 1976) ...................................................................28

*United States v. Lazarenko*,
  476 F.3d 642 (9th Cir. 2007) .......................................................................9

*United States v. Mottaz,*
 476 U.S. 834 (1986) ............................................................................................24

*United States v. Navarro-Vargas,*
 408 F.3d 1184 (9th Cir. 2005) .........................................................................22

*United States v. SCRAP,*
 412 U.S. 669 (1973) ............................................................................................14

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,*
 454 U.S. 464 (1982) ............................................................................................14

*Visendi v. Bank of America, N.A.,*
 733 F.3d 863 (9th Cir. 2013) .............................................................................34

*Warth v. Seldin,*
 422 U.S. 490 (1975) ...........................................................................................7, 9

*Washington v. Trump,*
 302 F. Supp. 3d 127 (D.D.C. 2018) .................................................................22

*Withrow v. Larkin,*
 421 U.S. 35 (1975) ..............................................................................................29

*Yang v. Reno,*
 925 F. Supp. 320 (M.D. Pa. 1996) ..............................................................24, 28

## Statutes

5 U.S.C. § 551 .........................................................................................................30

5 U.S.C. § 702 .........................................................................................................14

5 U.S.C. § 704 ...........................................................................................29, 30, 31

5 U.S.C. § 706 ...........................................................................................................2

8 U.S.C. § 1103(g)(2) ..............................................................................................23

8 U.S.C. § 1226(c) ...................................................................................................25

8 U.S.C. § 1229 .........................................................................................................4

8 U.S.C. § 1229a .................................................................................2, 4, 14, 18

8 U.S.C. § 1252(a)(2)(D) .........................................................................................21

8 U.S.C. § 1252(a)(5) ................................................................................5, 11, 16

8 U.S.C. § 1252(b)(9) ..................................................................................................... 17, 31

8 U.S.C. § 1252(g) ............................................................................................................... 20

8 U.S.C. § 1329 .................................................................................................................... 20

28 U.S.C. § 476 .................................................................................................................... 26

28 U.S.C. § 1391 ............................................................................................................... 31, 32

<u>Regulations</u>

8 C.F.R. § 1003.38 .................................................................................................................. 5

84 Fed. Reg. 33 ...................................................................................................................... 25

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7-1**

Counsel for Defendants has conferred by telephone with Plaintiffs' counsel, who oppose this motion. The parties made a good faith effort to resolve this dispute but have been unable to do so.

**MOTION TO DISMISS**

## I.      INTRODUCTION

Plaintiffs, six legal services organizations that assist asylum seekers in other parts of the country, challenge performance metrics and case-completion goals for immigration judges who hear asylum claims. They allege that by setting goals to encourage immigration judges to resolve cases within a reasonable time period, the Attorney General, who oversees the immigration courts, has created an unlawful risk of bias and driven immigration judges to disregard their responsibility to decide claims on a case-by-case basis and to instead deny most, if not all, asylum claims.

Plaintiffs' allegations fall into three categories. *First*, they allege that a number of immigration courts outside this jurisdiction in other States are so-called "asylum-free zones" where "asylum is effectively impossible to win." Compl. ¶ 6. According to Plaintiffs, immigration courts in the following States are "asylum-free zones": Arizona, California, Florida, Georgia, Kentucky, Louisiana, Missouri, Nevada, New York, North Carolina, Ohio, Tennessee, Texas, and Utah. *Id.* ¶ 95. *Second*, Plaintiffs allege that the immigration courts decide cases too slowly, creating a backlog of cases that "undermines fairness." *Id.* ¶ 7. Plaintiffs argue that the Attorney General has not properly managed the immigration courts' dockets to reduce this backlog. *Id.* ¶ 105. *Third*, Plaintiffs alternatively allege that the Attorney General *has* tried to manage the immigration courts' dockets "to minimize the immigration court backlog" but has done so improperly by setting performance metrics and case-completion goals to encourage immigration courts to resolve more

cases, resulting in cases being decided too quickly. *Id*. ¶¶ 8, 134.[1] Plaintiffs claim that these actions violate the Take Care Clause of the United States Constitution, the Immigration and Nationality Act (INA) requirement that cases be decided on a case-by-case basis, 8 U.S.C. § 1229a, and the Administrative Procedure Act (APA), 5 U.S.C. § 706. Compl. ¶¶ 52-62.

The Court should dismiss Plaintiffs' novel and groundless claims for lack of jurisdiction under Rule 12(b)(1), for failure to state a claim under Rule 12(b)(6), and for improper venue under Rule 12(b)(3).

Plaintiffs lack standing to raise these generalized grievances about the conduct of proceedings involving non-parties in various immigration courts in other jurisdictions. Plaintiffs are advocacy groups who assert injury based on alleged injuries to third parties seeking asylum in immigration court without putting forth specific factual allegations that show a connection between any particular government action and the outcome of asylum claims that harm Plaintiffs. The Plaintiff organizations cannot establish standing based on hypothetical injuries to a large and diffuse group of individuals in other parts of the country who are not parties to this case. Plaintiffs assert that they are harmed directly because the alleged difficulties of practicing in immigration court make their advocacy efforts less effective and less likely to secure asylum for their clients. But they do not allege that the actions they challenge actually prevent them from advocating for their clients in their removal proceedings or identify any real change in their missions or allocation of their resources. The organizations have thus failed to identify an independent injury sufficient to confer Article III standing. Plaintiffs' asserted injuries also fall outside the zone of interests of the INA— which provides a cause of action for individual *aliens* to challenge the conduct of removal proceedings and decisions on asylum claims, but limit such challenges to administrative appeals to

---

[1] Throughout their Complaint, Plaintiffs refer to these performance metrics as an "Enforcement Metrics Policy," but there is no such policy. The performance metrics contain no enforcement component, enforcement metrics, or enforcement goals.

the Board of Immigration Appeals ("BIA") and, if necessary, a petition for review to the court of appeals. 8 U.S.C. § 1252. Congress squarely eliminated district-court jurisdiction to hear challenges related to removal proceedings or policies and practices applicable in those proceedings and has channeled all such claims to the courts of appeals through the petition-for-review process. *Id*. § 1252(b)(9). Plaintiffs thus cannot establish jurisdiction over any of their claims.

Plaintiffs also fail to state any claim upon which relief can be granted. Plaintiffs' first claim argues that the Attorney General has violated the Take Care Clause through "mismanagement of the immigration courts," Compl. ¶ 197, but the Supreme Court long ago made clear that this clause is nonjusticiable. *See Mississippi v. Johnson*, 71 U.S. 475, 499 (1866). Plaintiffs' remaining claims allege in various ways that immigration judges are not adjudicating cases impartially on a case-by-case basis and argue that agency policies related to scheduling, prioritizing, and completing cases are to blame and create a risk of bias. *Id.* ¶ 202. But Plaintiffs provide no plausible allegations to establish that bias exists. Plaintiffs cannot state a plausible bias claim when their Complaint contains no allegations showing that bias motivated any particular decision in immigration court. Plaintiffs also cannot state an APA claim because they have not identified any final agency action that is subject to APA review. Plaintiffs cannot state an APA claim based on agency performance metrics for immigration judges or other case-completion goals aimed at encouraging timely decisions. The legal effect of these goals and metrics on Plaintiffs, if any, would only result from a decision in immigration court where an individual could show that scheduling somehow affected the outcome because the immigration judge considered improper factors or was somehow biased as a result. Again, Plaintiffs identify no such decisions, and to the extent that their claims for prospective declaratory or injunctive relief are based on future decisions, the claims are not ripe. Moreover, even if they identified a final agency decision, they still could not state an APA claim because Congress has created a specific avenue for challenging decisions in immigration courts

through petitions for review to the court of appeals. This adequate and exclusive alternative remedy precludes an APA claim.

Finally, even if Plaintiffs could identify injuries sufficient to support standing, establish jurisdiction, *and* state a claim for relief, the Court should still dismiss for improper venue because the injuries that Plaintiffs allege are not connected to this District. Plaintiffs challenge the asylum grant rates in immigration courts in various other States where the organizations operate, but not in *this* State or District. At a minimum, if the Court does not dismiss the Complaint in its entirety for improper venue, it should sever and dismiss the claims of all Plaintiffs who are not based in this District or that are based on allegations related to courts in other parts of the country.

