IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**LAS AMERICAS IMMIGRANT ADVOCACY CENTER**; **CATHOLIC LEGAL IMMIGRATION NETWORK, INC.**; **INNOVATION LAW LAB**; **SANTA FE DREAMERS PROJECT**; **SOUTHERN POVERTY LAW CENTER**; and **ASYLUM SEEKER ADVOCACY PROJECT**,

Plaintiffs,

v.

**DONALD J. TRUMP**, in his official capacity as President of the United States; **WILLIAM BARR**, in his official capacity as Attorney General of the United States; **U.S. DEPARTMENT OF JUSTICE**; **EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**; and **JAMES MCHENRY**, in his official capacity as EOIR Director of the United States,

Defendants.

Case No. 3:19-cv-02051-IM

OPINION AND ORDER

**IMMERGUT, District Judge**,

This matter comes before this Court on Defendants' Motion to Dismiss. ECF 24. For the

reasons discussed below, Defendants' motion is GRANTED in part and DENIED in part.

//

//

## PROCEDURAL BACKGROUND

Plaintiffs are nonprofit organizations which serve individuals in the immigration court system, including refugees and asylum seekers. ECF 1 ¶¶17–22. They allege, broadly, that Defendants have adopted certain policies and practices that have rendered it nearly impossible for Plaintiffs to deliver their legal services to their clients because the immigration court system has been modified in such a way as to be biased and grossly inefficient. *Id.* ¶¶ 1–14 (providing summary of allegations).[1] The allegations focus heavily on three policies or practices that Plaintiffs have identified: (1) "asylum-free zones" in which asylum applications are almost categorically denied, (2) the Enforcement Metrics Policy ("Metrics Policy") that establishes performance metrics for immigration judges, and (3) the family docketing (FAMU) directive. *Id.*

These allegations give rise to six claims for relief:

1. The asylum-free zones and the immigration court backlog violate the Take Care Clause of the U.S. Constitution and the Immigration and Nationality Act (INA);

2. The administration of the immigration courts violates the INA's "impartial adjudicator" requirement;

3. The Metrics Policy violates the Administrative Procedure Act (APA) because it is unlawful;

4. The Metrics Policy violates the APA because it is arbitrary and capricious;

5. The FAMU directive violates the Administrative Procedure Act (APA) because it is unlawful, and;

6. The FAMU directive violates the APA because it is arbitrary and capricious.

*Id.* at 53–62. Plaintiffs seek injunctive and declaratory relief to end these programs and to implement any necessary corrective actions. *Id.* at 63.

---

[1] The specifics of Plaintiff's allegations will be discussed at greater length below.

Defendants filed this motion in an effort to dismiss all six claims for relief. They proffer four distinct theories of why Plaintiff's lawsuit should be dismissed. First, Defendants argue that Plaintiffs do not have standing to bring these claims, either under the Constitution or under the INA, because they have not asserted the type of injury that is necessary to give rise to a lawsuit. ECF 24 at 17–26. Next, they argue that this court does not have jurisdiction over these claims because Congress has promulgated statutes that strip federal district courts of jurisdiction over claims arising out of decisions made by immigration courts. *Id.* at 26–32. Third, Defendants argue that Plaintiffs have failed to state a claim upon which relief can be granted, under Federal Rule of Civil Procedure 12(b)(6). *Id.* at 32–42. Finally, they argue that Oregon is not the proper venue for this case. *Id.* at 42–45.

Each of these arguments is addressed below.

## LEGAL STANDARD

When reviewing a motion to dismiss, the court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). In this case, Plaintiff is the nonmoving party. To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere legal conclusions are insufficient to state a claim. *Iqbal*, 556 U.S. at 678.

//

//

//

**DISCUSSION**

Although Defendants raise lack of venue as their final ground for dismissal, this Court addresses venue first because it is a threshold procedural question. ECF 24, at 42. If venue were improper, there would be no reason to address the substantive issues raised in the motion. Otherwise, this Court addresses each of Defendants' arguments in the order they appear in the motion.

I.    **Venue**

Defendants argue that the District Court of Oregon is not the proper venue for Plaintiffs' claims because the only Plaintiff bearing a connection to Oregon is Innovation Law Lab, which Defendants claim has not alleged that Oregon is where it "maintains its principal place of business" as required by 28 U.S.C. § 1391(c)(2). ECF 24 at 42. Further, Defendants argue that even if Innovation Law Lab were doing business in Oregon, the venue statutes were not meant to allow organization plaintiffs to "forum shop" and bring claims alleging violations of immigration law occurring in other venues and other circuits. *Id.* at 42–43. Defendants urge this Court to sever the claims in this complaint and force the Plaintiffs to bring them as challenges to individual removal proceedings, rather than the systemic claims that have been alleged in this lawsuit because they "do not present common questions of law or fact." *Id*. at 43–44. Notably, Defendants do not identify which venue they believe is proper. *See id.* at 42–45.

Venue is proper if it is satisfied under 28 U.S.C. § 1391. Venue against United States officers, acting in their official capacity, can be proper where "(C) the plaintiff resides." § 1391(e)(1). For an organization, venue is satisfied for a plaintiff's residency requirement "in the judicial district in which it maintains its principal place of business." § 1391(c)(2). To decide where a "principal place of business" is maintained, a court will consider the "nerve center" test

which looks to "where a corporation's officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010). Where there are multiple plaintiffs, only one plaintiff must be a resident of the district to satisfy the residency requirement of venue under § 1391(e)(1)(C). *See Railway Labor Executives' Ass'n v. ICC*, 958 F.2d 252, 256 (9th Cir. 1991) (citing *Exxon Corp. v. FTC*, 588 F.2d 895, 898–99 (3d Cir. 1978) ("[R]equiring every plaintiff in an action against the federal government . . . to independently meet section 1391(e)'s standards would result in an unnecessary multiplicity of litigation . . . There is no requirement that all plaintiffs reside in the forum district.").

Here, Plaintiff Innovation Law Lab was founded and incorporated in Oregon and directs and controls its operations out of its Portland office. ECF 57 at 56 (citing ECF 1 at ¶ 20). From the Portland office, Innovation Law Lab manages nationwide programs that do work in a number of other states, including Georgia, Missouri, California, North Carolina, and Texas. *Id*. This explanation of Innovation Law Lab's activities establishes that its "nerve center" is in Portland and that it is therefore a proper plaintiff in the District Court of Oregon. As noted above, no other plaintiff needs to reside in Oregon in order for venue to be proper here.