## II.    BACKGROUND

Immigration-Court System. Generally, when the Department of Homeland Security (DHS) seeks to remove an alien from the United States, DHS issues a "notice to appear" that explains the "charges against the alien and the statutory provisions alleged to have been violated." 8 U.S.C. § 1229. The INA sets out a range of grounds that can make an alien inadmissible to or removable from the United States. *See id.* § 1182 ("Inadmissible aliens"); *id.* § 1227 ("Deportable aliens").

Under 8 U.S.C. § 1229a, immigration judges located at various immigration courts across the country decide whether aliens are removable and resolve claims from individual aliens seeking relief or protection from removal, including claims for asylum. 8 U.S.C. § 1229a(a)(1). Asylum is a form of relief from removal, so an immigration judge will not issue a removal order to an alien if the judge decides that the individual should instead be granted asylum. *See id.* § 1158(c). For an alien seeking asylum, the immigration judge's resolution of the asylum claim is thus central to the determination the immigration judge must make at the conclusion of the removal proceedings of whether to issue a removal order. *Id.* § 1229a(c). In recent years, the immigration courts have received well over 100,000 new asylum claims each year—over a 200% increase in the number of

new claims annually between 2014 and 2018 (the most recent year for which numbers are

available). *See* U.S. Department of Justice Executive Office for Immigration Review, *Statistics

Yearbook*, at 24 (2018), *available at*: https://www.justice.gov/eoir/file/1198896/download.

An alien may appeal an immigration judge's decision on a claim for asylum to the Board of

Immigration Appeals (BIA), which hears appeals from all immigration courts across the country.

8 C.F.R. § 1003.38. An alien may seek judicial review of the BIA's decision on an asylum claim

through a petition for review filed with the court of appeals for the circuit where the immigration

court that initially heard the claim is located. 8 U.S.C. § 1252(a)(5), (b)(2). Congress has provided

that a petition for review filed in an individual case with the appropriate court of appeals is the

exclusive means of review for any question of law or fact or any interpretation or application of any

statutory provision that arises from any action or proceeding in immigration court. *Id.* § 1252(a)(5),

(b)(9). Thus, it is often circuit court case law that ultimately resolves legal questions related to

asylum eligibility within a particular circuit. As a result, asylum law can differ somewhat from one

circuit to the next, which can affect the rates at which asylum is granted by immigration courts in

that circuit. Each court of appeals also resolves any challenges related to how proceedings are

conducted in the immigration courts within its jurisdiction. *Id.*

This Lawsuit. Plaintiffs filed this lawsuit on December 18, 2019, to challenge the

performance metrics and case-completion goals for immigration judges who hear asylum claims at

immigration courts in other parts of the country. Plaintiffs are six legal advocacy organizations

located in various places in the United States, including Texas, New York, Maryland, New Mexico,

and Alabama. Compl. ¶¶ 17-22. Innovation Law Lab, a nonprofit incorporated in Oregon, is the

only Plaintiff that alleges any connection to this District. *Id*. ¶ 20. Plaintiffs claim that Defendants'

management of the immigration courts violates the Take Care Clause, the INA, and the APA. *Id*.

¶¶ 193-242. There are no individual plaintiffs and Plaintiffs do not raise any class claims.

Plaintiffs seek declaratory and injunctive relief requiring Defendants "to take specific corrective actions to ameliorate and mitigate the dysfunctionality of the immigration court system." Compl. ¶¶ 52-62. They do not identify the specific corrective actions that they believe this Court should order.

## III.    LEGAL STANDARD

The jurisdiction of the federal courts is limited. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). District courts "possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Id.* A court must dismiss a complaint for lack of jurisdiction under Rule 12(b)(1) unless Plaintiffs meet their burden to establish that the Court has subject matter jurisdiction to adjudicate their claims. *United States ex rel. Solis v. Millennium Pharm., Inc.*, 885 F.3d 623, 625 (9th Cir. 2018). Plaintiffs must affirmatively establish jurisdiction, *see United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 569 (9th Cir. 2016), and must separately establish standing and jurisdiction for each claim they raise and each form of relief they seek, *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006).

"To survive a motion to dismiss" for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Legal conclusions can form the framework of a complaint, but must by supported by specific factual allegations. *Id.* at 679.

A court may also dismiss a complaint under Rule 12(b)(3) based on improper venue. Fed. R. Civ. P. 12(b)(3). Whether venue is proper is determined by the "federal venue provisions." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 56 (2013).

IV.   **ARGUMENT**

A.   **Plaintiffs lack Article III standing.**

The Plaintiff organizations have not suffered any cognizable injury sufficient to establish Article III standing. To satisfy the "'irreducible constitutional minimum' of standing," the party invoking federal jurisdiction must demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "Foremost among these requirements is injury in fact—a plaintiff's pleading and proof that he has suffered the 'invasion of a legally protected interest' that is 'concrete and particularized.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

Where, as here, an organization sues on its own behalf, it must establish standing in the same manner as an individual. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975). Yet all the injuries Plaintiffs assert relate to alleged injuries of unidentified individual aliens seeking asylum in removal proceedings. Every alleged injury—whether based on immigration courts with asylum-grant rates they argue are too low, or immigration courts whose decisions they allege are affected because immigration judges decide cases either too slowly or too quickly—boils down to a speculative future injury in the form of an alien not obtaining asylum as a result. *See, e.g.*, Compl. ¶ 159 (alleging injury based on decreased "impact of their programming" for asylum-seekers they represent or support), *id*. ¶ 166 (appealing adverse asylum decisions), *id*. ¶ 168 (representing clients whose asylum claims immigration judges deny), *id*. ¶¶ 175, 180 (efforts to support pro se asylum seekers or to recruit and train pro bono counsel "wasted" where asylum denied), ¶ 177 ("legal services" that do not change "the ultimate outcome of the case"), ¶ 188 ("impact on case outcomes"). But none of the Plaintiffs are individual aliens who have been denied asylum, or who are even in removal proceedings, and their Complaint contains no allegations related to any specific

alien whose claim has actually been denied.[2] A party cannot establish an Article III case or

controversy by "raising only a generally available grievance about government—claiming only

harm to [it] and every citizen's interest in [the] proper application of the Constitution and laws, and

seeking relief that no more directly [or] tangibly benefits [the organization] than it does the public at

large." *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (citing *Lujan*, 504 U.S. at 560-61). Plaintiffs'

allegations of injury are thus far too attenuated to establish standing.

Plaintiffs' allegations of injury are not "concrete," "particularized," or "fairly traceable" to

particular conduct by the government. *Spokeo*, 136 S. Ct. at 1547. There are no specific allegations

of bias or any allegations showing that any alien would have been granted asylum if the claim was

heard at a different immigration court or on a different schedule. As discussed below, there are

many reasons an immigration judge might find someone ineligible for asylum, including various

statutory and regulatory bars to eligibility for certain categories of aliens. Plaintiffs do not address

these independent reasons that affect asylum determinations, and their lack of allegations related to

individual asylum decisions makes it impossible to evaluate the basis for any denial, or for the

Court to find bias or any other injury. Also, to the extent they challenge the effects case-completion

goals and metrics might have on hypothetical future decisions, their claims are also not ripe for

adjudication. *See Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 57 (1993) (noting that courts

should be "reluctant" to hear claims for prospective declaratory or injunctive relief related to future

"administrative determinations," because Article III cannot be satisfied until "the effects of

administrative action" are felt "in a concrete way").

---

[2] If an alien obtains asylum, then there is no injury to the alien (or to Plaintiff organizations'
efforts "to provide meaningful legal assistance" to these aliens, Compl. ¶ 13). *See Spokeo*, 136 S.
Ct. at 1549 ("bare procedural violation, divorced from any concrete harm" insufficient to "satisfy
the injury-in-fact requirement of Article III").

Plaintiffs also cannot establish Article III standing by raising injuries of non-parties. Even if they had identified an injury that was concrete and particularized, to establish standing, "a party must assert his own legal rights and cannot rest his claim to relief on the legal rights of third parties." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017). The asserted injury must be specific to the plaintiff, such that the plaintiff has "a personal stake in the outcome of the controversy." *Warth*, 422 U.S. at 498; *see also Lujan*, 504 U.S. at 560 n.1 (defendant's asserted conduct must affect plaintiff in a "personal and individual way"). A party lacks standing to challenge the government's provision (or denial) of benefits to a third party. *See, e.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342-46 (2006); *cf. O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 788 (1980) (emphasizing "distinction between government action that directly affects a citizen's legal rights" and "action that is directed against a third party and affects the citizen only indirectly or incidentally"). Thus, a party "lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *see also Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 804-07 (D.C. Cir. 1987) (applying principle to immigration context). Plaintiff organizations cannot establish standing by asserting non-specified injuries of aliens in removal proceedings in other parts of the country. *See Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1364 (D.C. Cir. 2000) (rejecting organizational standing "to raise claims, whether statutory or constitutional, on behalf of aliens," noting "the judicial presumption against suits seeking relief for a large and diffuse group of individuals, none of whom are party to the lawsuit"); *cf. United States v. Lazarenko*, 476 F.3d 642, 649-50 (9th Cir. 2007).