As to Defendants' other arguments, they are not persuasive. Plaintiffs are not challenging individual orders of removal or outcomes of individual cases—a point that will be relevant repeatedly in the analysis below as well. They are alleging systemic, executive-level harms that cause injury to themselves as organizations, and they have these harms in common. ECF 57 at 56–57. These claims have questions of law and fact in common, and severance is therefore not required. Further, not only is it not required, it would be improper in this case because it would require this Court to either force Plaintiffs to bring identical claims in multiple circuits or to

change their claims into attacks on individual orders of removal. It is not the court's role to do either.

Finally, Defendants suggest that this Court should transfer venue under the *forum non conveniens* doctrine. ECF 24 at 45 (citing *Bos. Telecommunications Grp., Inc. v. Wood*, 588 F.3d 1201, 1206 (9th Cir. 2009)). They argue that two factors weigh in favor of dismissal under this doctrine: "the lack of local interest in the lawsuit" and "the court's familiarity with governing law." *Id.* (citing *Wood*, 588 F.3d at 1211).This argument is not persuasive. The District of Oregon is home to immigration courts, immigrants, foreign nationals, and one of the plaintiffs in this lawsuit. That is sufficient to establish "local interest." Further, the argument that this court is not familiar with "governing law" is not well taken. It is not clear what Defendants believe the "governing law" is, but to the extent it is the constitutional and statutory law of the Untied States, this federal court is sufficiently familiar with it to apply it in this case.[2]

For these reasons, Defendants' motion to dismiss for lack of venue is DENIED.

## II.    Standing

In order to bring a claim for relief, a plaintiff must have standing. That is, he or she must have brought a claim that falls within the scope of a federal court's constitutional authority that presents a true case or controversy. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Here,

---

[2] Defendants appear to suggest that each circuit has its own body of immigration law and that individual removal claims should be adjudicated in their respective circuits. ECF 24 at 45. As stated elsewhere in this opinion, Plaintiffs are not challenging any individual removal determinations, and this argument is inapplicable to this lawsuit. In any event, federal courts are capable of applying federal law outside the circuit where that law originates or is frequently adjudicated. "If some believe that federal judges in [specific circuits] should be the only ones to decide certain issues, that is terribly elitist. For better or worse, the Congress and the nation entrusts these issues to federal trial judges throughout the country . . ." New Mexico Health Connections v. United States Dep't of Health & Human Servs., 340 F. Supp. 3d 1112, 1144 n. 11 (D.N.M. 2018).

Defendants advance two theories of standing, both of which they say preclude Plaintiffs from bringing this lawsuit. First, Defendants argue that Plaintiffs do not have Article III standing because they have not articulated the kind of cognizable injury necessary to bring a lawsuit in federal court. ECF 24 at 17. Second, Defendants argue that Plaintiffs' claims fall outside the "zone of interests" created by the INA, which Defendants say creates a right of action for individuals but not for organizations. *Id.* at 24. While related, these arguments are distinct and ask somewhat different questions. This Court finds that Plaintiffs do have standing to bring their claims under either framework.

### a.  Article III standing

In order to sue in federal court, a "constitutional minimum" of standing must be met. *Lujan*, 504 U.S. at 560. That minimum requires three elements to be satisfied: (1) the plaintiff must have suffered an "injury in fact"—i.e. an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent (as opposed to conjectural or hypothetical), (2) there must be a causal connection between the injury and the offending conduct, and (3) it must be "likely" that the injury will be redressed by a favorable decision from the court. *Id.* at 560–61 (internal quotations and citations omitted); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Plaintiffs bear the burden of proving all three elements. *Lujan*, 504 U.S. at 561.

Defendants focus primarily on the first element, arguing that Plaintiffs have failed to plead an injury that gives rise to Article III standing. They characterize Plaintiffs' alleged injury as "a speculative future injury in the form of an alien not obtaining asylum as a result" of the challenged policies. ECF 24 at 17. They argue that Plaintiffs have failed to plead concrete and particularized incidents of bias or specific allegations of harm to a particular alien's case. *Id.* at

18. They also argue that Plaintiffs are attempting to—and cannot—assert the rights of third parties in order to confer standing for themselves. *Id.* at 19. In other words, Defendants argue that Plaintiffs are contesting policies that do not affect them but, rather, affect other people with whom Plaintiffs have some relationship. *Id*.

This is not an accurate representation of the injuries that Plaintiffs have asserted, nor is it an accurate characterization of their legal argument. Plaintiffs allege, as a result of Defendants' policies, that they have been forced to divert resources into redesigning programs and systems, retraining staff, and ramping up community education programs, that their volunteer recruitment efforts have been rendered "futile," and that their attorneys have been forced to squander resources preparing for cases that are not heard on the merits. In sum, Plaintiffs allege that Defendants' policies have rendered it nearly impossible for the organizations to fulfill their missions and for their attorneys and staff to do their jobs. ECF1 at 46–53. The asserted injuries alleged in the complaint, regardless of their merits on the facts, are sufficient to confer Article III standing in the Ninth Circuit and this Court is bound by that precedent.

An organization may assert standing on its own behalf without invoking the rights of third-party individuals. *See East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1265 (9th Cir. 2020) ("EBSC II"). In order to do so, an organization must show that "defendant's behavior has "frustrated its mission and caused it to divert resources in response to that frustration of purpose." *Id*. (citing *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)); *see also East Bay Sanctuary Covenant v. Barr*, Nos. 19-16487, 19-16773, 2020 WL 3637585 *8–9 (9th Cir. July 6, 2020). An organizational plaintiff must show it has been "perceptibly impaired" in its ability to perform its services in order to prevail on its burden to prove standing. *EBSC II*, 950 F.3d at 1265.