The organizational Plaintiffs seek to avoid these requirements of Article III and establish standing based on alleged incidental effects on their missions, which they describe as "provid[ing] legal services by representing, advising, accompanying, and otherwise supporting" individuals who

are seeking asylum and other immigration relief in immigration court. Compl. ¶ 156; *id.* ¶¶ 155-192. As noted above, in their view, this mission is frustrated when immigration judges deny asylum claims, undermining the efforts of attorneys assisting aliens in presenting those claims and the effectiveness of the other legal resources Plaintiff organizations provide. *Id.* ¶¶ 159-61, 166, 168-69, 174-75, 180-81, 188, 191-92. Plaintiffs also allege that they are injured where "prospective pro bono attorneys are deterred" from volunteering to provide assistance in immigration court, in part because of the "unpredictability of hearing schedules" and potential "scheduling delays," *id.* ¶¶ 181, 183, 185; where potential pro bono attorneys they recruit ultimately "never provide substantive volunteer service" due to scheduling issues, *id.* ¶¶ 162, 184; where attorneys do not have the time they would like to present—or to prepare to present—an asylum claim because immigration judges will not delay scheduled hearings, *id.* ¶¶ 163, 167, 178; *and* alternatively where, immigration judges delay hearings, "extending case timelines" and making it "challenging" for attorneys to "sustain" legal assistance, *id.* ¶¶ 171, 176.

These injuries are far from the "concrete and particularized" invasion of a "legally protected interest" that is necessary to establish standing. *Lujan*, 504 U.S. at 560. Organizations have "no judicially cognizable interest" in the "enforcement of the immigration laws," *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984), in preventing the government from applying the law to third parties, or in immigration courts granting asylum to a higher percentage of applicants. *See Linda R.S.*, 410 U.S. at 619; *see also PETA v. U.S. Dep't of Agriculture*, 797 F.3d 1087, 1099 (D.C. Cir. 2015) (Millett, J., dubitante) (criticizing "precedents [that] now hold that the required Article III injury need not be what the defendant has done to the plaintiff; it can also be what the defendant has not done to a third party"). The INA confers no "legally cognizable interests," *Spokeo*, 136 S. Ct. at 1549, on advocacy organizations in the scheduling or other aspects of third-party aliens' hearings in immigration court. In fact, it does the opposite. The INA channels review of all removal-related

claims into removal proceedings, appeals to the BIA, and then to the federal courts of appeals—in claims *brought by individual aliens*. *See* 8 U.S.C. § 1252(a)(5), (b)(9). To the extent that the INA creates rights and procedures, it does so for individual aliens in proceedings in immigration court, and even for those aliens, eliminates judicial review outside of petitions for review to the appropriate court of appeals.

Even if the organizational Plaintiffs could show that they expended or diverted resources to respond to problems they allege exist in certain particular immigration courts, organizations cannot create an injury or establish standing by expending resources to respond to a problem for which they have no legally cognizable interest. "[O]rganizations cannot 'manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all.'" *East Bay Sanctuary Covenant v. Trump*, No. 18-17274, 2020 WL 962336, at *9 (9th Cir. Feb. 28, 2020) (quoting *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)); *see also Clapper v. Amnesty Int'l*, 568 U.S. 398, 416 (2013) ("self-inflicted injuries" "not fairly traceable to the Government's purported activities" do "not give rise to standing"). An organization's choice to expend resources on claims that they believe are hard to win is not an "injury" that can support article III standing. *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (no standing where "challenged conduct affects an organization's activities, but is neutral with respect to its substantive mission," or where organization manufactures injury through "self-inflicted budgetary choice" (quotation omitted)).

Courts that have found organizational standing have thus done so in certain limited circumstances where an organization can establish an independent, cognizable injury in fact to its own protected interests, meaning it puts forth sufficient allegations to show that the challenged conduct "impaired the organization's ability to provide services." *Turlock Irrigation Dist. v. FERC,*

786 F.3d 18, 24 (D.C. Cir. 2015). This requires allegations that, if true, would show that the

government's conduct inhibited the organization's "daily operations" in some cognizable way.

*PETA*, 797 F.3d at 1094; *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,

868 F.3d 104, 110-11 (2d Cir. 2017) (requiring showing that policy "impeded, and will continue to

impede, organization's ability to carry out" its "core activities"). Plaintiffs' alleged injuries are

insufficient to meet this standard. They allege they have been "forced" "to divert resources" to

designing "programs and systems," training "staff and volunteers," writing "guides and materials,"

contacting clients to explain "policies and practices," and engage in "community education,

monitoring, and advocacy work necessary to pursue their missions." Compl. ¶ 160. But the

activities Plaintiffs cite are a part of their existing missions, which they describe as "provid[ing]

legal services by representing, advising, accompanying, and otherwise supporting" aliens seeking

asylum in immigration court through providing representation in immigration court, providing

"legal services" to "unrepresented asylum applicants," placing cases with pro bono attorneys, and

supporting organizations assisting asylum seekers "with technical and case support." Compl.

¶¶ 156, 158.

　　　　In setting out the test for establishing organizational standing, the Ninth Circuit has

distinguished cases that "involve efforts by advocacy groups to show standing by pointing to the

expenses of advocacy—the very mission of the group itself." *E. Bay Sanctuary Covenant v. Trump*,

932 F.3d 742, 766 (9th Cir. 2018); *see also Am. Diabetes Ass'n v. United States Dep't of the Army*,

938 F.3d 1147, 1155 (9th Cir. 2019) (organization "going about its business as usual" by taking

calls from the individuals the organization serves, even where calls now required explaining new

policy, insufficient to establish organizational standing); *Havens Realty Corp. v. Coleman*, 455 U.S.

363, 379 (1982) (requiring diversion of "significant resources"). And, "[a]n organization does not

suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless

doing so subjects the organization to 'operational costs beyond those normally expended.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995). To establish standing, Plaintiffs must show that the challenged action "require[d] the organization 'to expend resources in representing clients they otherwise would spend *in other ways*.'" *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc) (emphasis added) (quoting *El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review,* 959 F.2d 742, 748 (9th Cir. 1992)).

To the extent that Plaintiffs allege that they engage in "time-consuming efforts" to win difficult claims or "provide meaningful pro se support," and that "these endeavors are wasted" when immigration judges "deny asylum," requiring Plaintiffs "to file additional applications for relief other than asylum" or "appeal the immigration judge's decision," Compl. ¶¶ 166, 168, 175, 180, if this constituted an "injury" sufficient to confer standing, then any legal services or advocacy organization could sue in federal court over any aspect of any immigration-court proceeding. Such incidental impacts on legal representation do not satisfy Article III. *See Food & Water Watch*, 808 F.3d at 919 (D.C. Cir. 2015) ("precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury."); *Nat'l Taxpayers Union*, 68 F.3d at 1434 ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.").

At bottom, Plaintiffs' allegations of injury, and their Complaint as a whole, reduce to a claim that the government should be granting asylum to more individuals. But an organization's abstract interest in a problem, without direct harm to the organization itself, is insufficient to establish standing. *See Sierra Club v. Morton,* 405 U.S. 727, 738-39 (1972); *Havens,* 455 U.S. at

379 ("a setback to the organization's abstract social interests" is not a "concrete and demonstrable injury to the organization's activities"). The Supreme Court has repeatedly rejected similar appeals to federal court "authority which would convert the judicial process into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.'" *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982) (quoting *United States v. SCRAP*, 412 U.S. 669, 687 (1973)). This Court should do the same here.