The bar is relatively low. In *ESBC II*, the Ninth Circuit found that it was sufficient for plaintiffs to have pleaded injuries that included frustration of their mission because the challenged policy discouraged asylum seekers and the loss of clients that resulted from that discouragement. 950 F.3d at 1266–67. Similarly, the Ninth Circuit also held that it was sufficient for Innovation Law Labs—a plaintiff in this case as well—to have pleaded that an immigration policy had hindered its core mission and forced it to divert resources because of the increased cost of the new program. *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1078 (9th Cir. 2020). Notably, the Ninth Circuit held that there is no "threshold magnitude" for the injuries that must be asserted. *ESBC II*, 950 F.3d at 1267. One less client, or an injury that "amount[s] to pennies" is enough. *Id.*

This Court is bound by the *East Bay* line of cases. There is no way to meaningfully distinguish the standing issues raised in the *East Bay* cases and the standing issues presented here. Plaintiffs in this case have pleaded more than a sufficient injury to confer Article III standing under *ESBC II*. It need not prove any "magnitude" of injury, and here, Plaintiffs have pleaded multiple injuries that satisfy the *Lujan* inquiry. For example, Plaintiffs have alleged that the challenged policies have forced them to divert resources away from their core activities, have rendered volunteer recruitment efforts futile, and have strained Plaintiffs' resources to the point that they cannot deliver effective representation. ECF1 at ¶¶ 160–63. Further, Defendants' arguments do not refute this. Defendants focus on third-party standing, which is not the applicable doctrine in this case, and which was rejected by the Ninth Circuit in *ESBC II* and *Innovation Law Lab*. In fact, many of the cases Defendants cite in their motion are the same third-party standing cases that the *ESBC II* court found were inapplicable to an organizational-standing case. *Compare* ECF 24 at 19–20 with *ESBC II*, 950 F.3d at 1267 n.6.

Given that Plaintiffs have satisfied the first the first prong of the *Lujan* analysis, they easily meet the second and third, neither of which Defendants challenge in their motion. ECF 24 at 17–24. There is no serious doubt, on these facts, that there is a causal link alleged between the policies described in the complaint and the alleged injuries, nor is there any serious doubt that injunctive relief—which Plaintiffs seek—would serve to redress that harm. Again, this Court is not ruling on the merits of the allegations at this stage in the proceedings, merely whether Plaintiffs have properly pled facts sufficient to confer standing. This Court therefore finds that Plaintiffs do have Article III standing to bring their claims and DENIES Defendants' motion on this ground.

### b. The Immigration and Nationality Act

Defendants also argue that Plaintiffs' claims are not within "the zone of interests" contemplated by the INA and are therefore not claims that may be brought under that statute. ECF 24 at 24. They argue that Congress did not intend for organizations to bring claims under 8 U.S.C. § 1229(a), the statute the Plaintiffs rely on, and that this lack of congressional intent precludes standing for the statutory claims. ECF 68 at 15–16. For their part, Plaintiffs argue that because they seek to enforce the INA and because their interests are aligned with and related to the interests of the individuals subject to removal proceedings, their claims fall squarely within the zone of interests contemplated by the INA. ECF 57 at 23–26.

The ultimate question to be answered is whether Plaintiffs "fall within the class of plaintiffs whom Congress has authorized to sue under [§ 1229a]." *Lexmark Int'l, Inc., v. Static Control Components, Inc*., 572 U.S. 118, 128 (2014). They must do so in order to bring their claims in federal court. *Id*. at 129. The breadth of the zone-of-interests test varies, depending on the provisions of law at issue. *Id*. Under the APA, the test is not "especially demanding." *Id*. at

130, (citing *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak,* 567 U.S. 209, 225 (2012)). The zone-of-interests analysis forecloses suit "only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' Congress authorized that plaintiff to sue." *Lexmark,* 572 U.S. at 130 (quoting *Patchack*, 567 U.S. at 225).

Courts are "not limited to considering the [specific] statute under which [plaintiffs] sued but may consider any provision that helps us to understand Congress' overall purposes" in enacting the statute. *ESBC II,* 950 F.3d at 1270 (citing *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 401 (1987)). This inquiry is intended only to help clarify the act's *scope*, not to determine whether Congress intended for a particular plaintiff to benefit from the cause of action. *Id.* (citing *Patchak,* 567 U.S. at 225 ("We do not require any indication of congressional purpose to benefit the would-be plaintiff.")). In other words, the question here is whether Plaintiffs' claims relate to the purpose and scope of § 1229a, not whether Congress imagined Plaintiffs themselves to be bringing these claims. It is the type of *claim*, not the type of *plaintiff* that is central to the "zone of interests" inquiry.

The statute at issue here is 8 U.S.C. § 1229(a), which sets out the procedure, requirements, and parameters of removal proceedings pursuant to the INA. It includes a section on the "rights of aliens," which provides aliens with the right to counsel in all proceedings covered by the section. §1229a(4)(A). Here, Plaintiffs' organizational purpose and mission is to provide low-cost or pro bono legal representation for aliens in proceedings that fall under § 1229a and to provide community education relating to these proceedings. Aliens in these proceedings have a right to Plaintiffs' services. The claims Plaintiffs have asserted allege that Defendants' policies and practices render it nearly impossible to provide these services and, by

extension, for aliens in removal proceedings to achieve their statutory right to counsel. Per *ESBC II*, these claims fall within the "zone of interests" covered by § 1229a. 950 F.3d at 1270 ("The Organizations' purpose is to help individuals apply for and obtain asylum, provide low-cost immigration services, and carry out community education programs with respect to those services. This is sufficient for the Court's lenient APA test: at the very least, the Organizations' interests are 'marginally related to' and 'arguably within' the scope of the statute.") (internal citations omitted).[3] Accordingly, Ninth Circuit precedent compels this Court to DENY Defendants' motion as to this ground.

## III.    Jurisdiction

Defendants argue that, even if Plaintiffs have standing to bring these claims, a federal district court does not have the jurisdiction to hear them. ECF 24 at 26. No one disputes that this case presents a federal question and diversity of the parties, either of which is typically all that is required to establish jurisdiction in a district court. *See* 28 U.S.C. §§ 1331, 1332. Rather, Defendants argue that Congress, consistent with its Article III power over lower federal courts,[4] has enacted a series of statutes that limit district court jurisdiction over claims relating to the

---

[3] Defendants attempt to distinguish *ESBC II* by arguing that Plaintiffs in this case have not brought their claims under the asylum statute that was at issue in the *ESBC* line of cases. ECF 68 at 13–14. This argument is not persuasive. The Ninth Circuit did not limit its holding in *ESBC* to the facts of that case, and the reasoning is almost perfectly analogous, as characterized by Defendants themselves: "Congress took steps to ensure that pro bono legal services of the type that the [Plaintiffs] provide are available to asylum seekers" and therefore Plaintiffs' claims fell within the statute. *Id.* at 13. (citing *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 768 (9th Cir. 2018) ("ESBC I"). That is exactly the reasoning this Court applies to the "zone of interests" question in this case.