**B.      Plaintiffs are outside the zone of interests of the statutes they seek to enforce.**

The Plaintiff organizations are also outside the zone of interests for the statutory provisions they cite. The APA does not "allow suit by every person suffering injury in fact." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987). It provides a cause of action only to one "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To be "aggrieved," "the interest sought to be protected" must "be arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Clarke*, 479 U.S. at 396 (modifications omitted). "[O]n any given claim the injury that supplies constitutional standing must be the same as the injury within the requisite 'zone of interests.'" *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996). Plaintiffs identify no such interest here.

Plaintiffs cite 8 U.S.C. § 1229a, which governs the conduct of removal proceedings, and emphasize the statutory rights of asylum seekers to be represented by counsel at no cost to the government, *id.* § 1229a(b)(4)(A), to examine evidence, *id.* § 1229a(b)(4)(B), to have a complete record kept of the proceedings, *id.* § 1229a(b)(4)(C), and to a decision from the immigration judge based on the evidence at the hearing, *id.* § 1229a(c)(1)(A). Compl. ¶¶ 35-38, 210, 228. But nothing in the INA or any of these provisions even arguably suggests that the statute creates any rights for or protects the interests of "immigration legal service providers" who seek "to provide meaningful legal assistance" to asylum seekers who are already in removal proceedings. *Id.* ¶ 13. These

provisions neither regulate the organizational Plaintiffs' conduct nor create any benefits for which these organizations are eligible. Courts have recognized that immigration statutes are directed at aliens, not the organizations advocating for them. When confronted with a similar challenge brought by "organizations that provide legal help to immigrants," Justice O'Connor concluded that the Immigration Reform and Control Act "was clearly meant to protect the interests of undocumented aliens, not the interests of [such] organizations," and the fact that a "regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect." *INS v. Legalization Assistance Project of L.A. Cty.*, 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers). Courts have thus held that immigrant advocacy organizations are outside the immigration statutes' zone of interests. *See, e.g.*, *Fed'n for Am. Immigration Reform, Inc. (FAIR) v. Reno*, 93 F.3d 897, 900-04 (D.C. Cir. 1996)

That reasoning fully applies here. Plaintiffs are not applying for asylum; they seek to help others do so. Unlike the plaintiffs in *East Bay*, they are not challenging substantive "law governing asylum [that] is collateral to the process of removal," or raising claims on behalf of aliens who are not in removal proceedings and instead "file affirmatively for asylum." 2020 WL 962336, at *9. Nothing in "the relevant provisions [can] be fairly read to implicate Organizational Plaintiffs' interest in the efficient use of resources" or a requirement that proceedings in immigration court be scheduled to serve such an interest. *Nw. Immigrant Rights Project v. USCIS*, 325 F.R.D. 671, 688 (W.D. Wash. 2016). "[I]t cannot reasonably be assumed that Congress intended to permit [a] suit," where Plaintiffs' interests are, at best, "marginally related to" the purposes of the statutes they cite. *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). Because Plaintiffs fall outside the statutory scheme, the alleged effects on their missions are outside the statutory zone of interests. *See Legalization Assistance Project*, 510 U.S. at 1302, 1305 (O'Connor, J., in chambers) ("The fact that the INS regulation may affect the way an organization

allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect," such as "organizations that provide legal help to immigrants"); *Situ v. Leavitt*, No. C06–2841, 2006 WL 3734373, at *10 (N.D. Cal. Dec. 18, 2006) ("[T]he organizational plaintiffs in this case fail to satisfy the zone of interests test because they have failed to rebut Defendant's argument that the Medicare statutory scheme is intended to protect individuals, not advocacy organizations.").

### C.   The INA limits jurisdiction over challenges to the conduct of removal proceedings and prevents Plaintiffs from establishing jurisdiction here.

The INA sharply limits the manner and scope of judicial review of all claims connected to removal proceedings. *See* 8 U.S.C. § 1252. Under Congress's carefully constructed scheme for judicial review of all challenges related to removal proceedings, including challenges to the policies and practices applied to individual aliens in those proceedings, only an individual affected alien may seek judicial review, and may do so only through a petition for review ("PFR") filed with the court of appeals following completion of proceedings in immigration court and any appeal to the BIA. A "petition for review filed with an appropriate court of appeals in accordance with this section shall be *the sole and exclusive means* for judicial review of an order of removal." *Id*. § 1252(a)(5) (emphasis added). "Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States . . . shall be available only in judicial review of a final order under this section" and no district court "shall have jurisdiction . . . to review such an order or such questions of law or fact." *Id*. § 1252(b)(9)). Through § 1252 "Congress has clearly provided that all claims—whether statutory or constitutional—that 'aris[e] from' immigration removal proceedings can only be brought through the petition for review process in federal courts of appeals." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1029 (9th Cir. 2016); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 840 (2018) (§ 1252(b)(9) is a "jurisdiction bar" to challenges

to "any part of the process by which [an alien's] removability will be determined"); *id*. at 841 n.3 (plurality opinion) ("the question is not whether [the challenged action] *is an action taken to remove an alien* but whether *the legal questions in this case* arise from such an action" (emphasis in original)).

 Section 1252(b)(9)'s channeling of all claims related to removal proceedings to the PFR process is "breathtaking" in scope and "vise-like" in grip, swallowing up "virtually all claims that are tied to removal proceedings." *J.E.F.M.*, 837 F.3d 1031 (quoting *Aguilar v. ICE*, 510 F.3d 1, 9 (1st Cir. 2007). "Taken together, § 1252(a)(5) and § 1252(b)(9) mean that *any* issue—whether legal or factual—arising from *any* removal-related activity can be reviewed *only* through the PFR process." *J.E.F.M.*, 837 F.3d 1031 (collecting cases); *see also P.L. v. U.S. Immigration and Customs Enforcemen*t, No. 1:19-CV-01336, 2019 WL 2568648, at *3 (S.D.N.Y. June 21, 2019) (holding that § 1252(b)(9) bars challenges raised by organizations to the rules in removal proceedings). This includes "policies-and-practices challenges," *J.E.F.M.*, 837 F.3d at 1032, arising from any "action taken or proceeding brought to remove an alien from the United States," 8 U.S.C. § 1252(b)(9), whether or not the challenge is to an actual final order of removal or whether there even is a final order at all. *See J.E.F.M.*, 837 F.3d at 1032; *Sophia v. Decker*, No. 19-9599, 2020 WL 764279, at *2 (S.D.N.Y. Feb. 14, 2020) (statutory "bar applies to 'question[s] of law' that 'aris[e] from [an] action taken . . . to remove an alien,' and is not limited to questions of law that would in fact determine removability" (alterations in original)); *Asylum Seeker Advocacy Project (ASAP) v. Barr*, 409 F. Supp. 3d 221, 225 (S.D.N.Y. 2019) (§ 1252(b)(9) bars challenges, including challenges by organizations, to process for issuing removal orders where relief Plaintiffs seek would indirectly "challenge to the removal orders" issued under that process).

 Thus, when a claim filed in district court, "however it is framed, challenges the procedure and substance of an agency determination that is 'inextricably linked' to the order of removal, it is

prohibited." *Martinez v. Napolitano*, 704 F.3d 620, 623 (9th Cir. 2012). Here, Plaintiffs' challenges all relate to (and are inextricably linked to) the conduct of removal proceedings of third-party aliens. All of their claims cite as a basis either how immigration judges adjudicate claims in individual removal proceedings, or cite 8 U.S.C. § 1229a, which governs how "[a]n immigration judge shall conduct proceedings," including the evidence to be considered and the right of asylum seekers to obtain counsel at their own cost. 8 U.S.C. § 1229a(a), (b)(4), (c)(1)(A); *see* Compl. ¶ 195 (Claim I, citing § 1229a); ¶ 202 (Claim II, citing § 1229a); ¶ 210 (Claim III, citing § 1229a); ¶ 221 (Claim IV, challenging how judges "adjudicate[e] removal cases"); ¶ 221 (Claim V, citing § 1229a); ¶ 239 (Claim VI, challenge to how judges are "adjudicating removal cases"). Plaintiffs' challenges to the scheduling of hearings, the factors that they allege immigration judges consider in those hearings, and rulings on asylum claims raised in removal proceedings all "'arise from' removal proceedings" and "are bound up in and an inextricable part of the administrative process." *J.E.F.M.*, 837 F.3d at 1033. These claims fit squarely within § 1252(b)(9)'s bar to district court review of claims "arising from any action taken or proceeding brought to remove an alien," and must be channeled to a PFR following the conclusion of administrative removal proceedings.