[4] "The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish." U.S. CONST. ART. III, § 1.

Immigration and Nationality Act. Defendants cite five statutes, each of which are addressed in turn below.

### a.  § 1252(a)(5)

Defendants argue that 8 U.S.C. § 1252 establishes a system of judicial review that precludes this lawsuit, beginning with § 1252(a)(5), which reads: "a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal. . ." ECF 24 at 26. They argue that a review of the practices and policies at issue in this suit would amount to a review of removal orders because those policies eventually lead to removals. ECF 68 at 17. In response, Plaintiffs argue that they are not challenging any individual removal orders, nor are they challenging any action that is "inextricably linked" to a removal order, and § 1252(a)(5) therefore does not apply. ECF 57 at 26–27.

The plain language of § 1252(a)(5) refers only to an "order of removal." *See also Singh v. Gonzales*, 499 F.3d 969, 978 (9th Cir. 2007). Plaintiffs have not challenged any particular order of removal—this Court is not being asked to review any decision by an immigration court, nor would a ruling in Plaintiffs' favor have the effect of reversing any order of removal. This Court therefore finds that § 1252(a)(5) is inapplicable here and does not limit this Court's jurisdiction over these claims because this lawsuit appears to fall outside the bounds of the narrow language of the statute.

### b.  § 1252(b)(9)

Next, Defendants argue that § 1252(b)(9) bars district court jurisdiction over Plaintiffs' claims. ECF 24 at 26. The statute provides that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from

any action taken or proceeding brought to remove an alien from the United States . . . shall be available only in judicial review of a final order under this section . . ." and no district court "shall have jurisdiction . . . to review such an order or such questions of law or fact." 8 U.S.C. § 1252(b)(9). Defendants argue that Plaintiffs' claims require a court to review removal proceedings and that the claims therefore fall within the statutory bar to judicial review outside the petition for review process. ECF 24 at 26–30. Plaintiffs argue that the statute does not preclude review of their claims and that Defendants' proffered interpretation would render Plaintiffs' claims effectively unreviewable, which they say is not a tenable outcome. ECF 57 at 27–33.

Read together with § 1252(a)(5), addressed above, § 1252(b)(9) requires that any question of law or fact "arising from" a removal proceeding is reviewable only through the petition for review ("PFR") process. *See J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016). These statutes do not, however, preclude judicial review for all questions of law that may be somehow related to removal proceedings. Claims that are independent of or collateral to the removal process fall outside the scope of § 1252(b)(9). *Id*. at 1032. As noted by the U.S. Supreme Court, Courts should not interpret "arising from" in such an expansive way as to preclude "any meaningful chance for judicial review" or that would lead to results "no sensible person could have intended." *Jennings v. Rodriguez*, 138 S. Ct. 830, 840 (2018) (internal quotations omitted). Section 1252(b)(9) does not bar jurisdiction where the parties are not challenging any removal proceedings, order of removal, the decision to seek removal, or the process by which removal will be determined. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020).

Defendants rely heavily on language in *J.E.F.M.* that characterizes § 1252(b)(9) as "breathtaking" in its scope and encompassing even "policies and practices" relating to the removal process. ECF 24 at 27 (citing *J.E.F.M.*, 837 F.3d at 1031). In determining the scope of § 1252(b)(9), however, this Court must look not only to *J.E.F.M.* but also to *Jennings*, which was decided by the United States Supreme Court two years later and which appears to adopt a somewhat more limited view of the scope of § 1252(b)(9). Taken together, these cases stand for the proposition that § 1252(b)(9) could not be used to bar judicial review of claims that were unreviewable through the PFR process. *Jennings*, 138 S. Ct. at 840.

The Ninth Circuit in *J.E.F.M.* held that (1) § 1252(b)(9) limits all aliens to "one bite of the apple" with regard to challenging an order of removal, (2) independent or collateral claims are not channeled through the PFR process, and (3) any issue arising from any removal-related activity must be brought through PFR. *J.E.F.M.*, 837 F.3d at 1031–33. The U.S. Supreme Court in *Jennings* agreed with this framework but suggested that the language of *J.E.F.M.* upon which Defendants rely heavily may be too broad. *Jennings*, 138 S. Ct. at 840. It also settled the question of whether claims that are unreviewable on PFR are necessarily independent and collateral to the removal process and therefore outside the scope of § 1252(b)(9). *Id.*

In applying this doctrine, district courts have generally applied a two-prong analysis to determine whether a question is unreviewable on PFR—i.e. whether it is collateral to the removal process. Courts ask (1) whether the claim "plainly" challenges the decision to detain an alien, and (2) whether the court may grant a remedy for the claim without impeding removal proceedings. *Cancino-Castellar v. Nielsen*, 338 F. Supp. 3d 1107, 1115–16 (S.D. Cal. 2018) (internal quotations removed); *see also Innovation Law Lab v. Nielsen*, 342 F. Supp. 3d 1067,

1077–78 (D. Or. 2018) (finding jurisdiction where claims did not challenge a removal action and were "too remote" from such an action to fall within the scope of § 1252(b)(9)).

In this case, § 1252(b)(9) does not preclude this court's jurisdiction over most of Plaintiffs' claims because these claims would not be cognizable through the PFR process, with one exception. Plaintiffs' claims relating to "asylum-free zones" appear to fall within the jurisdictional bar imposed by § 1252(b)(9), in spite of Plaintiffs' efforts to frame the issue differently. The crux of Plaintiffs' objection to the asylum-free zones is that the immigration courts Plaintiffs identify as belonging to this category deny asylum applications at rates that are too high to be legally tenable. In order to grant relief on these claims, this court would be required to issue a ruling that said that these courts need to produce different outcomes in some proportion of the asylum cases before them. In other words, these claims require a ruling that would interfere with immigration courts' disposition of asylum cases. That posture for these claims appears to fall within the § 1252(b)(9) jurisdictional bar.

This is not to suggest that Plaintiffs cannot discuss these asylum-free zones in other contexts. The high rates of denials in these courts may be *evidence* of other claims that Plaintiffs have brought forward, including claims of bias or a failure to adhere to the requirements of the INA. But, as a stand-alone claim that objects to the high rate of denials itself and which alleges that outcome ratio is, itself, a violation of the INA, the asylum-free zones do not give rise to jurisdiction in this court.