In *J.E.F.M.*, the Ninth Circuit similarly dealt with challenges to the conduct of removal proceedings and access to counsel. 837 F.3d at 1029; *id.* at 1038 n.12 (citing § 1229a). The Ninth Circuit held that "right-to-counsel claims must be raised through the PFR process" because these claims—just like Plaintiffs' claims here—"are not independent or ancillary to the removal proceedings. *J.E.F.M.*, 837 F.3d at 1033. The Ninth Circuit also explained that § 1252 does not strip all courts of jurisdiction or "foreclose *all* judicial review of agency actions"; instead, it channels judicial review of any challenge related to removal proceedings to the court of appeals after administrative exhaustion of the claims with the BIA, and makes the PFR process the exclusive mechanism for raising such claims. *Id.* at 1030. The Ninth Circuit noted that claims related to access

to counsel are thus regularly raised through the PFR process. *J.E.F.M.*, 837 F.3d at 1033. The same is true of the claims Plaintiffs seek to raise here. Challenges to the denial of asylum claims are regularly raised in PFRs, including claims that an immigration judge considered improper factors in reaching a decision or claims of bias. *See, e.g.*, *Hovhannisyan v. Holder*, 577 F. App'x 748, 750 (9th Cir. 2014); *Bhasin v. Gonzales*, 423 F.3d 977, 989 (9th Cir. 2005); so too are claims related to the scheduling of hearings, such as an immigration judge's denial of a continuance, *see, e.g. Hui Ran Mu v. Barr*, 936 F.3d 929, 936 (9th Cir. 2019), or time to obtain counsel (including pro bono counsel), *see, e.g. C.J.L.G. v. Barr*, 923 F.3d 622, 631 & n.3 (9th Cir. 2019) (Paez, J., concurring); *Biwot v. Gonzales*, 403 F.3d 1094, 1100 (9th Cir. 2005).

Plaintiffs acknowledge that similar claims have already been raised in the courts of appeals that hear claims related to the immigration courts identified in the Complaint. *See* Compl. ¶ 88 (citing *Diaz-Rivas v. Att'y Gen.*, 769 F. 748 (11th Cir. 2019), which addressed claim that immigration court had a lower asylum grant rate than other courts, and discussed similar appellate court decisions). And district courts regularly have dismissed similar challenges for lack of jurisdiction. *See, e.g.*, *Alvarez v. Sessions*, 338 F. Supp. 3d 1042, 1048 (N.D. Cal. 2018) (dismissing under § 1252 constitutional challenge to transferring aliens during removal proceedings even where result is "potential loss of counsel"); *Martinez*, 704 F.3d at 622 ("§ 1252(a)(5) prohibits [APA] claims that indirectly challenge a removal order," including "challenges [to] the procedure [for] and substance of" decision alien "was ineligible for asylum"); *Aguilar*, 510 F.3d at13-14 (claims related to "an alien's right to counsel in connection with removal proceedings, whether pending or imminent, arise from the removal proceedings"); *ASAP*, 409 F. Supp. 3d at 225 (collecting cases).

When Congress enacted the channeling provisions in § 1252(b)(9), it not only channeled individuals' particularized claims through the PFR process, it also specifically "crafted language to channel challenges to agency policies through the PFR process." *J.E.F.M.*, 837 F.3d at 1034. All

"claims, including policies-and-practices challenges" are channeled "through the PFR process whenever they 'arise from' removal proceedings." *Id.* at 1035. Thus, even though only aliens can file PFRs, district courts have similarly dismissed challenges brought by organizations as barred by § 1252(b)(9). *See, e.g.*, *ASAP*, 409 F. Supp. 3d at 227 (dismissing "action for declaratory and injunctive relief brought by organizational plaintiffs"); *P.L.*, 2019 WL 2568648, at *1-2 (§ 1252(b)(9) bars challenges by organizations to procedures they alleged caused "scheduling challenges" and delays, made it more difficult for immigrants to "adequately examine[] evidence against them, retain[] counsel," and communicate with counsel, and allegedly "increase[d] the time and cost" "to effectively represent their clients"); *see also Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 344-51 (1984) ([W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded"); *id.* at 348 (rejecting suits by other parties that "would severely disrupt [a] complex and delicate administrative scheme").

Congress has further made clear that, aside from the United States, no party can litigate a challenge to removal proceedings in district court. Congress specifically withdrew district-court jurisdiction for such a cause of action. In 1996, Congress amended 8 U.S.C. § 1329 to remove district court jurisdiction for suits challenging implementation of the immigration laws, "making clear that district court jurisdiction founded on the immigration statute is confined to actions brought by the government." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1162 (D.C. Cir. 1999); *see also Bains v. Schiltgen*, No. 97-2573, 1998 WL 204977, at *3 (N.D. Cal. Apr. 21, 1998). This change further shows that organizational plaintiffs lack any cognizable cause of action to raise challenges to the handling of removal proceedings or asylum claims in immigration court. *Block*, 467 U.S. at 349 ("presumption favoring judicial review of administrative action is just that—a

presumption" and is overcome by "specific language or specific legislative history" showing contrary congressional intent).

Finally, jurisdiction is also barred by 8 U.S.C. § 1252(g). Section 1252(g) provides that, apart from the specific procedures set out in § 1252, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien," "notwithstanding any other provision of law (statutory or nonstatutory)." Plaintiffs' challenges to decisions about how to prioritize cases or schedule hearings fall within this bar to "any cause or claim by or on behalf of any alien arising from" any "action" to "adjudicate cases." *Id*. And Plaintiffs cite no statutory or regulatory provisions limiting discretionary actions to manage immigration-court dockets or to prioritize certain types of cases. Thus, even if Congress had not stripped jurisdiction from this Court to hear such a challenge, jurisdiction would still be lacking because there is simply no law to apply to a claim challenging how the agency dockets cases or manages its backlog. *See, e.g.*, *Ekimian v. I.N.S.*, 303 F.3d 1153, 1158 (9th Cir. 2002) ("Emphasizing that agencies are better equipped than courts to prioritize administrative concerns and actions," and "even where Congress has not affirmatively precluded review, review is not to be had" if "no judicially manageable standards are available for judging" the agency's action (quoting *Heckler v. Chaney,* 470 U.S. 821, 830 (1985))); *Diaz-Covarrubias v. Mukasey*, 551 F.3d 1114, 1118 (9th Cir. 2009) ("absence of a 'meaningful standard' precludes review").

If an individual alien can show that scheduling or some other aspect of how proceedings were conducted affected the outcome of his case in a way that violates statutory or constitutional protections, then the appropriate—and only—avenue to raise such a challenge is through a petition for review to the court of appeals for that circuit, not through a suit in district court. In such PFR proceedings, the alien may raise any statutory or constitutional claim, based on a factual record in

their case. *See* 8 U.S.C. §§ 1252(a)(2)(D), (5), (b)(9). Plaintiffs' attempt to litigate claims outside

the context of actual removal proceedings is what Congress barred in § 1252. *See Reno v.*

*American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 487 (1999) (Congress enacted § 1252(g)

to prevent "deconstruction, fragmentation, and hence prolongation of removal proceedings").

     **D.**      **Plaintiffs fail to state a claim upon which relief can be granted.**

     The Court should also dismiss all of Plaintiffs' claims under Rule 12(b)(6).

     <u>Claim I</u>. Plaintiffs' first claim argues that the Attorney General has violated the Take Care

Clause of the United States Constitution, Compl. ¶ 196, but this clause is non-justiciable.

*See Mississippi*, 71 U.S. at 499 (distinguishing ministerial duties, which might be subject to a

mandamus claim, from the "[v]ery different" "purely executive and political" "duty of the President

in the exercise of the power to see that the laws are faithfully executed"). The Take Care Clause

falls under "the general principles which forbid judicial interference," and the Supreme Court long

ago held that a claim to restrain executive action through this clause was not only "without a

precedent," but that there was "much weight against it." *Id*. at 499-500; *cf. Citizens for*

*Responsibility & Ethics in Washington v. Trump*, 302 F. Supp. 3d 127, 139 (D.D.C. 2018), *aff'd*,

924 F.3d 602 (D.C. Cir. 2019) (finding no cases further resolving the question but noting that

"*Johnson* can be fairly read to suggest that a Take Care Clause claim is outright non-justiciable").