Plaintiffs' remaining claims, however, do fall within this court's jurisdiction. First, these claims do not plainly challenge any decision to detain an alien. Second, Plaintiffs are not challenging any removal order, nor would granting a remedy require any removal order to be overturned. Plaintiffs' challenge is to the immigration *process*, which they argue has become so

cumbersome as to force them to expend extra resources and hinder their ability to recruit volunteers. Further, Plaintiffs are not individual aliens and they are not bringing claims on behalf of any alien. They therefore do not have access to the PFR process for their asserted claims. Allowing organizational plaintiffs to bring claims alleging systemic problems, independent of any removal orders, that allegedly cause harms specific to those organizations does not thwart the purpose of § 1252(b)(9).

  c.  § 1329

Defendant next argues that 8 U.S.C. § 1329 deprives this court of jurisdiction over Plaintiffs' claims. ECF 24 at 30. That statute reads: "The district courts of the United States shall have jurisdiction of all causes, civil and criminal, *brought by the United States* that arise under the provisions of this subchapter." 8 U.S.C.§ 1329 (emphasis added). Defendants argue that the statute's affirmative grant of jurisdiction over cases brought by the United States implicitly strips district courts of jurisdiction over claims brought by any other party. ECF 24 at 30 (relying on *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1162 (D.C. Cir. 1999)). This interpretation is correct, they argue, because the statute previously granted jurisdiction over all suits challenging the implementation of immigration laws, and Congress removed that language when it amended the statute in 1996. *Id.* For their part, Plaintiffs assert that even if this reading were correct, the amendment did not strip district courts of jurisdiction over any claim arising under the INA because those claims are cognizable under other sources of jurisdiction. ECF 57 at 36.

As Plaintiffs note in their brief, the Ninth Circuit has stated that, although the amendments to § 1329 narrowed jurisdiction over claims arising under the INA, it did not strip district courts of jurisdiction over these claims through other "jurisdictional mechanisms." *Sulit v. Schiltgen*, 213 F.3d 449, 453 n.2 (9th Cir. 2000) ("[N]othing in the language

of § 1329 forecloses the operation of other jurisdictional mechanisms . . .”). Plaintiffs allege

jurisdiction under 28 U.S.C. § 1331, general federal question jurisdiction, and § 1329 does not

strip this court of the jurisdiction conferred by that statute. Rather, the Ninth Circuit has held that

§ 1329 does not confer jurisdiction under the INA for otherwise-unreviewable claims brought by

private parties. *See Allen v. Miles*, 896 F.3d 1094, 1106–07 (9th Cir. 2018) (holding that

*Saavedra Bruno* stands for the proposition that the Administrative Procedure Act and § 1329 do

not confer jurisdiction over challenges to consular visa decisions, which are otherwise

unreviewable.) As Plaintiffs’ claims here are not otherwise unreviewable, this Court finds that

§ 1329 neither confers nor strips district court jurisdiction in this case.

    **d.  § 1252(g)**

Next, Defendants argue that 8 U.S.C. § 1252(g) bars jurisdiction outside the PFR process,

citing the following language in the statute: “no court shall have jurisdiction to hear any cause or

claim by or on behalf of any alien arising from the decision or action by the Attorney General to

commence proceedings, adjudicate cases, or execute removal orders against any alien under this

chapter.” ECF 24 at 31. They argue that Plaintiffs cannot challenge the means by which the

attorney general or the agency (EOIR) manage the immigration dockets or the backlog of cases

because there is no “meaningful standard” for review. *Id.* (citing *Heckler v. Chaney*, 470 U.S.

821, 830 (1985); *Diaz-Covarrubias v. Mukasey*, 551 F.3d 1114, 1118 (9th Cir. 2009). To the

extent that an individual alien could prove that a backlog or a docket-management practice

affected his individual case, he could seek review in the PFR process, Defendants argue, but

these Plaintiffs cannot bring the freestanding claims asserted in this case. *Id.* at 31–32.

Next, This argument presents two distinct issues: first, whether § 1252(g) strips district courts

of jurisdiction, and second, whether the claims before this Court are subject to a meaningful

standard of review. As to the first question, this Court finds that the statute does not strip

jurisdiction, for the same reasons § 1252(b)(9) does not. The scope of § 1252(g) is limited to the

three discrete actions listed in the statute. *Reno v. American-Arab Anti-Discrimination*

*Committee*, 525 U.S. 471, 482 (1999) ("The provision applies only to three discrete actions that

the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate*

cases, or *execute* removal orders.' . . . It is implausible that the mention of three discrete events

along the road to deportation was a shorthand way of referring to all claims arising from

deportation proceedings.") (emphases in original); *see also DHS v. Regents*, 140 S.Ct. 1891,

1907 (2020). The statute is therefore narrower in scope than § 1252(b)(9), on its face and by way

of the court's interpretation. It stands to reason that if § 1252(b)(9) does not bar jurisdiction, §

1252(g) cannot.

Second, Defendants' argument that Plaintiffs' claims are not subject to a meaningful

standard of review is not related to § 1252(g), nor is it persuasive on the issue of jurisdiction.

Plaintiffs have argued throughout their briefing that the INA does impose standards for case-by-

case adjudication and that some level of process is required in immigration proceedings. Further,

the APA does provide a standard of review, which asks whether agency action is "arbitrary,

capricious" or otherwise an "abuse of discretion." 5 U.S.C. § 706(2)(A). That standard is well

developed in federal case law. *See, e.g. DHS v. Regents*, 140 S. Ct. at 1910  (applying arbitrary

and capricious review to the decision to rescind the Deferred Action for Childhood Arrivals

(DACA) program). Plaintiffs' claims are therefore subject to a "meaningful standard of review,"

and this Court therefore has jurisdiction over them.

//

//

####    e.    § 1252(f)(1)

Finally, Defendants argue that 8 U.S.C. § 1252(f)(1) prohibits this court from granting

the injunctive relief that Plaintiffs seek in this case. ECF 68at 28; *see also* ECF 1 at 63

(requesting injunctive relief). Section 1252(f)(1) provides:

> Regardless of the nature of the action or claim or of the identity of the party or
> parties bringing the action, no court (other than the Supreme Court) shall have
> jurisdiction or authority to enjoin or restrain the operation of the provisions of part
> IV of this subchapter, as amended by the Illegal Immigration Reform and
> Immigrant Responsibility Act of 1996, other than with respect to the application of
> such provisions to an individual alien against whom proceedings under such part
> have been initiated.