     The Take Care Clause places no justiciable restraints on executive action and cannot be a

basis for a claim by private parties. *Cf. Lujan*, 504 U.S. at 577 (rejecting attempt to "convert the

undifferentiated public interest in executive officer's compliance with the law into an 'individual

right' vindicable in the court" as such a claim would impermissibly intrude on the executive's

constitutional authority "to 'take Care that the Laws be faithfully executed'"); *United States v.*

*Navarro-Vargas*, 408 F.3d 1184, 1206 (9th Cir. 2005) (noting Executive's broad discretion under

this clause to enforce criminal law). Challenges to an agency's discretionary decisions on how to

allocate limited resources and set priorities for an overburdened federal agency are further non-justiciable because an "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Heckler*, 470 U.S. at 831-32 (noting deference owed to agency decisions on how "agency resources are best spent," particularly when addressing a "statute it is charged with implementing," and "the procedures it adopts for implementing that statute"); 8 U.S.C. § 1103(g)(2) (authorizing the Attorney General to "establish such regulations," "issue such instructions, review such administrative determinations in immigration proceedings," "and perform such other acts as the Attorney General determines to be necessary for carrying out" the INA). This is especially true for immigration, where "flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program," *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950), and funding limits and other strains on the system require the exercise of discretion on a vast scale.

Accordingly, Plaintiffs cannot, as a matter of law, assert violations of the Take Care Clause on behalf of third-party aliens and this claim must be dismissed.

Claim II. Plaintiffs' second claim is that Defendants have "create[d] a constitutionally and statutorily intolerable probability of actual bias in immigration court adjudication" that violates the Due Process Clause and INA requirements that "an impartial adjudicator preside over removal hearings and decide cases based on case-specific evidence." Compl. ¶¶ 202, 204. Plaintiffs argue that Defendants have "impeded judges from serving as impartial adjudicators" by "perpetuating asylum-free zones," by instituting performance metrics for immigration judges that encourage them to complete cases in a timely manner, and by tracking "family unit" cases at certain immigration courts to encourage those courts to resolve "family unit" cases within one year. *Id*. ¶ 204. There are multiple problems with this claim.

First, Plaintiffs cannot raise an independent statutory or constitutional claim without identifying an appropriate waiver of sovereign immunity for such claims. *Cf. Chacoty v. Tillerson*, 285 F. Supp. 3d 293, 301 (D.D.C. 2018) (discussing the difference between a claim, jurisdictional statute, and a waiver of sovereign immunity). The United States "is immune from suit unless it has waived its immunity." *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1173 (9th Cir. 2007). "When the United States consents to be sued, the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction." *United States v. Mottaz*, 476 U.S. 834, 841 (1986). Plaintiffs bear the burden of demonstrating an unequivocal waiver of sovereign immunity. *See, e.g., Baker v. United States*, 817 F.2d 560, 562 (9th Cir. 1987). The Fifth Amendment does not itself provide a waiver of sovereign immunity. *See Jaffee v. United States*, 592 F.2d 712, 717-18 (3d Cir. 1979); *cf. Chen v. United States*, 854 F.2d 622, 625 (2d Cir. 1988) (waiver of sovereign immunity in FTCA does not extend to claims based on "direct violations of the Federal Constitution" or "of federal statutes or regulations standing alone").

Second, even assuming Plaintiffs' "probability of actual bias" claim could proceed, the decisions of immigration judges are entitled to a presumption of regularity, and a party alleging bias bears a heavy burden. *See, e.g.*, *Citizens of Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *McLeod v. INS*, 802 F.2d 89, 95 n.8 (3d Cir. 1986). To state a claim, Plaintiffs must put forth plausible allegations of actual bias for particular aliens by immigration judges deciding individual asylum claims that, if true, would be sufficient for this Court to conclude that the decisions were based on bias. *Yang v. Reno*, 925 F. Supp. 320, 330-32 (M.D. Pa. 1996). But Plaintiffs' Complaint does not identify any particular immigration judges or any decisions that they allege would have had a different outcome absent the alleged bias. They raise generalized allegations of bias, but do not connect these allegations to any particular decisions; nor do they connect the performance metrics or other case-completion goals to the outcomes of any asylum claims. They note only that

certain immigration courts have lower-than-average asylum grant rates and allege that, "[on] information and belief, no legitimate variable affecting case outcomes explains the existence and entrenchment of asylum-free zones." Compl. ¶ 96. In essence, they allege that if asylum rates vary between immigration courts, then this Court should assume that bias is to blame. But these speculative allegations are insufficient to state a claim, particularly where they do not address the many more plausible explanations for the variability in grant rates. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (surviving a motion to dismiss under Rule 12(b)(6) requires sufficient allegations "to raise a right to relief above the speculative level").

Plaintiffs' allegations are insufficient in other ways to show that bias or agency case-completion goals are a likely driver of asylum rates. For example, some of the immigration courts that Plaintiffs identify hear claims only from detained aliens. *See, e.g.*, Compl. ¶ 91 (alleging "high denial rates in the courts with detained-only dockets"); ¶ 98 (alleging "asylum-free zones include many courts that hear detained cases" and acknowledging that "[d]etention itself imposes significant barriers to proving an asylum claim"). These courts hear claims from aliens who are detained during the removal proceedings because they have a criminal history. *See* 8 U.S.C. § 1226(c) ("Detention of Criminal Aliens"). Importantly, criminal history can also make an alien ineligible for asylum. *See* 8 U.S.C. § 1158(b)(2)(A)(ii) (bar to asylum eligibility for alien convicted of a particularly serious crime); (b)(2)(A)(iii) (serious nonpolitical crimes); (b)(2)(B)(i) (aggravated felonies); (b)(2)(B)(ii) (additional offenses designated by regulation). Thus, one explanation for the variability in grant rates is that many aliens in detained dockets are ineligible for asylum because of their criminal history and some courts only hear claims from these aliens. There are other explanations for inconsistencies in asylum grant rates, including a 2019 rule governing asylum claims. 84 Fed. Reg. 33,829. This interim final rule limits asylum eligibility for aliens who do not "apply for protection in at least one third country through which they transited en route to the

United States." 84 Fed. Reg. 33,829; *see also Barr v. East Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019); *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026 (9th Cir. 2019). This rule makes many recent arrivals ineligible for asylum and affects recent grant rates, but Plaintiffs do not address or challenge it here.

Plaintiffs allege that the case-completion goals "require judges to consider factors unrelated to the facts and merits of cases they decide," *see, e.g.*, Compl. ¶ 204, but they do not identify any factors that these goals require immigration judges to consider, and indeed the goals themselves do not add any additional factors immigration judges must consider. Instead, they merely encourage immigration judges to complete family-unit cases "within one year"—a reasonable timeline.[3] *Tracking and Expedition of Family Unit Cases* (Nov. 16, 2018) ("Family Unit Memo"), https://www.justice.gov/eoir/page/file/1112036/download. This guidance is also clear that immigration courts should complete cases "expeditiously" but also "consistent with due process." *Id*. Plaintiffs allege that setting goals for "prompt adjudication of [ ] claims" is itself "[i]n direct contravention of the INA," Compl. ¶ 204, but the INA, as part of the "procedures" for "consideration of asylum applications," states that immigration judges should complete "adjudication of the asylum application" "within 180 days after the date an application is filed" where circumstances allow. 8 U.S.C. § 1158(d)(5)(A)(iii). Consistent with the INA, the performance metrics similarly encourage immigration judges to make "rulings and decisions in a

---

[3] Plaintiffs themselves argue that Defendants must take action to reduce "long delays" and the backlog because "with the passage of time, witnesses become unavailable and evidence becomes lost or stale." Compl. ¶¶ 7, 104-05, 111.

In addition, the goals and metrics were adopted after the Inspector General, the Government Accountability Office, and the House Appropriations Committee all recommended that the agency adopt case-completion goals to address the backlog. *See Case Priorities and Immigration Court Performance Measures*, at 3 (Jan. 17, 2018). And, as the agency noted when it announced the performance measures, "[a]lmost every trial court system utilizes performance measures or case completion metrics to ensure that it is operating efficiently and appropriately." *Id*. at 2-3; *see also* 28 U.S.C. § 476 (encouraging federal judges to resolve pending cases within certain timeframes).

timely manner, consistent with available resources," while "preserving immigration judge discretion and due process." *Immigration Judge Performance Metrics* (Mar. 20, 2018) ("Performance Metrics"), *available at* https://www.aila.org/infonet/eoir-memo-immigration-judge-performance-metrics.