18 U.S.C. § 1252(f)(1). Part IV refers to 8 U.S.C. §§ 1221–1231. *See Catholic Soc. Servs., Inc. v.*

*INS,* 232 F.3d 1139, 1150 (9th Cir. 2000) (en banc). Therefore, Part IV includes § 1229a, the

statute at issue in this case.

Defendant argues that, because Plaintiffs are seeking injunctive relief, § 1252(f)(1) is

fatal to Plaintiffs' claims because only the United States Supreme Court could grant that relief.

Def.'s Reply [68] at 23. Defendants rely on a recent Ninth Circuit decision, *Padilla v. ICE*, that

Defendants argue should resolve this issue in their favor. *Id.* (citing 953 F.3d 1134, 1150 (9th

Cir. 2020).[5] Defendants cite *Padilla* for the proposition that "Congress intended [§ 1252(f)] to

prohibit injunctive relief with respect to organizational plaintiffs." *Id*. They rely on the *Padilla*

court's recitation of the legislative history underlying § 1252(f), which sought to prevent

organizations and persons not involved in removal proceedings from bringing "preemptive

challenges to the enforcement of certain immigration statutes." *Id*. Defendants argue that *Padilla*

and § 1252(f) prohibit this court from exercising jurisdiction over Plaintiffs' claims.

---

[5] *Padilla* was decided after Defendants filed their Motion to Dismiss (ECF 24) , which is why
this argument appears only in the reply brief.

This is not so. First, § 1252(f) does not prohibit district courts from granting declaratory relief to organizations, either on its face or by interpretation. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010) (*quoting Reno v. American-Arab Anti–Discrimination Comm.,* 525 U.S. 471, 481–82 (1999) ("By its plain terms, and even by its title, [Section 1252(f)] is nothing more or less than a limit on injunctive relief.")). Plaintiffs in this case have sought declaratory relief as well as injunctive relief. ECF 1 at 63. Therefore, this Court has jurisdiction over their claims, if only for the purpose of considering whether to grant them the declaratory judgment they seek.

Regardless, § 1252(f) is inapplicable in this case. As Plaintiffs argue, § 1252(f)(1) bars district court review only in cases where a plaintiff seeks to enjoin the operation of the relevant portions of the INA, not when a plaintiff seeks to enforce those statutes. ECF 72 at 8–9. *Rodriguez,* 591 F.3d at 1120. ("[Section] 1252(f)(1) limits the district court's authority to enjoin the INS from carrying out legitimate removal orders. Where, however, a petitioner seeks to enjoin conduct that allegedly is not even authorized by the statute, the court is not enjoining the operation of part IV of subchapter II, and § 1252(f)(1) therefore is not implicated."); *see also Ali v. Ashcroft,* 346 F.3d 873, 886 (9th Cir. 2003)*, vacated on unrelated grounds. Ali v. Gonzales,* 421 F.3d 795 (9th Cir. 2005); *Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1050 (C.D. Cal. Oct. 24, 2019) (holding that the requested injunction "would not prevent the operation of the law, but force Defendants to comply with it.").

The case before this Court falls within the *Ali/Rodriguez* line of cases. Plaintiffs have brought their claims pursuant to § 1229a—they seek to enforce it, not enjoin it. *See* ECF 1 at 53–62. They are alleging violations of the INA. They are not seeking to enjoin any aspect of the law but to force Defendants to comply with it. Nor have Defendants persuasively argued to the

contrary. Rather, they rely on language in *Padilla* that seems to suggest that § 1252(f)(1) prohibits district courts from granting injunctions to organizations in immigration cases. But that is not the holding of *Padilla*, and the *Padilla* court did nothing to upset the holding of *Rodriguez*.

In *Padilla*, the Ninth Circuit held that § 1252(f)(1) does not bar class action lawsuits brought by a class of individuals. 953 F.3d at 1151. In reaching that holding, the court recounted the legislative history of the statute in order to explain why allowing class action lawsuits was consistent with the purpose of the statute. *Id*. at 1150–51. The *Padilla* court observed that, by adopting § 1252(f)(1), Congress attempted to prevent "organizations and classes of persons, many of whom were not themselves in proceedings, [from bringing] preemptive challenges to the enforcement of certain immigration statutes." *Id.* at 1150. That is the same proposition on which the *Ali* and *Rodriguez* courts relied when they drew a distinction between enjoining the enforcement of a law and enjoining policies and practices that allegedly violate that law. *See Rodriguez,* 591 F.3d at 1120 (citing *Ali,* 346 F.3d at 886).

In sum, this Court finds that this case falls within the holding of *Ali* and *Rodriguez* and that § 1252(f)(1) does not prevent this Court from exercising jurisdiction over Plaintiffs' claims for injunctive relief because Plaintiffs seek to enforce the operation of § 1229a, not to enjoin its enforcement.

Based on the foregoing analysis, Defendants' motion to dismiss for lack of jurisdiction is GRANTED in part and DENIED in part.

## IV.    Failure to State a Claim

It is important to note that the analysis above does nothing more than conclude that these Plaintiffs have standing to bring their claims and that this court may hear them. It is not a ruling on the merits of those claims, and it does not have any bearing on whether Plaintiffs have stated

a valid claim for relief. That determination is set out in the discussion below. This Court finds that Plaintiffs' claims do not allege individual harms to specific aliens but, rather, allege a systemic "gross mismanagement" of the immigration system by Defendants. While not a common or traditional approach to a lawsuit like this, the "gross mismanagement" theory is sufficient to state a claim on the merits.

### a.   Claim One

Plaintiffs' first claim for relief alleges that "asylum-free zones" and the immigration court backlog violate the Take Care Clause[6] of the United States constitution and the INA's case-by-case adjudication standards.[7] ECF 1 at 53. By "asylum-free zones," Plaintiffs refer to certain immigration courts where judges deny asylum petitions at such a high rate as to allegedly deny aliens due process. *Id.* at ¶¶ 84–103. Plaintiffs allege that these high rates of denials stem from a discriminatory animus against asylum seekers. *Id.* at ¶ 97. In these courts, Plaintiffs contend, the law governing asylum has been essentially suspended. *Id.* at ¶ 100. As to the backlog, Plaintiffs allege that it constitutes more than 1 million cases and has grown by nearly 300 percent in less than nine years. *Id.* at ¶ 104. It has resulted in wait times that last years, sometimes as long as 4.5 years. *Id.* at ¶ 110. The extreme delays caused by the backlog allegedly compromise lawyers' ability to present witnesses and evidence and for asylum seekers to retain counsel. *Id.* at ¶ 111.