Plaintiffs do not put forth any factual allegations showing how setting reasonable goals for timely case completion would "drive[] immigration judges to negatively prejudge asylum claims," or to deny more claims, and it is not in immigration judges' interest to do so. Compl. ¶ 204. The performance metrics also set a "Remand Rate" goal that, "including BIA and Circuit Courts," is "less than 15%." Performance Metrics; *see also* Compl. ¶ 124 (acknowledging that performance metrics require "immigration judges to have fewer than fifteen percent of their decisions reversed on appeal"). Plaintiffs allege the performance metrics give "judges a personal pecuniary interest in the prompt adjudication of the claims before them," but the performance metrics are only met if both the BIA and the federal appellate courts decide that the immigration judge reached the right outcome at least 85% of the time. There is thus no incentive, pecuniary or otherwise, for immigration judges to improperly deny cases to meet their goals. Plaintiffs also put forth no allegations setting out why denying a claim is likely to result in quicker resolution of a case than granting asylum (or why immigration judges would believe that denying claims would help them meet the performance metrics). And, because the BIA and the courts of appeals review asylum decisions, the court of appeals for each circuit is in part responsible for the rate at which asylum is granted or denied. Accordingly, if Plaintiffs' allegations were true that bias is motivating the grant rates, then bias must be found equally in the BIA and the federal appellate courts. Such allegations are patently implausible and insufficient to state a claim.

There are further gaps in Plaintiffs' allegations that prevent them from putting forth a plausible theory of causation and claim for relief. Plaintiffs allege that the performance metrics have

caused immigration judges to "negatively prejudge asylum claims." Compl. ¶ 204. But the performance metrics apply to all immigration courts. Plaintiffs put forth no allegations that, if true, would explain why the performance metrics would affect certain immigration courts but not others. Plaintiffs' allegations related to the goals for family-unit cases face a similar problem; the family-unit goals apply only to immigration courts in 10 cities, and those 10 cities do not align with the courts whose decisions they challenge. *Compare* Family Unit Memo, at 1, *with* Compl. ¶ 95. Plaintiffs' allegations of causation and bias also depend on an implausible timeline. The metrics and goals are from the end of 2018, *see* Compl. ¶ 117, but Plaintiffs' allegations related to asylum grant rates pre-date this time period. *Id.* ¶ 86 (showing similar rates in 2015); ¶ 89 (describing rates as "persistently high" in particular courts dating back to 2014); ¶ 91 (describing rates going back to 2014); *compare also* ¶ 93 (alleging "Defendants' weaponization of the immigration courts began" in 2017) *with* ¶ 86 (showing a *decrease* in asylum denials in 2017).

Even if Plaintiffs could link the actions they challenge with the asylum grant rates at the immigration courts identified in their Complaint, they still could not state a bias claim without allegations showing case-completion goals somehow prejudiced the outcome of individual asylum decisions. *See United States v. Decoster*, 624 F.2d 196, 336 (D.C. Cir. 1976). Showing bias requires showing "there is a reasonable probability that, but for [the challenged conduct or practice], the result of the proceeding would have been different." *Lafler v. Cooper*, 566 U.S. 156, 163 (2012). Plaintiffs' general and implausible allegations that the only possible explanation for variance in asylum-grant rates across different immigration courts is bias driven by the agency case-completion goals are insufficient to state such a claim. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954); *Shaughnessy v. United States ex rel. Accardi*, 349 U.S. 280, 282 (1955). Such a claim "may not be based upon *speculation* that EOIR" immigration judges were "influenced by the [] Administration's alleged desire that Petitioners be deported." *Yang*, 925 F. Supp. at 332

(citing *Accardi*, 349 U.S. at 282) (emphasis added). Plaintiffs must put forth sufficient allegations to show that immigration judges "*were affected by*" the Administration's actions in particular decisions, *id.*, and "failed to exercise their own discretion and instead allowed the Administration to dictate the outcome," *Id.* (citing *Accardi*, 347, U.S. at 267-68). Plaintiffs have not done so. And as these cases demonstrate, Plaintiffs cannot state a categorical bias claim aimed at future decisions in immigration courts because, in resolving a bias claim, the Court will have to evaluate whether some aspect of the proceedings that led to a particular decision improperly affected the outcome. *See, e.g. Lafler*, 566 U.S. at 163. This means that there must already be a completed proceeding and a decision that the Court can consider. This is what the PFR process is designed to do by permitting courts of appeals to evaluate the factors that might have affected a particular decision and resolve bias claims and due process challenges based on case-specific facts. Courts have also previously rejected general claims that the Attorney General's role overseeing the immigration courts alone creates the potential for bias. *See, e.g.*, *Marcello v. Bonds*, 349 U.S. 302, 311 (1955) ("Petitioner would have us hold that the presence of this relationship so strips the hearing of fairness and impartiality as to make the procedure violative of due process. The contention is without substance[.]").

The cases Plaintiffs cite are not to the contrary. They cite *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 882-84 (2009), and *Withrow v. Larkin*, 421 U.S. 35, 46-47 (1975), for the proposition that "the INA's impartial adjudicator requirement is not met when there is a constitutionally intolerable probability of actual bias in immigration court adjudication," Compl. ¶ 202, but these cases are easily distinguishable. In *Caperton*, the Supreme Court found a constitutionally intolerable risk of bias where a party contributed $3 million to elect a judge who was likely to hear an appeal of $50 million judgment against the party. 556 U.S. at 884. *Withrow* addressed an issue not presented by this case: whether "the combination of investigative and adjudicative functions" in the same licensing board

created "an unconstitutional risk of bias." 421 U.S. at 47. Plaintiffs' Complaint, which fails to allege

any plausible chain of causation between case-completion goals and asylum decisions, falls far

short of stating a similar risk of bias. The Supreme Court has noted that any such claim "must

overcome a presumption of honesty and integrity in those serving as adjudicators." *Id.*

     Plaintiffs' Complaint does not contain sufficient factual allegations that, even accepted as true,

state a claim for relief that is plausible on its face. *Iqbal*, 556 U.S. at 678.

     <u>Claims III-VI (APA claims).</u> Plaintiffs' remaining claims allege that the performance

metrics and family-unit case-completion goals prevent immigration judges from adjudicating cases

impartially on a case-by-case basis and thus are in excess of statutory authority and arbitrary and

capricious in violation of the APA. Compl. ¶¶ 208-242. Plaintiffs cannot state a claim under the

APA.

     First, Plaintiffs fail to identify a "final agency action," as needed to state a claim under the

APA. *See* 5 U.S.C. § 704; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890-93 (1990). The APA

defines "agency action" to mean "an agency rule, order, license, sanction, relief, or the equivalent or

denial thereof, or failure to act." 5 U.S.C. § 551(13); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55,

61-62 (2004). Plaintiffs do not allege that internal agency performance metrics or case-completion

goals fall into any of these categories. Moreover, the APA permits review only of *final* agency

actions. 5 U.S.C. § 704. Generally, "two conditions must be satisfied for agency action to be 'final':

First, the action must mark the 'consummation' of the agency's decisionmaking process . . . . And

second, the action must be one by which 'rights or obligations have been determined,' or from

which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations

omitted).

     Plaintiffs allege that the performance metrics and the family-unit case-completion goals are

final agency actions that "require immigration judges to consider factors unrelated to the facts and

merits of cases," and to "prejudg[e] cases involving family units." Compl. ¶¶ 214-15, 231, 233. Plaintiffs' allegation that these policies require immigration judges to consider factors unrelated to an asylum claim is baseless. Furthermore, their only argument that "legal consequences" flow from these metrics and goals is that they affect the outcome of decisions on asylum claims. But even if that were true, to the extent any action has actual "force and effect of law," *Bennett*, 520 U.S. at 177-78, it would only be the actual decisions of immigration judges in *individual cases* and not the guidelines for how long it should take to reach those decisions. *See, e.g.*, *DRG Funding Corp. v. HUD*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) ("courts have defined a nonfinal agency order as one, for instance, that does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action" (internal quotations omitted)); *Scales v. INS*, 232 F.3d 1159, 1166 (9th Cir. 2000) (noting that internal agency guidelines lack the "force of law"). Because the only agency action that could be relevant to Plaintiffs' claims would be a decision in immigration court where an individual could show that improper factors had been considered in his or her case, where an immigration judge showed actual bias, or where the scheduling of the case somehow impacted the outcome of the agency decision, and because Plaintiffs do not put forward any allegations identifying such decisions (or challenging any individual immigration court decisions whatsoever), Plaintiffs have failed to state a claim under the APA.