---

[6] U.S. CONST., Art. III, § 3. ("[The President] shall take Care that the Laws be faithfully executed.").

[7] As explained above, this court does not have jurisdiction over Plaintiffs' claim that these "asylum-free zones" violate the INA and the Constitution. It is also questionable whether the mere fact of high rates of asylum denials states a claim at all. However, Defendants did not make that argument, choosing instead to focus on the Take Care Clause argument. In any event, as stated above, the high rates of asylum denials may not be a viable stand-alone claim for relief but does appear to be admissible of Plaintiffs' other, broader claims alleging systemic irregularities in the immigration system.

As presented, Claim One actually alleges two acts that violate two different laws. It alleges that the asylum-free zones and the backlog both violate (1) the Take Care Clause and (2) the INA. In their motion, Defendants focus exclusively on the Take Care Clause, arguing that it does not create a justiciable cause of action and that Plaintiffs' claim must therefore be dismissed under Federal Rule of Procedure 12(b)(6). ECF 24 at 22. Defendants do not take issue with the substance of Plaintiffs' claim as it relates to the asylum-free zones, the backlog, or the INA.

The parties' arguments focus exclusively on whether the Take Care Clause creates a justiciable cause of action. The case law, as it stands today, does not appear to provide any basis to find this claim non-justiciable. For example, the Ninth Circuit entertained a claim pursuant to the Take Care Clause as recently as December 2019. *See Center for Biological Diversity v. Bernhardt*, 946 F.3d 553, 561 (9th Cir. 2019) (considering on the merits a claim that an act of Congress interfered with the executive's power under the Take Care Clause). Other circuits have recognized it as a plausible claim as well. *See Texas v. United States*, 809 F.3d 134, 146 n.3 (5th Cir. 2015) (declining to reach the merits of the Take Care claim for procedural reasons). Indeed, it appears that even the U.S. Department of Justice understands the Take Care Clause to create some actionable limits on the executive, given that former Attorney General Jeff Sessions argued via internal memoranda that the DACA program was unconstitutional because it violated the Take Care Clause. *NAACP v. Trump*, 298 F. Supp. 3d 209, 239–40 (D.D.C. Apr. 24, 2018) (referencing the "Sessions Letter" and its arguments against the constitutionality of DACA, including references to the Take Care Clause). Neither the Ninth Circuit nor the D.C. District Court appear to have doubted that the Take Care Clause could give rise to a justiciable cause of

action, and this Court finds that it does not bar the cause of action asserted here. Defendants'

motion to dismiss Claim One is DENIED.[8]

### b. Claim Two

Plaintiffs' second claim for relief alleges that Defendants' policies and practices have

infected the immigration court system with a degree of actual bias that violates the INA's

guarantee that every alien be heard by an impartial adjudicator. ECF 1 at 55. Plaintiffs argue that

this impartial adjudicator guarantee is coextensive with the Fifth Amendment Due Process

Clause. *Id*. at ¶ 202. This systemic judicial bias, which Plaintiffs say is driven both by policies

and also by a general hostility toward immigrants, renders it nearly impossible to receive a fair

hearing and for Plaintiffs to render their services. *Id*. at ¶¶ 204–07.

Defendants attack this claim on two fronts. First, they argue that the INA does not waive

the government's sovereign immunity, and Plaintiffs may not sue them at all. ECF 24 at 34. As

Plaintiffs point out, the APA contains a waiver of immunity that applies to all actions brought

against agencies and federal officials, even when those actions do not seek review under the

APA. ECF 57 at 41 (citing 5 U.S.C. § 702, *Presbyterian Church v. United States*, 870 F.2d 518,

523–26 (9th Cir. 1989)). Defendants correctly note that this waiver does not apply in

circumstances where other statutes preclude judicial review. ECF 68 at 34 (citing 5 U.S.C. §

701(a)(1)). Defendants believe that the statutes discussed above bar judicial review in this case

and that Plaintiffs' claims therefore fall outside the APA's waiver of immunity. *Id*. As discussed

---

[8] Defendants did not attack Plaintiffs' first claim for relief on any grounds other than the Take
Care Clause. The court notes that it is likely debatable whether other aspects of this claim satisfy
FRCP 12(b)(6) but because Defendants did not raise those arguments, this Court declines to
reach them.

above, this Court disagrees with Defendants about whether those statutes bar judicial review of these claims and finds that the APA waiver of immunity applies here.

Defendants next argue that Plaintiffs' bias claim should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because Plaintiffs have not alleged facts sufficient to state a claim for judicial bias. ECF 24 at 34. They argue that Plaintiffs cannot show that the policies alleged in the complaint are evidence of bias in the immigration court system, and they focus heavily on whether Plaintiffs can show a causal link between the alleged bias and the outcomes of individual asylum cases, concluding that Plaintiffs cannot. *Id.* at 35–40.

A claim for actual bias in the judiciary requires a showing that "the average judge . . . is 'likely' to be neutral, or whether there in an unconstitutional 'potential for bias.'" *Echavarria v. Filson*, 896 F.3d 1118, 1130–31 (9th Cir. 2018) (*quoting Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009)). The inquiry extends to any procedure that could offer a "possible temptation" to the average judge to forego the proper burden of proof. *Id.* at 1131 (citing *Hurles v. Ryan*, 752 F.3d 768, 789 (9th Cir. 2014)). It is not a question of whether a judge harbors actual bias, only whether the potential for bias exists. *Hurles,* 752 F.3d at 789.

Here, Plaintiffs are alleging bias throughout a judicial system, rather than by a particular judge. They have pleaded facts that suggest a systemic bias or animus against immigrants and asylum seekers on the part of Defendants, including statements from former Attorney General Sessions and President Donald J. Trump. ECF 1 at ¶¶ 55–79. These statements include characterizations of DOJ policy to "end the lawlessness" in the immigration system and referring to "baseless [asylum] claims," as well as suggesting that asylum seekers were "breaking into this country" and "exploiting" the process. *Id.* at ¶¶65, 67. Plaintiffs also allege facts such as the unusually high rate of denials for asylum petitions in some courts, the extreme backlog in the

system, strict case-management guidelines, and policies that require judges to fast-track certain cases or certain aliens, all of which are at least plausible evidence of systemic bias and suggest a possibility that judges are influenced by factors independent of the merits of a particular case when making their decisions. It is not necessary for Plaintiffs to prove conclusively that actual bias led to any particular outcome. The facts pleaded here are sufficient to state a claim for actual bias.[9] Defendants' motion to dismiss Claim Two is DENIED.