Second, Plaintiffs also cannot state a claim under the APA because their challenges relate to decisions of immigration judges and, as set out above, Congress has set out a separate specific and exclusive mechanism for review of such decisions. The APA provides a cause of action only for claims challenging "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. An adequate alternative remedy in a court exists where "a legal remedy under the APA would impermissibly provide for duplicative review." *City of Oakland v. Lynch*, 798 F.3d

1159, 1165 (9th Cir. 2015). Here, APA review would impermissibly provide review that is duplicative of the review available in the courts of appeals under 8 U.S.C. § 1252(b)(9).

### E.    The Complaint should be dismissed for improper venue.

If the Court concludes that Plaintiffs have raised claims that can be heard in federal court, it should still dismiss Plaintiffs' claims because they are not properly raised in *this* Court.

Whether venue is proper is determined by 28 U.S.C. § 1391. *See Atl. Marine Const. Co*., 571 U.S. at 56. Section 1391(e)(1) provides venue for cases against United States officers or employees in districts where "(A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred," or where "(C) the plaintiff resides." Plaintiffs allege venue under § 1391(e)(1) on the basis that "one of the Plaintiffs has its principal residence in this District." Compl. ¶ 16. For an organization, residence is defined for venue purposes as where the organization "maintains its principal place of business." 28 U.S.C. § 1391(c)(2).

The only Plaintiff to claim any connection to this District is Plaintiff Innovation Law Lab, which alleges it is "incorporated in Oregon and based in Portland," but it does not allege that this District is where it maintains its principal place of business. Compl. ¶ 20. In fact it alleges it operates programs in Georgia, California, Missouri, North Carolina, Texas, Kansas, and in "sites on both sides of the U.S.-Mexico border." *Id*. Innovation Law Lab raises allegations throughout the Complaint related to its work in other states. Compl. ¶ 87 ("In Atlanta, where Plaintiff[ ] Law Lab . . . provide[s] legal services . . ."); ¶ 89 ("In the El Paso Region, where Plaintiff[ ] . . . Law Lab provide[s] legal services . . ."); ¶ 90 ("the Charlotte Immigration Court, where Plaintiff[ ] Law Lab . . . provide[s] legal services . . ."); ¶ 91 ("the Stewart Immigration Court, where Plaintiff Law Lab has also provided legal services . . ."); ¶ 108 (San Franciso); ¶ 162 (Atlanta).

Even if the Court nonetheless finds that this District is Law Lab's principal place of business, the venue statute, 28 U.S.C. § 1391(e)(1), was not intended to allow organizational

Plaintiffs to join together to forum shop and ask courts in one circuit to hear claims related to immigration courts in other circuits—claims that are already properly subject to review through the PFR process in the courts of appeals of those circuits. The venue statute must be read consistent with "the history of the statute and the evil it was designed to cure." *Natural Resources Defense Council, Inc. v. Tennesse Val. Authority*, 459 F.2d 255, 257 (1972). The current version of the venue statute was enacted "to broaden the venue of civil actions which could previously have been brought only in the District of Columbia," *Schlanger v. Seamans*, 401 U.S. 487, 489 (1971), to address the fact that "persons in distant parts of the country claiming injury by reason of the acts or omissions of a federal officer or agency were faced with significant expense and inconvenience in bringing suits for enforcement of claimed rights," *Stafford v. Briggs*, 444 U.S. 527, 534 (1980). There is no indication that Congress intended to allow organizational Plaintiffs to join together to bring a suit in a venue far from where the challenged actions occurred or the Plaintiff operates, or to allow a district court in one circuit to review claims that should be heard by the courts of another circuit. Allowing advocacy organizations to join together to forum shop in this way is inconsistent with the venue statute's manifest aims, as well as Congress's carefully designed system for review of claims related to immigration courts. Congress amended the venue statute "to give plaintiffs a broader choice of forums" but "did not intend to give plaintiffs the right to bring such suits in any district they might choose." *National Distillers and Chemical Corp. v. Dep't of Energy*, 487 F. Supp. 34, 36-37 (1980) (dismissing where venue was technically proper under the venue statute because plaintiffs appeared to have improperly joined parties for purposes of manufacturing venue).

For similar reasons, Plaintiffs, and their claims, are improperly joined together in this suit. Federal Rule of Civil Procedure 21 authorizes courts to "at any time, on just terms" "drop a party" or "sever any claim against a party." Courts have broad discretion to sever claims. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1297 (9th Cir. 2000). In deciding whether to sever, courts can

consider whether the claims arise out of the same transaction or occurrence, whether the claims present common questions of law or fact, and whether different witnesses and evidence are required for separate claims. *H.M. v. United States*, No. 17-00786-SJO, 2017 WL 10562558, *15 (C.D. Cal. Aug. 21, 2017) (severing claims involving distinct factual and legal issues). Here, Plaintiffs' claims relate to asylum decisions in various immigration courts that will necessarily apply the asylum law of the particular circuit where the immigration court is located to the widely varied facts of each individual asylum seeker. Plaintiffs repeatedly emphasize in their Complaint that these are decisions immigration judges make on a case-by-case basis and raise allegations related to "local operating procedures." Compl. ¶¶ 39, 167. These claims do not arise out of the same transaction or occurrence and given the myriad considerations that go into an individual determination of whether an individual is eligible for asylum, this Court cannot resolve claims across the country that are specific not only to an individual jurisdiction's law and local practices, but also to the particular facts and circumstances of each individual asylum claim.

Plaintiffs' suit is an attempted end-run around Congress's carefully crafted review scheme that limits review to individual decisions in petitions brought by individual aliens based on individual facts. They essentially ask this Court to resolve claims on class-wide basis without raising any class claims or moving for class certification, and where the class of individuals that would be covered by Plaintiffs' requested injunctive and declaratory relief could not possibly satisfy the commonality and typicality requirements to be certified under Rule 23. Their claims do not present common questions of law or fact that are properly joined in the same suit. *See Visendi v. Bank of America, N.A.*, 733 F.3d 863, 870 (9th Cir. 2013) (severing claims because they required particularized factual analysis); *Coughlin v. Rogers*, 130 F.3d 1348, 1351 (9th Cir. 1997) (same).

Accordingly, if the Court does not dismiss the Complaint in its entirety for the reasons set out above, it should sever and dismiss the claims of all organizational Plaintiffs who are not based

in this District and all claims based on allegations related to immigration courts in other parts of the country based on forum non conveniens. A court can dismiss based on forum non conveniens where there are adequate alternative forums and the balance of private and public interest factors favors dismissal. *Bos. Telecommunications Grp., Inc. v. Wood*, 588 F.3d 1201, 1206 (9th Cir. 2009). Among the private factors that must be considered is the residence of the parties and witnesses. *Bos. Telecommunications Grp., Inc.*, 588 F.3d at 1206-07. Here, only one of the Plaintiffs alleges any connection to this forum, while all the other Plaintiffs and Defendants are located elsewhere. Of the various public interest factors to consider, two factors weigh heavily in favor of dismissal here: "the local interest in the lawsuit," and "the court's familiarity with governing law." *Id*. at 1211. Plaintiffs' challenges to immigration courts in other parts of the country raise allegations of a foreign, rather than local, nature. And, because appeals from decisions on asylum claims are channeled to the court of appeals where a particular immigration court is located, each circuit determines—and is most familiar with—the relevant governing law. Plaintiffs' theory of venue and jurisdiction would have this Court improperly sit above these various courts, deciding the law in each circuit in which the organizations operate.

**V.    CONCLUSION**

For these reasons, the Court should dismiss this case.

DATED: March 20, 2020                     Respectfully submitted,

                                          JOSEPH H. HUNT
                                          Assistant Attorney General
                                          Civil Division

                                          WILLIAM C. PEACHEY
                                          Director
                                          Office of Immigration Litigation
                                          District Court Section

                                          EREZ R. REUVENI
                                          Assistant Director

                                          */s/ Brian C. Ward*
                                          BRIAN C. WARD
                                          Senior Litigation Counsel
                                          U.S. Department of Justice, Civil Division
                                          Office of Immigration Litigation
                                          District Court Section
                                          P.O. Box 868, Ben Franklin Station
                                          Washington, D.C. 20044
                                          (202) 616-9121
                                          brian.c.ward@usdoj.gov

                                          Attorneys for Defendants