### c. Claims Three–Six

Plaintiffs' third and fourth claims allege that Defendants' "metrics policy" violates the APA and the INA because it is unlawful and beyond the scope of Defendants' authority and because it constitutes arbitrary and capricious rulemaking. ECF 1 at 56, 58. The metrics policy includes three parts: a case completion quota, a remand rate, and speed-related adjudication benchmarks. *Id.* at ¶ 122. Judges are required to complete 700 cases per year, to maintain a remand rate of less than 15 percent, and to adhere to strict limitations on the time they spend on matters within the life of a case (evidentiary issues, motions practice, etc.). *Id*. at ¶¶ 123–25. Plaintiffs allege that immigration judges are given a computerized "dashboard" that resembles a speedometer, which shows them how closely they are adhering to the case management metrics, and that judges' performance toward these metrics is tied to their performance evaluations. *Id*. at ¶¶ 128–30. Judges may face discipline or termination if they do not meet the benchmarks set out in the metrics policy. *Id*. at ¶ 130. Plaintiffs allege that this metrics policy influences the outcomes in immigration cases in ways that are not related to the merits of the case, and it harms Plaintiffs in the ways already described above. *Id*. at ¶¶131, 155–60.

---

[9] Notably, this is not a ruling on the merits of Plaintiffs' claim. This Court is not making a finding that actual bias exists in the immigration system, only that Plaintiffs have presented facts sufficient to allow the claim to proceed.

Similarly, Plaintiffs' fifth and sixth claims for relief allege that Defendants have adopted a policy that requires immigration courts to fast-track certain cases that involve parents or guardians with minor children who seek asylum at the southern border of the United States and that this policy violates the INA and APA for the same reasons as the metrics policy. *Id*. at 60–62, ¶ 149. This policy is known as the family unit, or "FAMU," directive. *Id*. In these cases, courts are subject to strict deadlines and are required to resolve the case within one year. *Id*. at ¶¶ 151–53. The deadlines imposed via the FAMU directive include limitations on continuances, which are not allowed to exceed 45 days under any circumstances. *Id*. at ¶ 152. Plaintiffs allege the same harms described elsewhere.

Defendants argue that Plaintiffs have failed to state a claim under the APA with respect to either of these policies. ECF 24 at 40. First, they argue that Plaintiffs have failed to challenge any "final agency action," as required to state an APA claim. *Id*. Second, Defendants argue that Plaintiffs cannot bring these claims because the PFR process provides an exclusive, adequate review mechanism for these claims, and any APA review is therefore barred. *Id*. at 41. As to this second argument, this Court addressed whether the INA statutes provided by Defendant create an exclusive review mechanism outside the standard path of judicial review, and this Court found that they do not. This Court therefore declines to address this argument further here and addresses only the question of whether Plaintiffs have identified a "final agency action" for purposes of APA review.

The APA allows judicial review only for final agency actions. 5 U.S.C. § 704 (precluding review for preliminary, procedural, or intermediate action). "Agency actions" include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Whether an agency action is "final" is subject to a two-part

test. First, the action must be the "consummation" of the agency's decision-making process. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Second, it must be one by which rights and obligations are determined or by which legal consequences will follow. *Id*. at 178 (internal quotations omitted). The second prong of the *Bennett* test is not met if an agency action carries "no direct consequences," but it is met if the action "alters the legal scheme" to which the agency is subject. *Id*.

Plaintiffs allege two final agency actions: the adoption of the metrics policy and the promulgation of the FAMU directive. ECF 57 at 39. Defendants do not dispute that these actions are final, only that they carry any legal consequences independent of the outcomes in individual removal cases. ECF 24 at 41–42, ECF 68 at 38–39. This Court agrees that the alleged actions are final, as there is no indication that these policies are preliminary or subject to further review, so this Court will address only the question of whether they carry legal consequences for Plaintiffs.

Whether an agency action is final requires consideration of both legal and practical consequences. *Gill v. United States Dept. of Justice*, 913 F.3d 1179, 1185 (9th Cir. 2019). In *Gill*, the Ninth Circuit held that an administrative standard promulgated by the defendant in that case was a "final" action because agencies that did not comply could have their user agreement permits revoked for a related program. *Id*; *see also Oregon Natural Desert Ass'n v. U.S. Forest Service*, 465 F.3d 977 (9th Cir. 2006) (holding that "annual operating instructions" from the agency were a final action); *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1163 (9th Cir. 2018) (holding that agency opinion was a "final" action because both legal and practical consequences followed from the determination contained in the opinion).

Here, Defendants argue that no consequences of any kind follow from the metrics policy or the FAMU directive until an immigration judge makes a ruling in an individual case. But this

does not appear to be so. Both policies change the way immigration judges run their dockets and their courtrooms. Accordingly, Plaintiffs have at least sufficiently alleged that such docket management has practical consequence for parties or their attorneys. For example, if this court adopted a docket management policy in criminal cases that required all suppression hearings to be held within 30 days of an indictment, no one could argue that such a policy would not have practical consequences for everyone involved. Further, as Plaintiffs have stated, the metrics policy has direct consequences for judges' performance evaluations and, by extension, for their jobs. Finally, aliens in immigration courts have a statutory right to counsel, conferred by the INA. It seems plausible that the practical consequences of the challenged policies would interfere with their right to that representation and with Plaintiffs' ability to provide it, thus interfering with legal rights and obligations related to the policies. This Court finds that the challenged actions are therefore final agency actions for purposes of the APA, and Defendants' motion to dismiss these claims is DENIED.

//

//

//

//

//

//

//

///

//

//

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED in part and DENIED in part. Plaintiffs' claims that seek enjoinder of "asylum-free zones"—i.e. immigration courts with unusually high rates of denials for asylum applications—are DISMISSED on the grounds that this Court does not have jurisdiction to hear them, and Defendants' motion is GRANTED with respect to those claims. Defendants' motion is DENIED with respect to all of Plaintiffs' remaining claims.

IT IS SO ORDERED.

DATED this 31st day of July, 2020.

KARIN J. IMMERGUT
United States District Judge